Page 1

1              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
2                   ORLANDO DIVISION
3                     CASE NO.:  6:19-cv-00196-GAP-DCI
4    CLIFTON PICTON,
     individually and on behalf
5    of all others similarly
     situated,
6
          Plaintiffs,
7
     vs.
8
     GREENWAY
9    CHRYSLER-JEEP-DODGE, INC.,
     d/b/a GREENWAY DODGE
10   CHRYSLER JEEP,
11        Defendant.
     _____/
12
13   DEPOSITION OF:      CHARLES AGNER
14   DATE:               MONDAY, JULY 1, 2019
15   TIME:               10:41 A.M. - 1:18 P.M.
16   PLACE:              GRAY ROBINSON
                         301 EAST PINE STREET, 14TH FLOOR
17                       ORLANDO, FLORIDA 32801
18
     STENOGRAPHICALLY
19   REPORTED BY:        JAZZMIN A. MUSRATI, RPR, CRR
                         Registered Professional Reporter
20                       Certified Realtime Reporter
21
22
23
24
25

Page 2

1    A P P E A R A N C E S :
2    MANUEL S. HIRALDO, ESQUIRE
     OF: Hiraldo, P.A.
3       401 East Las Olas Boulevard
        Suite 1400
4       Fort Lauderdale, Florida 33301
        954.400.4713
5       mhiraldo@hiraldolaw.com
        APPEARING ON BEHALF OF THE PLAINTIFFS
6
     IGNACIO J. HIRALDO, ESQUIRE - via telephone
7    OF: IJH Law
        1200 Brickell Avenue
8       Suite 1950
        Miami, Florida 33131
9       786.496.4469
        ijhiraldo@ijhlaw.com
10      APPEARING ON BEHALF OF THE PLAINTIFFS
11   G. BROCK MAGRUDER, III, ESQUIRE
     OF: Gray Robinson
12      301 East Pine Street
        14th Floor
13      Orlando, Florida 32801
        407.204.3100
14      brock.magruder@gray-robinson.com
        APPEARING ON BEHALF OF THE DEFENDANT
15
16
17
18
19
20
21
22
23
24
25

```
 1                    C O N T E N T S
 2      TESTIMONY OF CHARLES AGNER
             CHARLES AGNER                          5
 3                                                  5
             DIRECT EXAMINATION                     5
 4      BY MR. HIRALDO
             CROSS-EXAMINATION                     114
 5      BY MR. MAGRUDER
             CERTIFICATE OF OATH                   116
 6           CERTIFICATE OF REPORTER               117
             ERRATA SHEET                          118
 7           READ AND SIGN LETTER                  119
 8
                     PLAINTIFF EXHIBITS
 9
        EXHIBIT                                    PAGE
10        Exhibit 1.................................  7
            Notice of Taking Deposition
11        Exhibit 2................................. 19
            First Amended Class Action Complaint
12        Exhibit 3................................. 25
            Defendant's Answers to Plaintiff's
13          First Set of Interrogatories
          Exhibit 4................................. 46
14          Defendant's Amended Answers to
            Plaintiff's First Set of
15          Interrogatories
          Exhibit 5................................. 57
16          Defendant's Response to Plaintiff's
            First Request for Production
17        Exhibit 6................................. 61
            Greenway Production
18        Exhibit 7................................. 61
            Greenway Production
19        Exhibit 8................................. 70
            Greenway Automotive  Advertising Policy
20          Regarding Robocalls, Pre-recorded
            Messages, Automated Text Messages, and
21          Ringless Voicemail
          Exhibit 9................................. 73
22          Event Contract and Order Form
          Exhibit 10................................ 90
23          2/2/2018 Email String From Williams
            Robert To Shaun Allen.
24          Subject: BDC Promotions Pricing
            Information
25
```

1       Exhibit 11................................  96
            Sales/Prospect Log
2       Exhibit 12................................  97
            2/23/2018 Email String From William
3           Specht To Shaun Allen.
            Subject: BDC - Appointments
4       Exhibit 13................................ 101
            2/23/2018 Email String From William
5           Specht To ccelli@telepointcomm.com.
            Subject: FWD: Greenway Unsold Leads (6
6           Days to make it happen!!!)
        Exhibit 14................................ 101
7           5/7/2018 Email String From William
            Specht To Shaun Allen.
8           Subject: Re: Greenway

9

10

11

12

13

14

15                 S T I P U L A T I O N S

16          It is hereby stipulated and agreed by and between

17      the counsel for the respective parties and the deponent

18      that the reading and signing of the deposition

19      transcript be reserved.

20                                  ------

21

22

23

24

25

1                    P R O C E E D I N G S

2                        *********

3           (Whereupon, the proceedings began at

4      10:41 a.m.)

5           THE STENOGRAPHER:  Raise your right hand,

6      please.

7              Do you swear or affirm that the testimony you

8      are about to give will be the truth, the whole truth

9      and nothing but the truth?

10          THE WITNESS: Yes.

11   Thereupon,

12                      CHARLES AGNER,

13   having been first duly sworn or affirmed, was examined

14   and testified as follows:

15                    DIRECT EXAMINATION

16   BY MR. HIRALDO:

17     Q.  Good morning.  Would you please state and spell

18   your name for the record.

19     A.  Charles Agner, A-G-N-E-R.

20     Q.  Mr. Agner, my name is Manuel Hiraldo.  I

21   represent the plaintiff in the case that has been filed

22   against Greenway Chrysler Jeep Dodge, Inc., doing

23   business as Greenway Dodge Chrysler Jeep.

24          Do you understand that you are here as the

25   corporate designee for Greenway?

Page 6

1      A.  I do.

2      Q.  Do you understand when I say "Greenway," I'm

3   referring to the corporate entity Greenway Chrysler Jeep

4   Dodge, Inc.?

5      A.  Correct.

6      Q.  Have you ever testified at a deposition prior to

7   today?

8      A.  I have.

9          MR. HIRALDO:  Actually, let's stop a second.

10         (Whereupon, a discussion was held off the

11      record.)

12  BY MR. HIRALDO:

13     Q.  Mr. Agner, have you testified at a deposition

14  prior to today?

15     A.  I have.

16     Q.  How many times?

17     A.  Twice.

18     Q.  Okay.  When was the last time?

19     A.  It's been at least five years.  It's been a while

20  ago.

21     Q.  So you may recall, I'm asking questions just

22  like -- I'll be asking questions just like I'm doing

23  now.

24         If you understand, please give me a verbal

25  response so she can write it down.

1      A.  Okay.

2      Q.  And if you don't understand my question, just let

3   me know.  I will rephrase it for you.

4      A.  Sure.

5      Q.  And if you want a break, water, anything, just

6   let me know.

7      A.  Will do.

8      Q.  Do you understand -- I think I may have asked you

9   this -- that you are here testifying on behalf of

10  Greenway --

11     A.  I do.

12     Q.  -- as the corporate designee for Greenway?

13     A.  I do.

14     Q.  And that your answers are binding upon the

15  corporation?

16     A.  Understood.

17          MR. HIRALDO:  Okay.  I'm going to hand you what

18      I've marked -- or we'll be marking as Exhibit 1.

19          (Whereupon, Plaintiff Exhibit 1 was marked for

20      identification.)

21  BY MR. HIRALDO:

22     Q.  This is the notice of deposition.  If you will

23  just share it with your attorney.

24          Do you recognize this document?

25     A.  Yes.

1     Q.  And if you -- this is the notice of deposition

2   for today.  If you turn over to the seventh page, the

3   examination topics --

4     A.  Yes.

5     Q.  -- do you see those there?

6     A.  I do.

7     Q.  Are you prepared to testify with respect to each

8   one of these topics?

9     A.  I am.

10     Q.  Are there any topics for which you are unable to

11   provide testimony?

12     A.  Not that I'm aware.

13     Q.  Can you give me your business address.

14     A.  My office is 9001 East Colonial.  I don't know

15   the ZIP Code.  I'm sorry.

16     Q.  And that's in Atlanta?

17     A.  No.  No.  No.  It's -- my office -- typically, we

18   don't office out of a store exactly.  But when I'm in an

19   office, I office out of the Fiat store, typically, which

20   is right behind Dodge, 9001 East Colonial.

21     Q.  Okay.  I'm sorry.  I thought you said you flew in

22   from Atlanta when we were speaking earlier.

23     A.  I did.  I'm in the field most of the time.

24     Q.  What is your position?

25     A.  I'm the chief marketing officer of the company.

1    Q.  And as the chief marketing officer, do you travel

2  around the country?

3    A.  I do.

4    Q.  To various Greenway locations?

5    A.  Yes.

6    Q.  How many locations does Greenway have?

7    A.  46.

8    Q.  Are each of those 46 entities -- or locations,

9  rather, separate entities, corporate entities?

10    A.  I can't tell you that.  I don't know the answer

11  to the corporate structure, legally speaking.

12    Q.  Okay.  When you are not in the field, you're

13  located here in Orlando?

14    A.  I'm either in Atlanta or in Orlando when I'm not

15  in the field.

16    Q.  All right.  If you were to explain to a layperson

17  at a party what Greenway does, how would you do that?

18    A.  Sure.  We're an automobile retailer, wholesaler,

19  and automotive repair organization.

20    Q.  And Greenway Dodge Chrysler Jeep is one of those

21  locations that is operated by Greenway, correct?

22    A.  That's correct.

23    Q.  And that's located here in Orlando?

24    A.  It is.

25    Q.  How many people work at that location?

1     A.   I don't know an answer to that.

2     Q.   How long has that location been open?

3     A.   I believe it's been over 20 years.  I don't have

4   an exact number.

5     Q.   And does Greenway -- the Greenway location here

6   in Orlando sell new vehicles?

7     A.   They do.

8     Q.   Do they sell used vehicles?

9     A.   They do.

10     Q.   And do they provide service to customers?

11     A.   They do.

12     Q.   Do they do anything else?

13     A.   Service.  They sell parts.

14     Q.   Okay.  Anything else?

15     A.   No.

16     Q.   In --

17     A.   Well, as part of that, they also provide finance.

18     Q.   Financing for --

19     A.   New and used vehicles.

20     Q.   -- for new and used sales?

21     A.   Yeah.

22     Q.   Okay.  What did you do to prepare for today's

23   deposition?

24          MR. MAGRUDER:  I'll just object to the extent

25     that --

1          Just don't disclose any attorney-client

2     communications, but anything else that you did sort

3     of outside of my direction or any conversations with

4     me, feel free to answer.

5     A.  My preparation was really limited primarily to

6 our conversations.

7 BY MR. HIRALDO:

8     Q.  Did you speak with anyone within the Greenway

9 operation to prepare for today?

10     A.  Not outside of counsel.

11     Q.  Did you speak with anyone employed by BDC

12 Promotions?

13     A.  I did not.

14     Q.  Do you know what BDC Promotions is?

15     A.  I do.

16     Q.  What is your understanding of what BDC Promotions

17 is?

18     A.  They're a third-party vendor who we used to

19 provide marketing services.

20     Q.  You never spoke with anyone from BDC; is that

21 correct?

22     A.  The only communication I have ever had with them

23 was when the first -- when the notice was first given.

24 I sent an email to BDC Promotions and copied our

25 corporate counsel and asked them to provide

1  documentation of what took place.

2      Q.  And who did you send that email to?

3      A.  The gentleman who runs the company, I believe.

4      Q.  Justin Specht?

5      A.  Yes.

6      Q.  Did he respond to your request?

7      A.  He responded to me and to our corporate counsel,

8  with the understanding that everything he gave us was

9  going directly to counsel.

10     Q.  What did he provide to you in his response?

11     A.  My recollection was that he provided two mailing

12 lists -- actually, they weren't mailing lists, they were

13 spreadsheets.

14     Q.  Excel spreadsheets?

15     A.  They were.

16     Q.  Did he provide anything else?

17     A.  Not that I recall, no.

18     Q.  Outside of that email exchange with Mr. Specht,

19 had you ever spoken to Mr. Specht about this lawsuit --

20     A.  No.

21     Q.  -- at any other point?

22     A.  At that point, I handed it all over to counsel.

23     Q.  One of the rules I didn't give you is, you may

24 anticipate my question.  Just let me finish it because

25 she can't write down when we speak over each other.

Page 13

1    A.   Okay.

2    Q.   So just bear with me.  It's a process.  I'll --

3    let me get my question out and then you can give me an

4    answer.

5    A.   Apologies.

6    Q.   Have you ever spoken with anyone from VoiceLogic?

7    A.   No.

8    Q.   Do you know what VoiceLogic is?

9    A.   I don't directly know.

10   Q.   Have you spoken with anyone from any other entity

11   or vendor that may have been involved in the prerecorded

12   campaigns that are at issue in this case?

13   A.   No.

14   Q.   In terms of documents, did you review any

15   documents in preparing for today's deposition?

16   A.   None other than this.

17   Q.   When you say "this," do you mean the notice of

18   deposition?

19   A.   Yes.  Yes, sir.

20   Q.   If you would, just give me a brief summary of

21   your education and then employment history leading up

22   until your employment with Greenway.

23   A.   I have a bachelor's degree from Florida State

24   University.  I have been engaged in this field for --

25   well, since 1989, in various capacities.

1          I have been approximately one year as the chief

2     marketing officer of Greenway.  And before that, I

3     served for 5 1/2 years in a similar capacity for a

4     private group in the Washington, D.C., market.

5          Prior to that, I was nine years with a public

6     company, Sonic Automotive, working in this field.

7      Q.  As the chief marketing officer, what are your

8     responsibilities?

9      A.  I have a hybrid of responsibility at Greenway.  I

10    work with them to coach, counsel, and guide them in

11    terms of vendor selection, based on their stated

12    marketing goals and business needs.  I help vet vendors.

13    I help set up basic corporate policies and guidelines.

14    And then I also operate in the field coaching business

15    development for the company.

16     Q.  What are the various channels used by Greenway to

17    market to consumers?

18     A.  Digital marketing, primarily.  And then direct

19    mail.

20     Q.  When you say "digital marketing," what does that

21    encompass?

22     A.  Primarily Google ad words, Google display

23    marketing, Facebook social media marketing, and then on

24    occasion, email marketing.

25     Q.  When you say "direct mail," what does that mean?

1   A.  That means someone -- we would maintain a

2   manifest and someone would send a piece of mail through

3   the U.S. Postal Service.

4   Q.  When Greenway engages in those types of

5   communications with consumers, what is the purpose of

6   those?

7   A.  To help sell automobiles or service.

8   Q.  You want to drive consumers to one of the

9   Greenway dealerships, correct?

10  A.  That's correct.

11      MR. MAGRUDER:  Objection; leading.

12  BY MR. HIRALDO:

13  Q.  For the purpose of selling that consumer either a

14  new or used vehicle, correct?

15  A.  Or service.

16      MR. MAGRUDER:  Same objection.

17  BY MR. HIRALDO:

18  Q.  Or service.

19      Has Greenway ever engaged in telephone

20  solicitations of consumers?

21  A.  Not since I have been with the company.

22  Q.  Okay.  When did you start with the company?

23  A.  June -- I believe it was 15th of last year.

24  Q.  Of 2018?

25  A.  Yes, sir.

1    Q.  Prior to your involvement with the company, were

2    you aware of any telephone solicitations of consumers

3    that had been performed by Greenway?

4    A.  No.

5    Q.  Are you aware of the campaigns that are at issue

6    in this case?

7    A.  Yes.

8    Q.  Are you aware that ringless -- what's called

9    ringless voicemail technology was used to solicit

10   consumers in the campaigns that are at issue in this

11   case?

12        MR. MAGRUDER:  Object to the form.

13   BY MR. HIRALDO:

14   Q.  You can answer.

15   A.  I'm aware of the campaign, yes.

16   Q.  What is Greenway's understanding of what a

17   ringless voicemail is?

18   A.  It is a voicemail that is delivered to a

19   consumer's -- it's a message delivered to a consumer's

20   voicemail without the telephone actively ringing.

21   Q.  And what is the purpose of sending a consumer a

22   ringless voicemail?

23   A.  To solicit sales for parts or service.

24   Q.  Would you agree with me that one of the purposes

25   is so that a consumer actually listens to that message

1    that's been sent to their phone?

2           MR. MAGRUDER:  Object to the form.

3           You can answer.

4      A.  Yeah, the purpose is to deliver a message, yes.

5    BY MR. HIRALDO:

6      Q.  When was the first time that Greenway used the

7    services of BDC Promotions?

8      A.  I don't know the answer to that question.

9      Q.  You don't know?

10     A.  The only incidence I'm familiar with is this one.

11     Q.  "This one" meaning the campaigns at issue in this

12   case?

13     A.  Yes, sir.

14     Q.  Okay.  What is BDC's understanding of what type

15   of telephone -- strike that.

16          Does BDC -- does Greenway have an understanding

17   of what BDC did for Greenway in terms of the telephone

18   solicitations that are at issue in this case?

19     A.  A very basic understanding, yes.

20     Q.  What is Greenway's understanding?

21     A.  The understanding is that a message was recorded

22   and then sent to consumers.

23     Q.  Okay.  How many times?

24     A.  Don't know the answer to that exactly.

25     Q.  Our client, the plaintiff in this case, has

1    alleged that he received prerecorded messages on

2    February 21, 2018 --

3        A.   Yes.

4        Q.   -- as well as February 28, 2018.

5        A.   Okay.

6        Q.   Does Greenway dispute that?

7        A.   I don't know that he did or didn't.

8            MR. MAGRUDER:   Object to the form.

9    BY MR. HIRALDO:

10       Q.   Does Greenway have an understanding of how many

11   campaigns BDC sent in February of 2018?

12       A.   The only one I'm familiar with is this one that

13   we're discussing.

14       Q.   When you say "this one," what do you mean?

15       A.   Mr. Picton, this exact, specific case.

16       Q.   Okay.

17       A.   That's the one I'm familiar with.

18       Q.   All right.   So the testimony of BDC last week was

19   that it sent campaigns on behalf of Greenway in January,

20   February, and March of 2018.

21       A.   Okay.

22       Q.   Does Greenway know one way or the other whether

23   that's true?

24       A.   No.

25            MR. MAGRUDER:   Object to the form.

Page 19

1    BY MR. HIRALDO:

2       Q.  Who at Greenway would have been responsible for

3    coordinating these campaigns?

4       A.  The only other person that I'm aware that was

5    involved was the general sales manager.

6       Q.  And who was that?

7       A.  Shaun -- sorry.  Drawing a blank.

8       Q.  Shaun Allen?

9       A.  Yes.

10      Q.  You, Mr. Agner, were not with the company in

11   January, February, or March of 2018, correct?

12      A.  That's correct.

13      Q.  Did you ever speak with Mr. Allen about these

14   campaigns?

15      A.  No.

16      Q.  Did you speak with Mr. Allen in order to prepare

17   for today's deposition?

18      A.  No.

19      Q.  I'm going to hand you what I've marked as

20   Exhibit 2, which is the first amended class action

21   complaint in this case.

22           (Whereupon, Plaintiff Exhibit 2 was marked for

23      identification.)

24   BY MR. HIRALDO:

25      Q.  Do you recognize this document, Mr. Agner?

Page 20

1   A.  No.

2   Q.  You've never seen this?

3   A.  Not to my knowledge.  I'm familiar with the

4   first, but not the second.

5   Q.  If you turn over to Page 12, please, do you see

6   there a Paragraph 44?

7   A.  Yes.

8   Q.  The allegation is:  "On or about February 21,

9   2018, defendant called plaintiff's cellular telephone

10  number ending in 1843 and transmitted the following

11  prerecorded telemarketing call to plaintiff."

12  A.  Okay.

13  Q.  And then the message that's recorded in there

14  says:  "Good afternoon.  This is Matt Bishop with

15  Greenway Dodge Chrysler Jeep Ram.  I'm sorry I missed

16  you.  I was calling cordially to invite you to attend

17  our elimination event this Friday, Saturday, and Sunday.

18  To dominate the market, Chrysler Motor Corporation has

19  rolled out 150,000 in additional rebates and incentives

20  this weekend only.  Every vehicle will be discounted up

21  to 11,000.

22      Plus, you'll receive zero percent financing for

23  up to 72 months or retail for your trade.  Only the

24  first 100 purchasers will be able to take advantage of

25  this incredible opportunity.  If you have been thinking

Page 21

1   about a new car or just not happy with your current

2   vehicle, don't miss this opportunity to save.

3        My name is Matt Bishop with Greenway Dodge

4   Chrysler Jeep Ram.  Call me to make an appointment for

5   the biggest sale of the year at (407) 704-2962.  That

6   number again is (407) 704-2962.  Thank you."

7      A.  Okay.

8      Q.  Does Greenway dispute that a message -- this

9   message was sent to the plaintiff's cellular telephone

10  on February 21, 2018?

11     A.  Greenway has no way to know that that did or did

12  not happen.

13     Q.  Does Greenway dispute that this message was sent

14  to other consumers on or about February 2018?

15     A.  The same answer, Greenway has no way to know

16  specifically to whom the message was sent.  I'm not

17  trying to not answer your question.

18     Q.  Your answers -- it's fine.  If you don't know

19  or --

20     A.  We have no way to know.

21     Q.  That's perfectly fine.

22        Who is Matt Bishop?

23     A.  I don't know.

24     Q.  Reading the content of this message here, what is

25  the purpose of this message?

1      A.   It appears that the message was to invite a

2    customer to attend an event.

3      Q.   What type of event?

4      A.   It would be an -- it would be an inventory

5    elimination event, would be the way I would read that.

6      Q.   Was one of the purposes of this message to

7    encourage the recipient of the message to come into

8    Greenway for the purposes of selling him or her a

9    vehicle?

10          MR. MAGRUDER:  Object to the form.

11          You can answer.

12     A.   It would seem reasonable to assume that, yes.

13   BY MR. HIRALDO:

14     Q.   The next allegation below it -- well, actually,

15   let me back up.  The telephone number (407) 704-2962 --

16     A.   Yes.

17     Q.   -- what number is that?

18     A.   Don't know off the top of my head.

19     Q.   Is that a Greenway number?

20     A.   I don't know -- I don't know the answer to that.

21   I don't know what that phone number is.

22     Q.   Do you know who wrote the script for this

23   message?

24     A.   Do not.

25     Q.   Do you know who recorded the message?

Page 23

1       A.   Do not.

2       Q.   Do you know how this message was transmitted?

3       A.   I don't know.

4       Q.   Do you know if ringless voicemail technology was

5   used to send this message?

6       A.   I have no way to know that.

7       Q.   Do you know what vendor was used for the

8   transmission of this message?

9       A.   To the best of my knowledge, the dealership felt

10  that BDC Promotions was their vendor.

11      Q.   Paragraph 46 of the complaint alleges that the

12  defendant called plaintiff's 1843 number with another

13  prerecorded message on or about February 28, 2018.

14           Do you see that?

15      A.   Yes, sir.

16      Q.   Does Greenway dispute that allegation?

17      A.   Again, we have no way to know that that did or

18  didn't happen.

19      Q.   And the alleged message is then quoted in

20  Paragraph 47, and I will read it into the record.  The

21  message says:  "Hi.  This is Shaun Allen, general sales

22  manager here at Greenway Dodge.  I just wanted to make

23  sure that you're taking advantage of our inventory

24  elimination event that started on Friday.  It was a huge

25  success this past weekend, and we've decided to extend

Page 24

1   it through Wednesday, February 28th.

2          We still have all of the additional discounts and

3   promotions, if you're able to stop by.  We need

4   approximately 24 more deals to get your incentive.

5   And" -- "to get our incentive.  And I'm instructing my

6   management team to accept any offers.  With discounts

7   over 11,000 in trade value to the highest peak, I'm sure

8   we can make you happy.

9          You can reach me at (407) 605-5908.  Please don't

10  miss this opportunity.  And I look forward to hearing

11  from you.  Thank you."

12     A.  Very well.

13     Q.  The telephone number (407) 605-5908, what number

14  is that?

15     A.  Again, I don't know the answer to that.

16     Q.  Was one of the purposes of sending this message

17  to the plaintiff to encourage him to come into Greenway

18  for the purposes of selling him a vehicle?

19          MR. MAGRUDER:  Object to the form.

20     A.  The best way that I can answer is, we don't know

21  specific -- I can't say that we know specifically that

22  this was sent to the plaintiff.  But the general purpose

23  of that message would be to encourage a consumer to come

24  in, yes.

25

Page 25

1    BY MR. HIRALDO:

2       Q.   Okay.   Do you recognize the telephone number

3    that's identified in Paragraph 50 of the complaint?

4    It's (407) 211-6060.

5       A.   I do not.

6       Q.   The allegation in Paragraph 51 is that both of

7    the prerecorded messages are telemarketing and/or

8    advertising, as they promote defendant's dealership and

9    vehicle inventory.

10          Do you see that?

11      A.   I do.

12      Q.   Does Greenway dispute that allegation?

13          MR. MAGRUDER:   Object to the form.

14      A.   We don't know that those messages were delivered.

15   But the general purpose of a message similar to those

16   would be to encourage a consumer to come in and purchase

17   a vehicle.

18   BY MR. HIRALDO:

19      Q.   You can put that to the side.

20          Let me hand you Exhibit 3, which is defendant's

21   answers to plaintiff's first set of interrogatories.

22          (Whereupon, Plaintiff Exhibit 3 was marked for

23      identification.)

24      A.   Okay.

25

1   BY MR. HIRALDO:

2       Q.   Do you recognize these?

3       A.   I do not.

4       Q.   Is that your signature on Page 7?

5       A.   Let me get to it.

6            Okay.  Yes, I do understand it.

7       Q.   You've seen these before?

8       A.   Yes.

9       Q.   That's your signature on the second page?

10      A.   Yes.  I just needed to reread it.

11      Q.   Did you provide information to help respond to

12   these interrogatories.

13      A.   To counsel, yes.

14      Q.   All right.

15           MR. MAGRUDER:  So you answered the question,

16      but just don't say what we talked about, basically.

17           THE WITNESS:  Okay.  Yes.

18   BY MR. HIRALDO:

19      Q.   All right.  Turn to Page 2.  We're looking at

20   Interrogatory Number 3.

21           Are you there?

22      A.   Yes, sir.

23      Q.   So in that question, we asked Greenway to

24   describe in detail the method or process by which

25   prerecorded messages were sent.

Page 27

1      A.   Yes.

2      Q.   And then the response is:  "Defendant hired a

3   third-party marketing company via contract produced at

4   Bates Number Greenway 0001" --

5      A.   Yes.

6      Q.   -- "to, among other things, send prerecorded

7   voice messages to certain customers' voicemail inboxes

8   without making a call to the individual's telephone."

9      A.   That is correct.

10      Q.   The third-party marketing company that is

11   referenced here is BDC Promotions; is that correct?

12      A.   Yes.

13      Q.   And the prerecorded voice messages, are those the

14   messages that are identified in the complaint?

15      A.   Yes.

16      Q.   Is Greenway aware of any other messages --

17   prerecorded messages being sent other than the ones that

18   are identified in the complaint?

19      A.   We are not.

20      Q.   Part of this answer states that the messages were

21   sent without making a call to the individual's

22   telephone.

23           Do you see that?

24      A.   Yes.

25      Q.   Okay.   How does Greenway know that?

1     A.   We do not know that specifically.  That was the

2   purpose -- that is what the vendor represented to us.

3     Q.   Who at BDC Promotions made this representation?

4     A.   That's what ringless voicemail is.

5     Q.   No, I understand what you're saying, but who is

6   it?  Was it Mr. Specht?

7     A.   Yes.  He would have been the one between -- when

8   the agreement was signed, Mr. Specht represented that's

9   the method of delivery.

10    Q.   To who at Greenway?

11    A.   That would have been Shaun.

12    Q.   So Mr. Specht told Shaun Allen that these

13   ringless voicemails are sent without a call being placed

14   to the individual's phone; is that correct?

15    A.   That's the definition of a ringless voicemail,

16   yes, sir.

17    Q.   You say that's the definition of the ringless

18   voicemail.  How do you know that?

19    A.   It's a marketing term.  I'm familiar with it as a

20   marketing vehicle.  I know what it is.

21    Q.   You personally, Mr. Agner, know what a ringless

22   voicemail is?

23    A.   I do.

24    Q.   When did you first learn of the technology?

25    A.   It's been several years.  It's been in play for

1    more than three years, that I'm aware of.

2       Q.  Have you used it in order to market at any of

3    your other jobs that you've held?

4       A.  Never.

5       Q.  Has any other company that you've ever worked for

6    ever used ringless voicemail technology?

7       A.  No.

8       Q.  Okay.  Has Greenway ever used ringless voicemail

9    technology prior to the campaigns that are at issue in

10   this case?

11      A.  Not to my knowledge.

12      Q.  When you learned of ringless voicemail

13   technology, how was it that you became aware of it?

14      A.  It's my job to stay abreast of marketing tools.

15      Q.  Did you read something on the Internet?

16      A.  I don't recall exactly.  I -- I -- typically, the

17   way a technology would be introduced is through a

18   vendor.  And then when a technology is introduced, I

19   would normally go and research the technology, multiple

20   sources.

21      Q.  Which vendor introduced you to the ringless

22   voicemail technology?

23      A.  I don't recall, as I said.  It's been several

24   years.

25      Q.  Was it Stratics Network?

1      A.   No.

2      Q.   Was it VoiceLogic?

3      A.   It was not.

4      Q.   Was it some other vendor?

5      A.   Yes.

6      Q.   Are you familiar with Stratics Network?

7      A.   No.

8      Q.   From a technological standpoint, does Greenway

9  have an understanding of how ringless voicemail

10 technology works?

11     A.   Yes.

12     Q.   And what is Greenway's understanding?

13     A.   That using software and a calling system, the

14 voicemail is delivered to the carrier directly -- by

15 using a carrier directly.  You have to contract with

16 someone else.

17     Q.   Okay.  And then once that message is delivered to

18 the carrier, what happens with the message?

19     A.   The consumer would receive a notice on their cell

20 phone or mobile device that they have a message waiting

21 and they would be able to listen to that message.

22     Q.   Does Greenway know whether ringless voicemail

23 technology uses the carrier's switching network in the

24 transmission of the message?

25          MR. MAGRUDER:  Object to the form.

1    A.  No.

2   BY MR. HIRALDO:

3    Q.  Does Greenway know how a carrier notifies an

4   individual that he or she has received a ringless

5   voicemail?

6    A.  Technically, no.  In general terms, in the way

7   that you would receive any other voicemail, just come up

8   on your phone.

9    Q.  Does Greenway consider a ringless voicemail to be

10   a call?

11       MR. MAGRUDER:  Object to the extent that you're

12      asking him to provide a legal conclusion.

13       You can answer the question.

14    A.  Never researched it in that line of thought.

15   BY MR. HIRALDO:

16    Q.  Well, Interrogatory Number 3 says that the

17   message was sent without making a call.

18       Do you see that?

19    A.  Yes, I understand that.

20    Q.  So what is Greenway's definition of what a call

21   is?

22    A.  The definition of the phone call is that I pick

23   up the phone and dial your phone, and the phone will

24   ring.

25    Q.  So the distinction, then, that Greenway is making

1    is that nobody dialed these phone numbers?

2        A.   And the phone does not ring.

3        Q.   Meaning that the phone doesn't make -- doesn't

4    ring as a traditional audible alert that a phone call is

5    incoming, correct?

6             MR. MAGRUDER:   Object to the form.

7        A.   Doesn't ring at all.

8    BY MR. HIRALDO:

9        Q.   How is a consumer notified that he or she has

10   received a voicemail?

11       A.   As I answered before, depends upon your carrier,

12   but you would receive a notice on your phone.   Depends

13   upon your carrier.   I can't tell you exactly.   It's

14   not -- there's no ring.   It's just that you're notified

15   that you have a voicemail waiting.

16       Q.   What kind of phone do you have, Mr. Agner?

17       A.   I have an iPhone.

18       Q.   Okay.   Which model?

19       A.   I don't know.   The latest one.   I don't know what

20   that is.

21       Q.   When you receive a voicemail on your phone, does

22   your phone make any type of sound?

23       A.   No.

24       Q.   Okay.   Do you know if phones -- iPhones are

25   traditionally set up with a default setting for an

1   audible alert when a voicemail is received?

2          MR. MAGRUDER:  Object to the form.

3      A.  I don't -- I don't know what the -- I don't know

4   what the default settings are.  I know my phone doesn't

5   make any noise.

6   BY MR. HIRALDO:

7      Q.  So besides the fact that nobody is punching in a

8   telephone number --

9      A.  Yes.

10     Q.  -- and that the phone does not ring --

11     A.  Yes.

12     Q.  -- is there any other distinction that

13  Greenway -- that Greenway draws between a call and a

14  ringless voicemail?

15         MR. MAGRUDER:  Object to the form.

16     A.  A ringless voicemail is not a phone call.

17  BY MR. HIRALDO:

18     Q.  Because it doesn't ring?

19     A.  It doesn't ring.  No one actually calls you.  It

20  doesn't ring.  It's an electronically delivered message.

21  The most similar message would be like an email, but in

22  a verbal form.

23     Q.  What about a text message?

24     A.  It's not a text message.

25     Q.  Okay.  Is a text message a call?

1      A.  No.

2            MR. MAGRUDER:  Object to the form.

3            Just to the extent that you're asking him to

4      draw a legal conclusion.

5   BY MR. HIRALDO:

6      Q.  Does Greenway consider a text message to be a

7   call?

8            MR. MAGRUDER:  Same objection.

9            You can answer.

10     A.  No.

11  BY MR. HIRALDO:

12     Q.  Why not?

13     A.  It's not a phone call.

14     Q.  It's not a -- when you say "phone call," you're

15  referring to a voice call?

16     A.  It's not any kind of a phone call.  In a phone

17  call, the definition would be that I pick up my phone, I

18  dial the number, that you answer it or choose not to.

19     Q.  Okay.  So Greenway's definition of a call is

20  strictly limited to a scenario where somebody picks up

21  the phone, dials it, and then the phone on the other end

22  rings, correct?

23            MR. MAGRUDER:  Object to the form and legal

24      conclusion.

25            You can answer.

1     A.  Yes, that's correct.  That's the only way --

2     that's the only definition of a phone call, yes.

3     BY MR. HIRALDO:

4     Q.  All right.  Turn over the next page, page --

5     Interrogatory Number 4.

6          The question is:  "Describe in detail the method

7     or process by which you or anyone on your behalf

8     collected or obtained plaintiff's telephone."

9          Do you see that?

10    A.  Uh-huh, I do.

11    Q.  Do you -- and then the answer is:  "Plaintiff

12    engaged in business activities with defendant during

13    which plaintiff provided his phone number to defendant

14    on various forms that the plaintiff filled out without

15    any indication he was providing defendant his phone

16    number with any conditions."

17    A.  Correct.

18    Q.  Do you see that?

19    A.  I do.

20    Q.  What business activities is Greenway referring to

21    here?

22    A.  My understanding is that this gentleman is a

23    service customer.

24    Q.  And so he completed paperwork in connection with

25    that service?

1    A.  He would complete numerous pieces of paperwork in

2    connection with the service, yes.

3    Q.  And do any of those forms contain a section where

4    Mr. Picton would have agreed to the receipt of

5    telemarketing calls?

6         MR. MAGRUDER:  Object to the form to the extent

7       that he's being asked to draw a legal conclusion.

8         You can answer.

9    A.  I'm not aware of every form that he signed.  But

10   the privacy policy of the company is published in

11   numerous places, including on all websites.  And it

12   specifically states that any time a consumer give us a

13   phone number, they are giving us express consent to use

14   that phone number in the marketing or any other form.

15   BY MR. HIRALDO:

16   Q.  Does Greenway have an understanding of what type

17   of consent is needed from a consumer in order to send a

18   marketing call to that consumer?

19        MR. MAGRUDER:  Object to the extent that he's

20      being asked to provide a legal conclusion.

21        You can answer.

22   A.  I'm not an attorney.  But the general

23   understanding is that if a consumer gives a phone number

24   or does business in any way with the business, like

25   ours, there is a window in which the consumer can be

Page 37

1    contacted for marketing purposes.

2         We also go to the additional level of publishing

3    policies to keep people expressly informed that when

4    they give us their information, we may -- we may use it

5    in marketing context.

6    BY MR. HIRALDO:

7         Q.  When you say "window," what do you mean by that?

8         A.  I'd have to go back and do some research, but

9    there is a -- it's defined as a preexisting business

10   relationship.

11        Q.  It's Greenway's position that if somebody does

12   business with them, that has then created a business

13   relationship which allows Greenway to send marketing

14   communications to that consumer; is that correct?

15            MR. MAGRUDER:   Object to the form and calling

16       for a legal conclusion.

17            You can answer.

18        A.  In a general context, yes.  The specific ones we

19   would refer to counsel.

20   BY MR. HIRALDO:

21        Q.  And then it is Greenway's position that the

22   publishing of Greenway's marketing policies and its

23   privacy policy on its website also allows Greenway to

24   engage in communications -- marketing communications

25   with consumers; is that correct?

1          MR. MAGRUDER:  Object to the form and calling

2     for legal conclusion.

3     A.  Yes.

4  BY MR. HIRALDO:

5     Q.  Does Greenway know what express written consent

6  is?

7          MR. MAGRUDER:  That's a legal term.

8          Object to the extent that it's calling for a

9     legal conclusion.

10          But you can answer, if you know.

11     A.  To the best of my knowledge, when a consumer --

12  well, yeah, the best answer I can give you on that is

13  very specifically spelled out on our websites.  And it

14  has a very, very clear definition of -- of giving

15  express consent for marketing.

16  BY MR. HIRALDO:

17     Q.  What is Greenway's understanding of what express

18  consent to receive marketing communications is?

19          MR. MAGRUDER:  Same objection.

20          But you can answer.

21     A.  Again, I would refer you to the text on the

22  website simply because it was produced by an attorney.

23  But it specifically tells people that by giving us their

24  information, they are giving us express consent, unless

25  they choose to opt out to communicate within the

1  marketing context.

2  BY MR. HIRALDO:

3     Q.  And that's in a -- that's in the privacy policy

4  of Greenway's website?

5     A.  All the store websites.

6     Q.  How long has that been on there?

7     A.  Better part of -- better part of a year.

8     Q.  Was that on there before the communications that

9  were sent in this case?

10    A.  I don't recall.  I don't recall the answer to

11  that.  When I became the chief marketing officer of the

12  company, I clarified certain things.  There were always

13  privacy policies, to the best of my knowledge, but I

14  clarified them.

15    Q.  When did Mr. Picton engage in business activities

16  with Greenway?

17    A.  It's been an ongoing business relationship, to my

18  understanding.

19    Q.  When Mr. Picton engaged in business activities

20  with Greenway, was the privacy policy on which

21  Greenway's relying for express consent on the Greenway

22  website?

23    A.  That I don't know the answer to.  But my

24  understanding is that the privacy policies were always

25  also made a part of other documentation.  So you would

1  have to go back and check.

2      Q.   But my understanding, from your testimony, is

3  that the privacy policy containing express consent was

4  not added onto the website until about June of 2018; is

5  that correct?

6      A.   It was clarified after June of 2018.

7      Q.   What do you mean by "clarified"?

8      A.   There was always a privacy policy, as I recall,

9  on websites, but I clarified it and expounded on it,

10  made it a little bit easier to understand.

11      Q.   You, Mr. Agner, did?

12      A.   With the advice of counsel.

13      Q.   Okay.  Why?

14      A.   It's always company's -- in a company's best

15  interest to expound upon and clarify, whenever possible,

16  in my opinion, because it enhances the consumer's

17  relationship and it makes things a little bit easier to

18  understand, about what exactly constitutes relationships

19  and what doesn't.  So it was really in the interest of

20  customer service.

21      Q.   Did the privacy policy make any reference to

22  marketing communications prior to June of 2018?

23      A.   I don't know the answer to that question.

24      Q.   Who would know the answer to that question?

25      A.   We would have to -- I -- I assume you have

1    documents from his previous business dealings.  That's

2    probably where it would be found.

3        Q.  I'm sorry?

4        A.  He has a previous business relationship with the

5    company.  And that documentation is where any of the

6    privacy policies would be found.  But I don't know the

7    answer to the question you're asking.

8        Q.  Turn over to Page 4, Interrogatory Number 12.

9            And the question is:  "Describe what type of

10   consent or permission, if any, you obtained from

11   plaintiff to send subject prerecord" -- "to send the

12   subject prerecorded messages prior to sending the

13   messages."

14           Do you see that?

15       A.  I do.

16       Q.  And the answer is:  "Express written consent.

17   Plaintiff provided his phone number to the defendant

18   without any restriction or objection to receiving

19   marketing communications."

20       A.  Yes.

21       Q.  Is that true?

22           MR. MAGRUDER:  Object to the form.

23       A.  As far as I know.

24   BY MR. HIRALDO:

25       Q.  When Greenway says "express written consent" in

1   this interrogatory response, what does it mean by that?

2           MR. MAGRUDER:  Objection to the extent it calls

3       for legal conclusion.

4           MR. HIRALDO:  Well, this is -- it's in the

5       answer, so...

6           MR. MAGRUDER:  Same objection.

7       A.  The plaintiff provided his phone number without

8   any restrictions, and there's a clearly published

9   privacy policy.

10  BY MR. HIRALDO:

11      Q.  That's what Greenway thinks express written

12  consent is?

13          MR. MAGRUDER:  Same objection.

14      A.  To the best of my recollection.

15  BY MR. HIRALDO:

16      Q.  And so because the plaintiff provided his phone

17  number without any restrictions or objection to

18  receiving marketing communications, it's Greenway's

19  position that it was able to engage in marketing

20  communications with Mr. Picton; is that correct?

21          MR. MAGRUDER:  Object to the form.  And calls

22      for legal conclusion.

23          You can answer.

24      A.  That would be the general conclusion.  A consumer

25  may also opt out at any time.

Page 43

1  BY MR. HIRALDO:

2      Q.  So is it Greenway's position, then, that

3  consumers have to provide restrictions or objections to

4  marketing communications when they provide their

5  telephone numbers in order not to receive marketing

6  calls from Greenway?

7           MR. MAGRUDER:  Object to the form.  And calls

8       for legal conclusion.

9           You can answer.

10     A.  In general terms, yes, a consumer may opt out if

11  they choose not to.  It is my understanding that that

12  didn't happen in this case.

13  BY MR. HIRALDO:

14     Q.  Does Greenway have a do not call list?

15     A.  Greenway's vendors -- we do not keep one

16  internally.  We use our customer relationship management

17  tool for do not call if a consumer opts out.

18     Q.  If a consumer would provide Greenway with his or

19  her telephone number and a restriction on the use of

20  that telephone number, specifically that it may not be

21  used for marketing --

22     A.  Yes.

23     Q.  -- how would Greenway note that in its system, if

24  at all?

25     A.  Oh, no, they would.  We would.  Basically, inside

1   the software, whoever received the notice would simply

2   go in and mark the customer's phone number do not call.

3   And at that point, that phone number is no longer able

4   to be used in marketing and would no longer be produced

5   in any marketing lists.

6        Q.   So unless a consumer -- or a customer, rather, of

7   Greenway's makes those restrictions --

8        A.   Yes.

9        Q.   -- with connection to their telephone number,

10   they will receive marketing communications from

11   Greenway; is that correct?

12            MR. MAGRUDER:   Object to the form.

13        A.   They may.

14   BY MR. HIRALDO:

15        Q.   They may receive, okay.

16            So the only scenario where they would not receive

17   a marketing communication from Greenway, after having

18   provided their telephone number, is if they specifically

19   said, "Do not use my number for marketing," correct?

20            MR. MAGRUDER:   Object to the form.

21            You can answer.

22        A.   That's correct.

23   BY MR. HIRALDO:

24        Q.   So Interrogatory Number 13, then, says:

25   "Describe what type of consent or permission, if any,

1   you obtained from recipients of the prerecorded messages

2   prior to sending the prerecorded messages."

3        Do you see that?

4   A.  I do.

5   Q.  Okay.  The response is:  "Express written

6   consent.  All of the individuals that were contacted by

7   the third-party vendor provided phone numbers to

8   defendant without any restriction or objection to

9   receiving marketing communications."

10  A.  That is correct.

11  Q.  Is that true?

12  A.  That is.  To the best of my knowledge, yes,

13  that's true.

14  Q.  So it's Greenway's position that it was permitted

15  to contact these individuals because they had provided

16  their telephone numbers to Greenway without a specific

17  restriction on the use of those phone numbers, correct?

18       MR. MAGRUDER:  Form and calling for legal

19  conclusion.

20       You can answer.

21  A.  Yes.

22  BY MR. HIRALDO:

23  Q.  I'm going to hand you what I've marked as

24  Exhibit 4.  This is defendant's amended answers to

25  plaintiff's first set of interrogatories.

Page 46

1          (Whereupon, Plaintiff Exhibit 4 was marked for
2      identification.)
3      A.  Yes.
4  BY MR. HIRALDO:
5      Q.  Is that, again, your signature on Page 7 of this
6  document?
7      A.  Yes.
8      Q.  If you turn to Page 3, Interrogatory Number 10,
9  there's a reference here to eLead.  That's E-L-E-A-D.
10     A.  That's right.
11     Q.  Software?
12     A.  Yes.
13     Q.  Is that Greenway's CRM?
14     A.  It is.
15     Q.  Okay.  And when I say -- what is your
16  understanding of what CRM means?
17     A.  It's the software by which we maintain our
18  customer records, sequester them, place them in
19  protective silos, and then also use as a compliance tool
20  in the event that someone may choose to opt out of
21  communication.
22     Q.  Yeah, my question is even more basic.  CRM stands
23  for what?
24     A.  Customer relationship management software.
25     Q.  And how long has Greenway used the eLead platform

1  as its CRM?

2      A.  Greenway began using eLead this year.  Prior to

3  that, they used different software.

4      Q.  What type of information is kept within eLead for

5  each specific customer of Greenway's?

6      A.  Name -- the information will depend on the

7  information that the consumer gives us.  It must be

8  given to us by them.  Generally, name, address, phone

9  number, email, and then any details of our relationships

10  or transactions.

11      Q.  When you say "phone number," is there a field for

12  a home phone number?

13      A.  There is.

14      Q.  Is there a field for an office number?

15      A.  There is.

16      Q.  Is there a field for a cellular telephone number?

17      A.  There is.

18      Q.  Is there a -- some kind of account history

19  related to how the consumer has interacted with

20  Greenway?

21      A.  Yes.

22      Q.  Meaning, this individual came in as a new sale

23  purchase?

24      A.  Yes.

25      Q.  This individual came in as a used sale purchase?

Page 48

1    A.   Yes.

2    Q.   This individual came in as a service customer?

3    A.   Yes.

4    Q.   Okay.  And that's notated in the system?

5    A.   Typically, yes.  New and used are very --

6    Q.   How is it that it's notated within the system?

7    A.   The system will note how the record was created,

8    whether it was created physically, by someone entering

9    as you came in to us or walked in, or whether it was

10   created from an Internet conversation, email

11   communication, so on.

12   Q.   If I want to pull a list of every individual that

13   has only been a service customer of Greenway, would I be

14   able to do that using eLead?

15   A.   Should be.

16   Q.   How would I do that?

17   A.   By performing a search inside the system.

18   Q.   And what search term would I use to make that

19   search -- to perform that search?

20   A.   The search allows you to segregate prospects,

21   sold customers, and service clients.  So you would be

22   able to search from within the service database.

23   Q.   If I wanted only service clients, would I be able

24   to get a list of only service clients?

25   A.   Yes.

Page 49

1    Q.  And that would not -- would that include

2    individuals that may have potentially purchased a

3    vehicle from Greenway?

4    A.  Typically, yes.  If they did, yes.

5    Q.  And is there a way to weed out the individuals

6    that have made purchases from that list?

7    A.  I honestly never tried.  I never tried.  The

8    system does not typically look at people that way.  It

9    looks as people as a holistic relationship.

10   Q.  All right.  Let's look at Page 4, Interrogatory

11   14.

12   A.  Uh-huh.

13   Q.  Actually, let's look at 13 first.

14   A.  Okay.

15   Q.  Again, this is asking for the type of

16   permission -- 12 and 13 -- we can look at them

17   together -- are asking for the types of permission that

18   were received by Greenway from the plaintiff and other

19   individuals who were sent the prerecorded messages at

20   issue in this case to send them those messages.

21        Do you see that?

22   A.  I do.

23   Q.  And the response, again, is that Greenway had

24   express written consent by virtue of the plaintiff and

25   these other consumers not instructing Greenway to use

1    their number for marketing purposes; is that correct?

2             MR. MAGRUDER:  Object to the form.

3        A.  I'm sorry.  You're asking me the -- I think I

4    understand the question.  If I'm understanding the

5    question, you're asking me if we believe -- as a

6    company, the company believes it had consent because the

7    consumers gave us their phone number and did not object

8    or restrict that phone number.

9    BY MR. HIRALDO:

10       Q.  Correct.

11       A.  Is that correct?

12       Q.  Yes.

13       A.  Then yes, sir.

14       Q.  And then now there's a reference to the privacy

15   policy, correct?

16       A.  That's correct.

17       Q.  Greenway can't tell me if this privacy policy, at

18   least specifically, made reference to marketing

19   communications prior to June of 2018, correct?

20            MR. MAGRUDER:  Object to the form.

21       A.  To the best of my knowledge, there was always a

22   privacy policy in place.  All I did was simply clarify

23   it.  So I can't give you an exact answer.

24   BY MR. HIRALDO:

25       Q.  When you made the clarifications to the privacy

1   policy in June of last year --

2       A.   Approximately June.

3       Q.   -- approximately June of last year, what was the

4   clarification that was made?

5       A.   It simply expounded on the topics a little bit

6   more.  We use the same privacy policy that is given by

7   the FTC, I believe, is the origination of it.  I just

8   simply expounded upon the business relationship a little

9   bit more.  And in the terms of clarifying the ways in

10  which the information was used or not used.  Mostly had

11  to do with us not sharing information with certain

12  partners.

13      Q.   Was one of the clarifications that was made on or

14  about June of 2018 having to do with the use of a

15  customer's telephone number?

16      A.   The entire product -- I'm not trying to not

17  answer your question.  That's the entire policy.  And

18  the premise is that if we have an ongoing business

19  relationship and you give us your phone number without

20  restriction, that we may market to you.

21      Q.   Uh-huh.

22      A.   Most of the clarifications, to the best of my

23  recollection, had to do with people to whom we do not

24  share -- with whom we do not share that information, not

25  sharing.

1    Q.  Does Greenway maintain records of the various

2   types of privacy policies that have existed on

3   Greenway's website?

4    A.  I don't know the answer to that.  You would have

5   to check with counsel.  I wouldn't be the arbiter of

6   that.  I wouldn't be the keeper.

7    Q.  Now, let's look at 14.  This is asking -- I'll

8   paraphrase for you -- the ways in which the telephone

9   numbers were acquired by Greenway to -- the telephone

10  numbers to which these prerecorded messages were sent

11  were acquired by Greenway.

12       Do you see that?

13   A.  I do.  Yes.

14   Q.  And there's reference -- references to various

15  sources, the first one being providers online.  What

16  does that mean?

17   A.  If a consumer contacts us electronically, as part

18  of that contact, they will give us an email address and

19  typically their phone number, as well, through email.

20   Q.  And this is through the Greenway website?

21   A.  It may be.  I believe the reason that we use the

22  word "providers" in that response is it may be through

23  third-party providers as well, third-party advertisers,

24  Autotrader, Cars.com, a number of providers.

25   Q.  Does Greenway know?

1          MR. MAGRUDER:  Object to the form.

2     BY MR. HIRALDO:

3          Q.  Does Greenway know what is being referred to

4     there in that response?

5          A.  I don't understand the question.  I'm sorry.

6          Q.  The answer here talks about submitted by the

7     providers only.

8          A.  The providers, yes.  If a consumer comes to us

9     online, whether it's directly or through a third-party

10    provider, they will give us that information and they

11    would consent to the use of it.

12         Q.  When a consumer provides his or her telephone

13    number through the Greenway website --

14         A.  Uh-huh.

15         Q.  -- does he or she check a box, sign, or agree

16    to -- and I know you're going to tell me about the

17    privacy policy.  But aside from the privacy policy, is

18    there anything else where the consumer checks a box or

19    signs off or agrees to receive marketing calls on his or

20    her cellular telephone number?

21         A.  Actually, yes.  In that information box in

22    which -- or through which you would submit that

23    information to us, there is a very specific check box

24    that says that you're consenting to -- for use of your

25    phone number, cellular phone number.  And there is also

1  a very specific reference to the privacy policy in

2  there.

3      Q.  And how long has that language been on the

4  Greenway website?

5      A.  In one form or another, the open consent, I

6  believe, has been there for at least six months, if not

7  longer.  I don't recall if it was there a full year ago,

8  but I know it's been there for at least six months, if

9  not longer.

10     Q.  Was that put on there as a result of this

11 lawsuit?

12     A.  No.

13     Q.  And so when you say "six months," you mean

14 approximately December of 2018 or January of 2019?

15     A.  I'm guessing at this point.  A number of our

16 websites have gone through migrations because of

17 manufacturer requirements.

18     Q.  Okay.

19     A.  But that type of box is very standard.  And when

20 I performed audits of the websites, even through last

21 year, that's something that we would check for.

22     Q.  Why were you checking for that when you were

23 performing website audits?

24     A.  In my opinion, it's just a standard notification.

25     Q.  Okay.  When is it that Greenway first became

1   aware of the Telephone Consumer Protection Act?

2       A.   I can't answer that question.

3       Q.   Does Greenway -- is Greenway aware of the

4   Telephone Consumer Protection Act as you sit here today?

5       A.   Of course.

6       Q.   And I'll refer to it as the "TCPA" for short.

7       A.   Uh-huh.

8       Q.   Did -- when is the first time that Greenway

9   had -- well, strike that.

10          Does Greenway have a TCPA compliance policy?

11      A.   Yes.

12      Q.   When was that first initiated?

13      A.   When I came to the company, one of the

14  in briefings I received was current policies.  And as

15  part of that in briefing, I was told that a policy of

16  the company was to comply with all local, state, and

17  federal regulations.

18          Since I have been a part of the company, we have

19  clarified different pieces of how we comply with those

20  policies.  But the general policy was always there, to

21  the best of my knowledge.  It was how I was in briefed

22  to the company.

23      Q.   Did you, Mr. Agner, have an understanding of the

24  TCPA prior to commencing your employment at Greenway?

25      A.   Yes.

1      Q.  And did you identify issues with Greenway's TCPA

2    policy when you started working at the company?

3      A.  No, I didn't identify issues.  The only changes,

4    as I said, were clarifications and a simple decision

5    that in the spirit of always -- it was a sense of

6    agreement that this policy has always been in place, but

7    simply just expound upon it.  That's probably a better

8    way to phrase that.

9      Q.  Now, looking back at Interrogatory 14, the next

10   area is in written contracts for the purchase and lease

11   of vehicles.

12         Do you see that?

13     A.  Yes.

14     Q.  Okay.  Now, do the purchase and lease contracts

15   that Greenway uses make reference specifically to

16   marketing communications?

17     A.  The contracts do not, no, but there's a written

18   privacy policy also that's a part of that deal package.

19     Q.  In the deal package, there's a privacy policy?

20     A.  Yes.

21     Q.  Does that privacy policy make reference to

22   marketing calls?

23     A.  It's contained there.

24     Q.  We'll look at that later on.

25         And then the last one is in written contracts for

1   service of vehicles.

2       A.   Yes.

3       Q.   Do those make reference to marketing calls?

4       A.   I don't recall off the top of my head.  It's a

5   better phrasing that would be repair orders.  But yes,

6   that is what a written contract is.

7       Q.   We can put that aside.

8            (Whereupon, Plaintiff Exhibit 5 was marked for

9       identification.)

10  BY MR. HIRALDO:

11      Q.   I'm going to hand you what I've marked as

12  Exhibit 5, which is defendant's response to plaintiff's

13  first request for production.

14           Do you recognize this document?

15      A.   Give me just a moment, please.

16           I'm not completely familiar with this, no.

17      Q.   Does Greenway understand that this is a request

18  for documents?

19      A.   I get that.

20      Q.   Okay.  What did Greenway do in order to locate

21  documents responsive to this request for production?

22           MR. MAGRUDER:  Object to the extent that this

23      calls for any correspondence with counsel.

24           But to the extent that you know, feel free to

25      answer.

1          THE WITNESS:  Sure.

2     A.  When this -- this topic was originally raised, I

3  sent an email to BDC and requested they turn over all

4  documents pertinent to the conversation, copied in

5  corporate counsel.  And I believe I did inform them that

6  counsel was attached.  And at that point, the -- the

7  remainder of the conversation was carried directly by

8  counsel.

9  BY MR. HIRALDO:

10    Q.  And were you copied on those communications that

11  counsel handled?

12    A.  Yeah.

13    Q.  And when did that occur?

14    A.  Several months ago.  I don't know the exact date.

15    Q.  Was it shortly after Greenway received this

16  lawsuit?

17    A.  Yes.

18    Q.  In addition to contacting BDC and asking that

19  they turn over all of their documents, did Greenway

20  contact any other vendor?

21    A.  No.

22    Q.  Did Greenway contact VoiceLogic?

23    A.  No.

24    Q.  Why not?

25    A.  Don't know who they are.

1    Q.  Okay.  Does Greenway know who VoiceLogic is

2    today?

3    A.  I do.

4    Q.  When did Greenway first learn of who or what

5    VoiceLogic was?

6    A.  Learned peripherally only after some of the

7    discovery had already taken place.

8    Q.  If you look at Request Number 2, you see there

9    where it says:  "Plaintiff initially provided defendant

10   information, including a phone number, an email address,

11   via Autotrader Trade-in Marketplace"?

12   A.  Yes.

13   Q.  What does that mean?

14   A.  That means that the gentleman who was the

15   plaintiff originally contacted the dealership through

16   the Autotrader Trade-in Marketplace and in that

17   communication gave the dealership his phone number and

18   his email address and gave the dealership his email --

19   his phone number several different times.

20   Q.  Okay.  When Mr. Picton provided his number

21   through Autotrader, does Greenway know if he signed

22   anything in which he agreed to the receipt of marketing

23   calls on his telephone -- on his cellular telephone

24   number?

25   A.  I don't know that exactly.

1    Q.  And then it goes on to say that he provided his

2    phone number in several forms when he brought his Dodge

3    Sprinter --

4    A.  Uh-huh.

5    Q.  -- to be serviced in October of 2014; is that

6    correct?

7    A.  That is correct.

8    Q.  In those forms, did Mr. Picton explicitly agree

9    to the receipt of marketing calls on his cellular

10   telephone?

11        MR. MAGRUDER:  Object to the extent that it's

12      calling for a legal conclusion.

13        But you can answer.

14   A.  Again, I don't know the answer to that.  We would

15   have to look at the form exactly.  We would have to look

16   at the forms.

17   BY MR. HIRALDO:

18   Q.  Now, Request Number 5 asks for all documents

19   identifying the following information regarding

20   recipients of prerecorded messages --

21   A.  Uh-huh.

22   Q.  -- name, address, email, phone numbers, sources

23   of where you obtained the telephone numbers called.

24        Do you see that?

25   A.  I do.

1    Q.  And then in response, Greenway makes reference to

2    Bates Greenway Numbers 38 through 741.

3         Do you see that?

4    A.  I do.

5    Q.  I'm going to hand you two exhibits, the first one

6    being 6 and the second one is 7.

7         (Whereupon, Plaintiff Exhibit 6 was marked for

8      identification.)

9         (Whereupon, Plaintiff Exhibit 7 was marked for

10     identification.)

11   BY MR. HIRALDO:

12   Q.  For the record, Exhibit 6 is production from

13   Greenway Bates labeled 38 through 43 and then the last

14   page of that log, which is Bates 270.

15        Do you see that, Mr. Agner?

16   A.  I do.

17   Q.  Okay.  And then the second exhibit, 7, is

18   Bates 284 --

19   A.  Uh-huh.  283.

20   Q.  -- through 287, then 375, and then the last page

21   being 741.

22        Do you see that?

23   A.  I do.

24   Q.  So I'll represent to you, you do not have the

25   complete list in front of you because it's just a lot of

1  paper and I didn't want to waste paper.

2      A.  Fair.

3      Q.  So can you tell me, the first exhibit, 6, what is

4  this document?

5      A.  It appears to be a manifest.

6      Q.  A manifest?

7      A.  It appears to be a manifest of names and

8  telephone numbers.

9      Q.  Okay.  Are these the names, addresses, and

10  telephone numbers of individuals who received

11  prerecorded messages sent by BDC?

12      A.  I don't know that.

13      Q.  Where did Greenway obtain this list?

14      A.  I don't know this -- I don't know the answer to

15  that question.

16      Q.  Well, Greenway produced this in discovery.

17      A.  That would have been from the information sent to

18  Greenway by BDC Promotions.

19      Q.  Is that where this came from?

20      A.  That would be it.

21      Q.  Does Greenway have an understanding of what this

22  list is?

23      A.  Greenway has an understanding of what BDC

24  represents it to be.  Specifically, BDC represents that

25  these are the people to whom they marketed.

1    Q.  Okay.  Are there -- is this list, Exhibit 6, a

2    list of Greenway customers or is it a list of -- that

3    was purchased by BDC?

4    A.  My understanding is that the only information

5    that Greenway provided were customers.

6    Q.  Looking at this Exhibit 6, this list, can you

7    tell if these are Greenway customers?

8    A.  I cannot.

9    Q.  Do you see there on the top right-hand corner

10   where it says "home market value"?

11   A.  I do.

12   Q.  Would Greenway maintain information about the

13   market value of its customers?

14   A.  Greenway would maintain information about the

15   historical purchase of the customer -- what the

16   historical purchase patterns have been, what they have

17   purposed from us.

18   Q.  But not home market values?

19   A.  No, not the market value of your home.

20   Q.  Right.  So if Greenway had to take a guess, would

21   Exhibit 6 be a list of customers of Greenway's?

22        MR. MAGRUDER:  Object to the form.

23   A.  I'm not in the business, with all due respect,

24   dealing with these lists and stuff like that.

25

1    BY MR. HIRALDO:

2        Q.   That's fair.

3             Does Greenway know if BDC sent prerecorded

4    messages to a list of customers that they had purchased?

5        A.   I believe that was included in it.   The best

6    answer I can give you on that is that Greenway has no

7    way specifically of knowing that BDC did or did not send

8    these exact messages other than what BDC represents.

9        Q.   Did BDC ever send Greenway a list of outcomes of

10   attempted prerecorded messages?

11       A.   I don't know the answer to that question.   None

12   that I'm aware of.

13       Q.   Take a look at Exhibit 7.   Can you tell me what

14   this is?

15       A.   Again, it appears to be a manifest of names,

16   addresses, and phone numbers.

17       Q.   Is this information that was obtained from the

18   eLead platform?

19       A.   I don't know where it comes from.   But it appears

20   to be people who have purchased a vehicle.

21       Q.   How do you know that?

22       A.   Because it seems to have the model that they

23   purchased and the VIN number.

24       Q.   Okay.   That last column where it says "distance,"

25   what does that mean?

Page 65

1      A.   Don't know.

2      Q.   Does the eLead platform maintain information

3   about the distance from where the customer resides as it

4   relates to the dealership?

5      A.   No, it does not.

6      Q.   Do you know if that was something that may have

7   been added?

8      A.   I can't speculate, but I do know -- I can tell

9   you that that's not information that the CRM would

10   contain.

11      Q.   The column where it says "cell numbers," what

12   does that mean?

13      A.   Appears to be the customers' cell phone numbers.

14      Q.   And the column where it says -- I can't -- I

15   don't know if you can read it.  It's right to the right

16   of the ZIP.  I think it's C -- CRT or C --

17      A.   CRRT, I think.

18      Q.   CRRT?

19      A.   Yeah.

20      Q.   What is that?

21      A.   No clue.  I don't know.

22      Q.   Do you know what any of the codes that are in

23   that column mean?

24      A.   I don't know what that column means.

25      Q.   Sale date, what does that mean?

1    A.  Typically, that would be the date the consumer

2  purchased the vehicle that's referenced to the right.

3    Q.  Turn to Greenway 375, please.

4    A.  Okay.

5    Q.  Do you see here, pointing it out to you, might

6  make it easier, I've highlighted it, the plaintiff's

7  name, Picton?

8    A.  Yeah.

9    Q.  Do you see it there?

10    A.  I see yours.  Oh, Clifton.  I see him.  Clifton

11  Paul.

12    Q.  It's about 27th down from the top.

13    A.  Is the name Clifton Paul Picton?

14    Q.  Yeah.

15    A.  Okay.

16    Q.  Do you see the name there?

17    A.  I do.

18    Q.  Now, next to -- or for his row, under sale date,

19  the -- that little -- that column is empty; is that

20  correct?

21    A.  That's the way I read it, yes.

22    Q.  Meaning that no vehicle was ever purchased by

23  Mr. Picton from Greenway, correct?

24        MR. MAGRUDER:  Object to the form.

25    A.  It doesn't appear he made a purchase.

1  BY MR. HIRALDO:

2     Q.  For the other individuals on this list, where

3  their sale date section is empty --

4     A.  Yes.

5     Q.  -- does that mean that they did not purchase a

6  vehicle from Greenway?

7           MR. MAGRUDER:  Object to the form.

8           THE WITNESS:  I'm sorry.

9           MR. MAGRUDER:  You can answer.

10    A.  If the system does not have a sale recorded,

11  typically it would be a service customer.

12  BY MR. HIRALDO:

13    Q.  In what instances would the system not have a

14  sale recorded for a consumer?

15    A.  If it was a prospect who inquired about a

16  vehicle, but did not purchase one, or was a service

17  customer, one of the two.

18    Q.  Is there anything else in this document for

19  Mr. Picton that identifies whether he was a service or a

20  purchase customer?

21    A.  Does not.

22    Q.  And then you see the CRRT column for Mr. Picton

23  is blank?  Do you know why that is?

24    A.  I don't know what that column is.  I don't know

25  why it's blank.

1      Q.  All right.

2           MR. MAGRUDER:  Is now a good time to take a

3      five-minute break?

4           MR. HIRALDO:  Sure.

5           (Whereupon, a break was taken from 11:52 a.m.

6      to 12:00 p.m.)

7    BY MR. HIRALDO:

8      Q.  Let's take a look again at the request for

9    production.  Should have been...

10     A.  15?

11     Q.  Yeah.

12     A.  Okay.

13     Q.  Did you say 15?  5, right?

14     A.  Oh, I'm sorry.  Yeah, 5.

15     Q.  Yeah, there's a little plaintiff symbol -- yeah,

16   5.  So Exhibit 5.

17     A.  Gotcha.

18     Q.  We're looking at Number 6, please.

19          And the request is:  "Documents sufficient to

20   identify the total number of prerecorded messages sent."

21          And then this response makes reference again to

22   Bates 38 through 741.  Do you see that?

23     A.  I do.

24     Q.  So is it Greenway's position that a prerecorded

25   message was sent to each one of the individuals

Page 69

1    identified in Exhibits 6 and 7?

2        A.   That's the only ones -- that's the only ones I'm

3    aware of.

4        Q.   Do you know how many prerecorded messages were

5    sent?

6        A.   Do not.

7        Q.   By our count, the total number of individuals in

8    these two lists that we just covered is roughly 40,000.

9        A.   Okay.

10       Q.   Does Greenway have a different understanding?

11       A.   Greenway only paid --

12             MR. MAGRUDER:   Object to the form.

13       A.   -- for 15,000 records.

14   BY MR. HIRALDO:

15       Q.   Okay.

16       A.   But to be clear, Greenway has no way of knowing

17   that the messages were or were not sent exactly.   They

18   were handled through a third-party vendor.

19       Q.   Did Greenway ever ask BDC if the messages were

20   sent?

21       A.   I don't know that.   I do not.

22       Q.   Does BDC -- I'm sorry.   Does Greenway know if the

23   prerecorded messages that are alleged in the complaint

24   were sent to cellular telephone numbers, residential

25   telephone numbers, or both?

1           MR. MAGRUDER:  Object to the form.

2      A.   Do not know the answer to that question.

3  BY MR. HIRALDO:

4      Q.   Let's take a look at what I will mark as

5  Exhibit 8.

6      A.   Okay.

7           (Whereupon, Plaintiff Exhibit 8 was marked for

8      identification.)

9  BY MR. HIRALDO:

10     Q.   This is Greenway's production Bates 742 and 743.

11          Can you tell me what this is?

12     A.   Yes.  This is a policy, both for employees and

13  then one for vendors, specifically related to robocalls,

14  prerecorded messages, automated text messages, and

15  ringless voicemail.

16     Q.   When was this policy implemented by Greenway?

17     A.   I don't recall the exact date.  It was last year.

18     Q.   Was it in June of last year?

19     A.   A little later than that.

20     Q.   August of last year?

21     A.   I'm not trying -- I don't recall.

22     Q.   Was this policy implemented after the prerecorded

23  messages that are at issue in this case were sent?

24     A.   This is a clarification of the previous policy.

25  The previous policy, as I stated, when I came to work

1   for the company, it was said the company complies with

2   all local, state, and federal regulations.  As the year

3   went on, I clarified that policy and then handed my

4   clarification notice to counsel.  And that was the

5   production of this.

6       Q.  Where is the prior policy -- was there a written

7   policy regarding marketing calls that was in effect

8   prior to this Exhibit 8 that we're looking at?

9       A.  There is a handbook, and I -- but I don't have

10  that specific information.

11      Q.  And what is the policy that is outlined in

12  Exhibit 8?

13      A.  In this policy, that we simply don't engage in

14  any of those communication methods at all.

15      Q.  Why not?

16      A.  Over time, number one, I just don't believe that

17  they're effective.  And I don't believe that it's the

18  best way to communicate with a consumer.  So we made a

19  decision not to do it.

20      Q.  Okay.  Has Greenway engaged in any type of

21  telephone marketing since the initiation of this policy?

22      A.  Telephone marketing, certainly.

23      Q.  And how did that occur?

24      A.  It occurs regularly within dealerships that all

25  telephone marketing that has been done since I have been

1   with the company is person to person.

2       Q.   An actual live --

3       A.   A live human.

4       Q.   -- human placing a call to a consumer?

5       A.   That is correct.

6       Q.   What about the use of prerecorded messages?

7       A.   No.

8       Q.   Have any prerecorded messages been sent by

9   Greenway after the initiation of this policy?

10      A.   Not to my knowledge at all, no.

11      Q.   This policy makes specific reference to ringless

12  voicemail; is that correct?

13      A.   Robocalls, prerecorded, text, ringless voicemail,

14  yes.

15      Q.   Prior to the initiation of this policy that we've

16  marked as Exhibit 8, did Greenway have a specific policy

17  regarding ringless voicemails?

18      A.   Not that I'm aware, no.

19      Q.   Who made the decision to include ringless

20  voicemails in this policy?

21      A.   I did.

22      Q.   And why was that?

23      A.   Again, a number of different methods that we can

24  use to contact a customer.  There are a lot of different

25  marketing companies that attempt to sell us marketing.

1   And I felt that these are not methods or channels that

2   would be -- the most appropriate use of our capital with

3   the consumer.  And so I wanted to very much narrow that

4   conversation.

5      Q.  Who wrote this policy?

6      A.  I did originally and then passed it over to

7   counsel.

8      Q.  When you, Mr. Agner, wrote this policy, had you

9   become aware of the ringless voicemail campaigns that

10  had been conducted through the use of BDC Promotions?

11     A.  No.

12     Q.  Next, we will be looking at Exhibit 9.  And this

13  is a composite exhibit consisting of a Greenway

14  production Bates 1 through -- 1 through 12 and then 29

15  through 37.

16          (Whereupon, Plaintiff Exhibit 9 was marked for

17      identification.)

18  BY MR. HIRALDO:

19     Q.  All right.  Let's start with -- do you understand

20  when I'm saying "Bates 1," I'm referring to the number

21  in the bottom right-hand corner?

22     A.  Okay.  I don't know who Bates is, but I caught

23  the number.

24     Q.  All right.  So we're looking at Bates 1.  Can you

25  tell me what this document is?

1      A.   This appears to be an event order between

2    Greenway Dodge and BDC Promotions.

3      Q.   And are ringless voicemails identified in this

4    invoice?

5      A.   Yes.

6      Q.   How many?

7      A.   15,000.

8      Q.   Did somebody at Greenway pay this invoice?

9      A.   I assume so.

10     Q.   Who would have had to sign off on this invoice

11   before accounting made the payment?

12     A.   Shaun Allen.

13     Q.   Was Mr. Allen authorized to enter into contracts

14   with vendors for things like ringless voicemail

15   campaigns?

16     A.   That was before I was involved with the company.

17   And so you would have to really -- can't answer that

18   one.  I assume so based on the fact that he did it, but

19   I don't have personal knowledge of that.

20     Q.   Okay.  Let's look at the second page, which is

21   Bates Number 2.  Can you tell me what this is?

22     A.   This appears to be a repair order.

23     Q.   Okay.  For who?  Which customer?

24     A.   Clifton Picton.

25     Q.   And what is the date of this repair order?

1   A.   It looks like October of 2014.

2   Q.   Okay.  When would this repair order have been

3   handed to Mr. Picton?

4   A.   He would have seen this before any work was done

5   on his vehicle.  And then he would most likely have

6   gotten a copy of this with his receipt when the work was

7   completed.

8   Q.   Can you tell me why, under customer signature,

9   there's no signature?

10   A.   This may -- I don't know the answer to that.

11   It's very possible that this was a -- this was before a

12   charge.  I don't know why it wasn't signed.

13   Q.   Does Greenway require its service customers to

14   sign these repair orders before work begins?

15   A.   The customer would have to approve the work.  But

16   if he was waiting in the service lane and said go ahead

17   and do it, you know, they may not have required him to

18   sign at that point in time.

19   Q.   We'll look at some repair orders that -- sample

20   repair orders that were produced to us later on.  But

21   I'll represent to you that I did not see signatures on

22   any of them.

23   A.   Okay.

24   Q.   Can you tell me why that is?

25   A.   No.  I didn't run the service department, so I

1   can't tell you why they didn't have them sign them.

2      Q.   Is there any specific policy at Greenway that

3   requires a customer to sign a repair order before work

4   is commenced?

5      A.   No.   They have to consent to the work; they don't

6   have to sign it.   In fact, the consent may be given

7   electronically, verbally, or not personally.   Customer

8   may not be --

9      Q.   Over the phone?

10      A.   Yes, telephonically.

11      Q.   So the customer doesn't have to sign this for

12   work to actually begin, correct?

13      A.   That's right.

14      Q.   Now, you see there under cell there's a number

15   identified as (321) 960-1843?

16      A.   I do.

17      Q.   Okay.   And is that how Greenway obtained

18   Mr. Picton's telephone number, through this repair work

19   that was done?

20      A.   I don't know the answer to that.   Because he

21   also -- we do know that Mr. Picton submitted his

22   information through the Autotrader Trade-in Marketplace.

23   So we have multiple points of contact where that cell

24   phone number could have been given.

25      Q.   How long does Greenway keep a lead that would

1  come in, for example, through Autotrader and its eLead

2  system?

3     A.  It stays there forever.

4     Q.  And is there a -- any kind of note associated

5  with the lead source for that customer?

6     A.  Yes.

7     Q.  Okay.  So in this case for Mr. Picton, does his

8  eLead file have an indication that he submitted his

9  information through --

10    A.  Trade-in marketplace.

11    Q.  Trade-in marketplace?

12    A.  Uh-huh.

13    Q.  How does -- how does it -- what is shown in his

14 customer file for that?

15    A.  It would be his name, address.  The customer file

16 will aggregate all of his information.

17    Q.  I wasn't clear.

18       What annotation is made in the account to reflect

19 that this is a marketplace lead?

20    A.  It would give the source of the original contact,

21 Autotrader Trade-in Marketplace.

22    Q.  There's a lead source field?

23    A.  Yes, that's right.

24    Q.  If I wanted to pull a list of all leads from

25 certain sources, would I be able to do that?

1    A.   Uh-huh.  Yes.

2    Q.   Okay.  Let's look at the next page, Bates 3.

3         Do you see that very small font at the top of the

4    page?

5    A.   Yeah.

6    Q.   Well, before you get there, what is this

7    document?

8    A.   This would appear to be a receipt.  It's a part

9    of a repair order, it appears to be.  It's either a

10   receipt or diagnostic.  Appears to be a receipt.

11   Q.   Is any of that small font at the top related in

12   any way with the use of the telephone number that has

13   been provided by the customer?

14   A.   It's too small for me to read.  In this

15   reduction, I can't read it.

16   Q.   You see there that this isn't signed with the

17   prior page?

18   A.   Right.

19   Q.   Do you know why that is?

20   A.   Again, I don't.

21   Q.   Are customers required to sign receipts before

22   they can take possession of their vehicles?

23   A.   No, they're required to pay for them.

24   Q.   Just payment?

25   A.   Yeah.

1     Q.   Okay.  No signatures are needed?

2     A.   Apparently not.

3     Q.   What was the answer?

4     A.   I said, "Apparently not."  It would be a best

5  practice, but it's not required.

6     Q.   Okay.  Next page, Bates Number 4.

7     A.   Okay.

8     Q.   I'll point it out to you -- well, can you tell me

9  what this is?

10     A.   It looks like the back of a repair order where

11  the technician has inspected the vehicle and made notes.

12     Q.   Is this document provided to the service customer

13  at some point during the transaction?

14     A.   Possibly.  I don't know in this particular one.

15  It would be just simply the technician's notes.  It

16  could have been provided to the consumer.  I can't

17  determine based on looking at this.

18     Q.   So the answer is you don't know?

19     A.   The answer is I don't know based on what I'm

20  looking at.

21     Q.   Okay.

22     A.   It's made a part of the record.  It's archived

23  and kept.

24     Q.   You see under additional terms?

25     A.   Yes.

 1     Q.  It says:  "Servicing and collection contacts."

 2     A.  Uh-huh.

 3     Q.  And I'll read it to you.  It says:  "You agree

 4   that we may try to contact you in writing, by email, or

 5   using prerecorded artificial voice messages, text

 6   messages, and automatic telephone dialing system, as the

 7   law allows you" -- "as the law allows.

 8        "You also agree that we may contact you in these

 9   and other ways at any address or telephone number you

10   provide us, even if the telephone number is a cell

11   number or the contact results in a charge to you?"

12     A.  Yes.

13     Q.  What did Greenway mean when it said "servicing

14   and collection contacts"?

15     A.  It's a -- it's intended as a blanket statement of

16   contact that -- with the service or collect money, but

17   in context of the service, but also you're -- it's a

18   blanket agreement between Greenway and the consumer that

19   Greenway can contact the consumer by writing, email, or

20   by any prerecorded voice or text as part of a business

21   relationship.

22     Q.  Does the word "marketing" appear anywhere in

23   there?

24     A.  In this particular one, it does not appear to.

25     Q.  Does the word "promotional" appear anywhere in

1   there?

2       A.  Doesn't seem to, no.

3       Q.  And how would Mr. Picton have encountered this

4   additional terms section?

5       A.  It most likely -- typically, from what I'm seeing

6   here, it would be a part of the paperwork that was given

7   to him.

8       Q.  Is there a signature line anywhere on this page

9   for the customer to sign?

10      A.  Doesn't appear to be.

11      Q.  Next page is Bates 5.  Can you tell me what this

12  is?

13      A.  It's an invoice.

14      Q.  Okay.  And is it for work that Mr. Picton had

15  done on his vehicle?

16      A.  Seems to be, yes.

17      Q.  Okay.  Is this for a separate service date than

18  the one we looked at on Bates 2?

19      A.  Yes.  We were originally looking at October.

20  This is November.  And the original date here was

21  October of 2014.  This is November of 2014.  And there's

22  a delivery date also noted on here of 2006.

23      Q.  Where do you see November?  Because I see

24  September.

25      A.  I'm sorry.  September.  September, October.

1    Q.  All right.  So it looks like Mr. Picton came in,

2   in September and then he came back in October for

3   service?

4    A.  It would seem.

5    Q.  Can you tell me why the customer signature line

6   is blank again?

7    A.  Again, I don't know the answer to that question.

8   I don't know why it would not be, so...

9    Q.  Does Greenway require its customers to sign these

10  invoices before they commence work on the vehicle?

11   A.  Again, no.  To the best of my knowledge, what

12  they require the customer to do is approve the work.

13  Signature would be the best practice.  But I can't speak

14  as to the operational discipline of every detail inside

15  of a specific department.  Hope that makes sense.

16   Q.  Is there anything on this page that discusses the

17  use of the cellular telephone number that has been

18  provided by Mr. Picton by Greenway?

19   A.  Not on the front side.  I would have to see the

20  back side.  There's a front and a back.

21   Q.  Has the back been produced?

22   A.  I don't know the answer to that.  First time I'm

23  seeing this one.

24   Q.  Okay.  Take your time.

25       MR. MAGRUDER:  Can we just go off the record

1    for a second.

2         (Whereupon, a discussion was held off the

3    record.)

4    BY MR. HIRALDO:

5    Q.  So, Mr. Agner, we were just off the record.  And

6    your counsel kindly clarified for me that these Bates 5

7    and 6, while they were located within Greenway's file

8    for Mr. Picton, they do not appear to be documentation

9    that was ever generated by Greenway, given that it does

10   not have a Greenway logo on top of the page; is that

11   correct?

12   A.  I concur.

13   Q.  So we can just skip through those.

14        Let's look at Bates 7.  Can you tell me what this

15   is?

16   A.  Let's see.  Give me just a moment.

17        This appears to be an internal document that was

18   provided -- it's a summary.  It looks like the warranty

19   coverage on the vehicle.

20   Q.  Where did this summary come from?

21   A.  If it was generated internally, this is -- this

22   is something that typically would have been generated

23   out of a dealership management system.  Or it could be a

24   service history, simply a service history.  It looks

25   like it was provided by Chrysler.

Page 84

1    Q.   Provided by Chrysler?

2    A.   If you look at the -- it says:  "Strictly

3    confidential.  It was provided to dealer in accordance

4    with Section 4 of the software license with Chrysler

5    Group, LLC."

6    Q.   I see.  And when you say -- okay.  So when you

7    say the -- by Chrysler, you mean --

8    A.   The manufacturer.

9    Q.   -- the manufacturer?

10   A.   Yes, sir.

11   Q.   And so this is information that Greenway was able

12   to pull from some manufacturer database?

13   A.   That's what it appears to be.  It looks like it's

14   either a warranty notification or they're also perhaps

15   searching for open recalls.  It would be a normal part

16   of the dealership business.

17   Q.   And Bates 8 is a continuation of that first page?

18   A.   That's right.

19   Q.   All right.  Let's look at Bates 9.  Can you tell

20   me what that is?

21   A.   It is an eligibility report to determine whether

22   or not the vehicle is eligible under warranty

23   coverage -- factory warranty coverage.  That's what

24   Mopar is for.  Mopar is part of Chrysler.

25   Q.   Okay.  And then let's look at Bates 10.

Page 85

1       A.  Yep.

2       Q.  What is this document?

3       A.  It appears to be -- it appears to be something

4   that was done in the lane to identify the vehicle.  It's

5   like a cover sheet, is what it looks like.  When you

6   look at the left, concern, cause, correction, that's how

7   you would normally identify a customer -- the

8   customer -- the concern is what the customer complained

9   about.

10      Q.  Is this -- Bates 10, the document entitled

11  "service repair order request," is that for the same

12  service that was performed on October 3rd of 2014?

13      A.  It's not dated, but it appears to be, only

14  because the ABS light and the ABS light are referenced,

15  one as handwritten, one as typed.

16      Q.  I'm sorry.  You said it does not appear to be?

17      A.  It appears to be, yes.

18      Q.  It appears to be.

19      A.  It is not dated, but it appears to be because it

20  references the same complaint.

21      Q.  Is this a document that would have been completed

22  by Mr. Picton?

23      A.  No.  That's something that would have been

24  completed by the service advisor.  And then typically,

25  they would ask Mr. Picton to sign it.  But it would be

1   completed by the service advisor, whoever was assisting

2   him.

3       Q.  Was this document signed by Mr. Picton?

4       A.  It is not.

5       Q.  Does Greenway require its service customers to

6   sign service repair order requests before commencing

7   work on the customer's vehicle?

8       A.  Again, they should, but it requires them to

9   authorize the work.

10      Q.  Is there any disclosure on Bates 10 regarding the

11  use of the telephone number that has been provided by

12  the customer?

13      A.  I'm not trying to not answer your question.  I

14  would have to see the back.  But there's front and back

15  to all of these documents.  It's not on the front.

16      Q.  This is all we've been given.  Is there anything

17  on the front of the page?

18      A.  No.

19      Q.  Is there anything on the back of the page -- I

20  mean the back of the document?

21      A.  Not aware of it, no.  It's a pretty old form.  So

22  I don't know the answer to that.

23          MR. MAGRUDER:  What was the Bates number?

24          THE WITNESS:  It was 10.

25

Page 87

1    BY MR. HIRALDO:

2        Q.  All right.  Looking back at the documents that we

3    just covered --

4        A.  Yes.

5        Q.  -- which are Bates 2 through 11, with the

6    exception of the documents that are not Greenway

7    documents, can you point me to anything in there where

8    Mr. Picton agreed to the receipt of marketing or

9    promotional calls on his cellular telephone number?

10            MR. MAGRUDER:  Object to the form to the extent

11        it calls for a legal conclusion.

12            But you can answer.

13       A.  There's nothing in those documents that

14   stipulates that.

15   BY MR. HIRALDO:

16       Q.  Has Greenway ever used any type of document

17   associated with service and repair work that makes

18   specific reference to marketing or promotional calls to

19   cellular telephones?

20       A.  Not that I'm aware of, no.

21       Q.  Let's look at Bates 29, please.

22       A.  Okay.

23       Q.  Can you tell me what this document is, please?

24       A.  It appears to be a lawsuit.

25       Q.  It looks like it's a lawsuit that was filed in

1    magistrate court in Fulton County, Georgia --

2        A.   Uh-huh.

3        Q.   -- by Willis Johnson against Greenway Automotive

4    and other various Greenway entities; is that correct?

5        A.   That's how I read it, yes.

6        Q.   What was the outcome of this lawsuit?

7        A.   I don't know the answer to that.

8        Q.   How did Greenway obtain Mr. Johnson's telephone

9    number?

10       A.   You have to give me a moment because I don't know

11   exactly who Mr. Johnson is.

12       Q.   Sure.

13       A.   If this is the same gentleman that I was

14   recalling, he was a client of the Orlando Kia store,

15   also as a prospect of the Dodge store and a number of

16   other stores.  He submitted Internet leads with his

17   email and phone numbers to a number of dealerships under

18   a number of different names.

19       Q.   Mr. Johnson alleges that on or about October of

20   2018, he received a text message --

21       A.   Yeah.

22       Q.   -- from defendant's sales marketing team; is that

23   correct?

24       A.   That's what he alleges, yes.

25       Q.   Does Greenway engage in text message marketing to

1  consumers?

2     A.  No.  What he was referring to in this specific

3  incidence was a text communication from someone who

4  worked in sales at one of the stores specifically, or

5  several of the stores.

6     Q.  How did that individual send the text message to

7  Mr. Johnson?

8     A.  I don't recall on this one.  This one, I don't

9  know that it was ever disclosed.

10    Q.  Does the eLead platform have the ability to

11 transmit text messages?

12    A.  It does.

13    Q.  Does it have the ability to send --

14    A.  But only if the consumer opts in.

15    Q.  Does it have the ability to transmit mass text

16 messages?

17    A.  No.

18    Q.  Meaning you can only send one text message at a

19 time using eLead?

20    A.  Correct.  And then only if the consumer consents

21 to receive text messages.

22    Q.  Other than this lawsuit by Mr. Johnson and the

23 current lawsuit by Mr. Picton, and then there was

24 another lawsuit -- that we represent the plaintiff and

25 dismissed -- has Greenway been sued for an alleged

Page 90

1    violation of the TCPA?

2        A.   Not to my knowledge.

3            (Whereupon, Plaintiff Exhibit 10 was marked for

4        identification.)

5    BY MR. HIRALDO:

6        Q.   All right.  The next document will be Exhibit 10.

7    It's another composite consisting of Bates -- Greenway

8    production Bates 744 through 809.

9            So starting with the first page, which is

10   Bates 744, it's an email from

11   williamroberts@fcagroup.com --

12       A.   Okay.

13       Q.   -- to Shaun Allen, who was employed by Greenway,

14   correct?

15       A.   Yes.  Seems to be, yes.

16       Q.   FCA is Fiat Chrysler, correct?

17       A.   Fiat, Chrysler, Alfa Romeo.

18       Q.   The manufacturer?

19       A.   Yes.

20       Q.   Did Fiat Chrysler suggest to Greenway that it

21   contact BDC Promotions?

22       A.   In this document, they do.

23       Q.   Do you know if Fiat Chrysler was aware of the

24   ringless voicemail campaigns that are at issue in this

25   case?

1    A.  I do not know.

2    Q.  Turn to Bates 746, please.  This is an email from

3  William Specht at BDC Promotions dated February 25,

4  2018, to Shaun Allen requesting a CSV file or Excel

5  spreadsheet with certain data fields.

6        Do you see that?

7    A.  I do.

8    Q.  Did Greenway, in fact, provide BDC with that

9  information?

10   A.  Yes, sir.

11   Q.  And was that the list that we looked at

12  previously which contained Mr. Picton's name?

13   A.  I believe that's where that list came from.

14  There were two lists.  One of them I don't know where it

15  came from.  That one, I do.

16   Q.  All right.  Next page, 747.  This is an email

17  from Mr. Allen to Mr. Specht dated February 5, 2018, at

18  1:02 p.m.  Do you see there where he says, in part, does

19  that say 3800 for -- $3,800 for ringless voicemails?

20  I'm paying less than $2,000 for 4,000 currently.

21   A.  Yes.

22   Q.  Who was he paying $4,000 -- or $2,000 to for

23  4,000 ringless voicemails?

24   A.  I don't know that that did or didn't happen.  It

25  may have been simply a negotiating tactic on his part.

1  But I don't know -- I'm not aware of any other

2  campaigns.

3     Q.  Was Greenway -- so that's -- my next question is:

4  Did Greenway engage in any other ringless voicemail

5  campaigns prior to the campaigns that were done through

6  BDC?

7     A.  Not that I'm aware of.

8     Q.  So it's possible he was just posturing?

9     A.  I believe it was a posturing and negotiating.  I

10  don't know for a fact, but that would be my supposition.

11     Q.  Let's look at Bates 750, email from Shaun Allen

12  to Alesia --

13     A.  McWhite.

14     Q.  -- McWhite --

15     A.  Uh-huh.

16     Q.  -- at Greenway Dodge.  Who is Alesia McWhite?

17     A.  It appears she was the one -- she was the person

18  that he needed to pay the bill.  She worked in

19  accounting.

20     Q.  Okay.  When he says can you do 75 percent new and

21  25 percent used, what does he mean by that?

22     A.  He's referring to an expense allocation.  So if

23  they pay $10,000 for something, he's telling her to

24  charge 75 percent of the cost to the new car department

25  and 25 percent to the used car department.

Page 93

1    Q.   Bates 756, please.  Can you tell me what this is?

2    A.   Appears to be the check by which they paid BDC

3    Promotions.

4    Q.   For the invoice that we looked at earlier on --

5    actually, we didn't look at it.  It's in here too.  It's

6    752.

7         Is that payment --

8    A.   That would appear to be the payment for the

9    invoice.

10   Q.   So on 756 is payment for the invoice that's

11   referred to on 752?

12   A.   That would seem to match, yes.  Yep, that

13   matches.

14   Q.   Let's look at 792.

15   A.   All right.

16   Q.   Can you tell me what this email is about?

17   A.   This appears to be the script that they agreed to

18   use for the campaign we're discussing.

19   Q.   Did Mr. Allen approve the use of this script

20   after it was sent to him by Mr. Specht?

21   A.   Yes.

22   Q.   Did Mr. Allen approve the use of the Greenway

23   name in this message?

24   A.   He approved the script, so that's part of it,

25   yeah.

1    Q.  All right.  Let's look at 796.  This is an email

2    from Mr. Specht to Shaun Allen and the subject line is

3    BDC appointments generated 2/21.

4         What appointments is he referring to in this

5    email?

6    A.  He would be referring to the appointments that

7    his business development center supposedly generated

8    based on this campaign.

9         And to be clear -- I do want to clarify one other

10   thing -- when you're asking if Shaun authorized use of

11   the Greenway name, he specifically authorized the use of

12   Greenway Dodge, and only Greenway Dodge.

13   Q.  I understand.

14   A.  But in this, what they're referring to is, as

15   part of the promotion, Mr. Specht's business development

16   center says they have generated appointments on behalf

17   of the dealership.

18   Q.  Now, these appointments, were they generated as a

19   result of the prerecorded message that was sent on 2/21

20   or something else?

21   A.  I believe it was something else, if you look back

22   in the paperwork.  But I'll have to go back and dive

23   through real quickly.  Give me a minute --

24   Q.  Are you referring to the live calls --

25   A.  Yes.

1    Q.  -- that are referred to in the invoice?

2    A.  Yes.  It's not clear where those appointments

3  came from.  So it could have been through live calls.

4  It could have been through prerecorded.  It's not clear.

5    Q.  Does Greenway know if the prerecorded messages

6  campaign generated any leads?

7    A.  I have no idea.

8    Q.  Would Greenway -- would Greenway have any

9  indication in its database as to where the lead source

10  came from?

11    A.  Not on something like this, no.  That was a

12  campaign.  And a campaign is classed completely

13  differently than something else.  It's a lump sum.  So

14  there would be no specific indicator that one came from

15  this part or that part or that part.  It would be part

16  of the one campaign.

17    Q.  And so the campaign that was performed by BDC

18  consisted of ringless voicemails, correct?

19    A.  Check.

20    Q.  Live calls?

21    A.  Yes.

22    Q.  And direct mailers?

23    A.  That is correct.

24    Q.  And the live call component of this campaign,

25  what was it?

1      A.   That would be people calling, live human beings

2   calling customers.

3      Q.   What about the direct mail?

4      A.   That would be mail sent by the postal service.

5      Q.   So let's look at 801.

6           Is your answer the same, you don't know where

7   the -- where -- you don't know whether these leads were

8   generated as a result of the prerecorded messages or the

9   live calls; is that correct?

10          MR. MAGRUDER:   Object to the form.

11     A.   That's correct.   There's no delineation.

12  BY MR. HIRALDO:

13     Q.   This next document is another composite.   It's

14  Bates labeled 810, 811, and the last page being 851.

15  It's Exhibit 11.

16          (Whereupon, Plaintiff Exhibit 11 was marked for

17     identification.)

18  BY MR. HIRALDO:

19     Q.   Do you recognize this document?

20     A.   It appears to be a sales log or a prospect log,

21  but I can't specify that, based on what I'm looking at.

22     Q.   Do you see the first column says lead date?

23     A.   Yep.

24     Q.   Does that help you answer the question?

25     A.   These are leads that came on -- these are leads

1   that came in, but it doesn't tell me what the source of

2   the lead was.  But yes, that's -- that's a desk log.

3      Q.  Was this lead list provided by Greenway to BDC?

4      A.  I don't know where this came from, specifically.

5      Q.  Does Greenway know if live calls were placed to

6   the individuals identified in this list?

7      A.  I have no knowledge.  There is no way for me to

8   know that, based on what I'm looking at.

9      Q.  Okay.  Would there have been an email

10  communication attaching this list to BDC?

11          MR. MAGRUDER:  Object to the form.

12     A.  I can't tell you how it was -- I don't know how

13  it was delivered to BDC, so I don't know.  It could have

14  been just downloaded.  It could have been printed.  I

15  don't know how it was delivered.

16  BY MR. HIRALDO:

17     Q.  Were prerecorded messages sent to the individuals

18  in this list?

19     A.  There's no way to know, based on looking at this.

20     Q.  The next exhibit is another composite, which is

21  852 through 862.

22          (Whereupon, Plaintiff Exhibit 12 was marked for

23      identification.)

24  BY MR. HIRALDO:

25     Q.  The first page, 852, is an email from Mr. Specht

1    to Shaun Allen.  It says:  "Appointments generated from

2    tonight's efforts.  I spent a lot of extra money on live

3    agents and RBMs for this weekend, and I think it's going

4    to pay off."

5         These appointments, does Greenway know, the

6    appointments that are reflected on the following pages,

7    if they were as a result of the prerecorded message

8    campaign, the live campaign, or both?

9         MR. MAGRUDER:  Object to the form.

10    A.  The best answer I can give you is that there's no

11    way to know that.  Nothing is delineated.  And then

12    other than Mr. Specht saying -- telling us that this is

13    what happened, we don't know.

14    BY MR. HIRALDO:

15    Q.  Flip over to 861, please.

16    A.  Okay.

17    Q.  It's an email from Mr. Specht dated February 24th

18    to Shaun Allen.

19    A.  Yes.

20    Q.  And then, in part, it says:  "Deployment to home

21    or cells, date Monday, February 26th at 1:00 p.m.,

22    21,000 total."

23    A.  Yes.

24    Q.  All right.  What does that mean?

25    A.  My understanding is that this is the phone number

1   that Shaun would have used to record the outbound voice

2   message and that Mr. Specht is telling him that his

3   voice message will be sent on that date to this number

4   of people.

5      Q.  To home and cellular telephones?

6      A.  Yes.  Well, it's not -- it's clearly what he's

7   saying, yes, deployment to home and/or cell phone

8   numbers.  There's no way of specifying how many belong

9   to which category.

10     Q.  Next page, 862.

11     A.  Okay.

12     Q.  It's an email from Shaun Allen to Mr. Specht.  It

13  says:  "This is the phone number to use for ringless

14  voicemails in March for callbacks."

15     A.  Okay.

16     Q.  And there's a number there, (407) 605-5908.

17     A.  Yes.

18     Q.  What is that number?

19     A.  It would be the phone number that Shaun wished to

20  have placed in the campaign as the phone number the

21  customer would call.

22     Q.  If a customer would have called that number, who

23  would have answered?

24     A.  I don't know specifically.  Most likely it would

25  have rung back to the sales center.  It would go back to

1    the dealership.

2        Q.  Somebody within the BDC department?

3        A.  I don't know.  I have no way of knowing

4    specifically.  Could have gone to the sales desk.  Could

5    have gone to the BDC.  Could have gone to a personal

6    cell phone that someone used.  It could have gone to any

7    number of places.

8        Q.  What does BDC mean?

9        A.  Business development center.

10       Q.  Does Greenway have a BDC department?

11       A.  You're specifically referring to the Dodge store.

12   They have an Internet and telephone department.  I don't

13   believe they have what we could call a BDC.  They have

14   more of an Internet department, though.

15       Q.  Do you know if this number that's identified here

16   leads back to somebody at Greenway?

17       A.  I do not know that.

18       Q.  And then he makes reference to ringless

19   voicemails in March.  Was a ringless voicemail campaign

20   conducted in March?

21       A.  I don't know.  The only one I'm familiar with is

22   exactly the one we're discussing.

23       Q.  All right.  Next list -- next document is

24   Exhibit 13.  It's a BDC document that we're provided in

25   response to a subpoena.  It's a composite exhibit

1    consisting of Bates 21, 23, through 2124, and then 2979.

2            (Whereupon, Plaintiff Exhibit 13 was marked for

3        identification.)

4    BY MR. HIRALDO:

5        Q.  Do you recognize the list that follows the email?

6        A.  No.

7        Q.  Do you know where that came from?

8        A.  I do not.

9        Q.  Was that something that was provided by Greenway

10   to BDC?

11       A.  I have no way to know that.  And I specifically

12   have never seen one that has numbers down the left-hand

13   side.

14            (Whereupon, Plaintiff Exhibit 14 was marked for

15       identification.)

16            MR. HIRALDO:  The next document is Exhibit 14,

17       which is another BDC response Bates labeled 38

18       through 41, and then the last page being 449.

19   BY MR. HIRALDO:

20       Q.  Do you recognize the list that follows the email

21   communication in this composite exhibit?

22       A.  Again, no, I don't recognize the list.  It's not

23   a format I'm familiar with.

24       Q.  Is this something that came from eLeads -- from

25   the eLead platform?

1      A.  No, it definitely did not.

2      Q.  Do you know if this is a list that was purchased

3   by BDC?

4      A.  I don't know where the list came from.  I can

5   tell you where it did not come from, but I can't tell

6   you where it came from.

7      Q.  So it did not come from Greenway?

8      A.  It did not come from eLeads.  It did not.

9      Q.  So the next thing we're going to look at is an

10  Excel spreadsheet, and I'll show it to you on this

11  laptop because of the length.  This was something that

12  was produced to us in discovery.  And the file name is

13  M1044691A.

14     A.  Okay.

15     Q.  Do you recognize -- and you're welcome to just

16  scroll through it.  It's touch screen.

17     A.  Do you mind if I stand up?

18     Q.  No.  No.  Can you tell me what this is?  Where

19  did it -- where did it come from, first of all?

20     A.  It's a spreadsheet, so it's just -- I have no

21  idea where it originally came from.  It's simply

22  electronically produced.  And the file name is not one

23  that I'm familiar with at all.  We don't use file names

24  like that internally.

25     Q.  Okay.  Well, this was given to us by Greenway in

Page 103

1    discovery.

2        A.   Understand.

3        Q.   But Greenway doesn't know where it came from?

4        A.   No.   That's not a format -- that type of file

5    name is not one that -- that we would normally use.  So

6    I don't know exactly how it was generated.

7        Q.   Did BDC give this Excel spreadsheet to Greenway?

8        A.   That would be my guess, but I can't -- I can't

9    swear to that.  It would be my guess.  It has 20,000

10   names on it.  So it looks like something that BDC would

11   have generated.  That's not a Greenway file name,

12   typically.

13       Q.   So as far as Greenway knows, this is not one of

14   its files?

15       A.   No, sir.

16       Q.   The next Excel spreadsheet that we're looking at

17   is called "BDC Promotions-Greenway Dodge

18   NCOA-dedup-radiusappend."

19       A.   Okay.

20       Q.   Do you recognize that name?

21       A.   I have never seen it before, but I can tell you

22   what it is.

23       Q.   What is it?

24       A.   By the name of it, NCOA stands for National

25   Change of Address.

1    Q.  Okay.

2    A.  And dedup radius append.  So my -- my best

3  professional guess on that one would be that that was a

4  document provided by BDC Promotions to take sorted

5  records and to add other information to them and to

6  remove information from them.  That's what -- that's

7  what a dedup radius append is.

8    Q.  So is this a list of -- I'll represent to you, if

9  you do a control F, Mr. Picton's name appears on

10  Line 7932.

11    A.  Okay.

12    Q.  Okay.  Is this a document that was originally

13  provided of customers to BDC?

14    A.  That would be my best guess.

15    Q.  And then it was BDC's job to do an update through

16  the National Change of Address database?

17    A.  That's what it appears to be.

18    Q.  For purposes of sending mailers?

19    A.  Direct mail.

20    Q.  And then why do a radius append?

21    A.  When they changed the address, they would -- the

22  best answer would be you don't want to market to people

23  too far away.

24    Q.  Okay.  Do you know if everyone on this list was

25  sent a prerecorded ringless voicemail?

1    A.  I don't know if anyone on this list received a

2  voice message.

3    Q.  Do you know if anybody on this list was sent a

4  direct mail?

5    A.  I don't know for certain, but that's what you

6  would use a list like that for, would be a mail piece,

7  postal mail.  Otherwise, you wouldn't need the change of

8  address.

9         MR. HIRALDO:  Let's take a quick bathroom

10     break.

11         (Whereupon, a break was taken from 12:52 p.m.

12     to 12:57 p.m.)

13  BY MR. HIRALDO:

14    Q.  Mr. Agner, I'd like to next look at some

15  documents that were recently produced by Greenway in a

16  folder called "deals"?

17    A.  Okay.

18    Q.  And these look like -- what do you refer to them

19  as in the -- in the industry, dealer -- deal jackets

20  or --

21    A.  Deal jackets.

22    Q.  Deal jackets, right.

23         What is a deal jacket comprised of?

24    A.  A deal jacket is the paperwork that we're

25  required to keep by law for someone who has purchased a

1   vehicle.

2      Q.   Okay.  So this is a sampling of deal jackets for

3   individuals that were purchase customers who were sent

4   prerecorded messages.

5         And my question to you is -- I'd like to try to

6   do this as efficiently as possible.  Can you point me to

7   where within these closing documents there's a reference

8   to the use of the consumer's telephone number for

9   marketing purposes?

10     A.   Sure.

11     Q.   It's touch screen too.  Use a mouse.  That will

12   make it easier.

13         MR. MAGRUDER:  Did you compile this from -- are

14      these directly from those folders or did you compile

15      these?

16         MR. HIRALDO:  No, it's -- I basically just took

17      the folder and put it --

18         MR. MAGRUDER:  Okay.  Because it might be

19      word-searchable, if you wanted to...

20     A.   There's a partial one on 907, where there's a

21   contact statement.  I made that bigger.  Sorry.  Make it

22   easier to read.

23         What I'm looking for I haven't found quite yet.

24   It's called a "privacy statement."  There's also a

25   statement on 907.

1   BY MR. HIRALDO:

2       Q.  So we're looking at -- let's get a couple of

3   things on the record.  We're looking at a file called

4   1504 Quintero -- Q-U-I-N-T-E-R-O, comma, Victor, and

5   then the letter M dot PDF.  This is Greenway 907,

6   Bates 907.  And then within -- where in 907 are you

7   looking at?

8       A.  You agree that we may try to contact you -- voice

9   message, text message -- you also agree that we may try

10  to contact you in other ways, address, telephone

11  provided, even it's a cell phone number.

12      Q.  And so you're looking at the subparagraph called

13  "servicing and collection contacts?

14      A.  Yeah, correct.

15      Q.  The servicing and collection contact language

16  looks very similar to the additional terms language in

17  the invoice, the invoice that we reviewed earlier,

18  correct?

19      A.  Yes, it does.

20      Q.  Okay.  Is this standard language that Greenway

21  essentially has used in all its various contracts?

22      A.  It would appear to be, yes.

23      Q.  Does that language, like the invoice language

24  that we looked at before, make any reference to

25  marketing calls?

Page 108

1     A.   Does not.

2     Q.   Does it make any reference to promotional calls?

3     A.   Does not.

4     Q.   Instead, it specifically makes reference to

5  servicing and collection contacts?

6     A.   Yes, it does.

7     Q.   You want to keep going?

8     A.   Yes, sir.

9     Q.   I don't know how you want to identify this, but

10  it is 938.  And then there is quite a bit of

11  conversation in this privacy notice, which also I

12  believe it's going to reference promotions or

13  marketing -- promotions and it also has a consent clause

14  right there.

15          So then we're looking at Bates 938.  Can you --

16  I'm having a hard time reading this.  Can you read for

17  me where it says -- where it talks about calls?

18     A.   And as you're aware, we acquired information to

19  help you purchase a vehicle -- another dealership -- the

20  information collected comes from a number of sources,

21  which includes credit reporting, you, credit reporting

22  agencies, lenders and our -- and this dealership.  The

23  information was about the type of vehicle and the price

24  as well.

25          Information we receive from you may be -- must be

1   shared with certain other entities.  We will share

2   information in order to help you obtain financing.  We

3   may share your information with other manufacturers.  We

4   offer a number of products to customers when they

5   purchase their vehicle to enhance their ownership

6   experience, including but not limited to -- and it names

7   a number of things -- service contracts, accident/health

8   insurance.  When you purchase products, information is

9   shared with the companies that provide these products.

10          We may use the information to contact you.  We

11   may send you a newsletter or other information.  We're

12   proud of our service department managers and

13   technicians.  From time to time, we may access customer

14   information so we may advise you regarding special

15   promotions and service or information regarding your

16   vehicles.  In the future, we may even make promotions

17   regarding the purchase of vehicles.

18          It is our hope that your experience was an

19   enjoyable one that you remember when purchasing vehicles

20   and service in the future.  We restrict access to

21   nonpublic information about you to employees who need to

22   know that information.

23          We maintain physical, electronic, and procedural

24   safeguards that comply with federal regulations to guard

25   your nonpublic personal information, do not sell or give

1   information to third parties.  And the customer must

2   acknowledge they received that.

3          And by signature, we hereby consent in

4   participation, financing of the vehicle, to a primary

5   investigation, the option, credit, employment history,

6   obtaining information in effect, such as not obligated

7   to the vehicle -- the vehicle can only be purchased with

8   finance -- and then basically says that you don't have

9   to finance with us.

10         But I would construe that privacy notice to

11  inform the customer that they may be marketed to with

12  the information that is provided.

13     Q.  Does that privacy notice make reference to the

14  use of prerecorded messages by Greenway?

15     A.  It does not specifically note any channel.  So

16  no, it does not specifically note prerecorded messages.

17     Q.  What about the language underneath the privacy

18  notice?  Does the make reference to prerecorded

19  messages?

20     A.  Does not.

21     Q.  Is there anything in the deal jacket that we're

22  looking at here that specifically references the use of

23  prerecorded messages for marketing purposes to cellular

24  telephones?

25     A.  No.

1    Q.  Is there anything in -- has Greenway ever used

2   any document in the sale of a new or used vehicle which

3   makes specific reference to the use of prerecorded

4   messages for marketing purposes to an individual's

5   cellular telephone?

6          MR. MAGRUDER:  Object to the form.

7    A.  Not to my knowledge, not since I have been here.

8   I can't testify to what they have done previously

9   specifically to that.

10  BY MR. HIRALDO:

11   Q.  Have you looked, Mr. Agner, at these deal jackets

12  that have been produced to us as a sample --

13   A.  Not all.  I have gone through partially, but not

14  entirely.

15   Q.  How many deal jackets did you look at in your

16  review?

17   A.  This is the first time I've reviewed deal

18  jackets.

19   Q.  Do you know if within any of the deal jackets

20  there is disclosure language that talks about the use of

21  prerecorded marketing messages?

22   A.  I don't know that.

23   Q.  And as you see here today, you don't know if

24  Greenway has ever used anything like that, correct?

25   A.  Specifically regarding prerecorded messages, no,

Page 112

1   I don't know that.

2      Q.   What about in its service documentation?  Has

3   Greenway ever used anything that says you hereby agree

4   to use -- you hereby agree to receive prerecorded

5   marketing messages on your cellular telephone?

6      A.   In the specifics, not since I've been here, no.

7   Not since I've been with the company.  I don't know they

8   did that.  I don't know that's -- to the best of my

9   knowledge, we do not, simply because it's not a

10   marketing channel we would use.  We do, however, you

11   know, reference it on our websites.

12      Q.   Okay.  Let's look at some service contracts -- or

13   just one, rather.

14         This is a file called "Abbate," A-B-B-A-T-E,

15   "-19099."

16         Can you just flip through this and let me know if

17   you see anything in here that talks about using

18   prerecorded messages for marketing purposes.

19      A.   Let's see.  20539 does specifically speak to

20   that, and it's the same disclosure that we've seen

21   multiple times:  You agree that we may try to contact

22   you in writing, by email, using prerecorded artificial

23   voice messages, text messages, automatic telephone

24   dialing systems, as the law allows.  We may try to

25   contact you in other ways, at any address or telephone

Page 113

1  number, even if it's a cell phone number.

2      Q.  That doesn't -- that's the same disclosure that

3  we looked at before that doesn't make reference to

4  marketing, correct?

5      A.  That's correct.

6      Q.  Same disclosure we looked at before that doesn't

7  make reference to promotional messages, correct?

8      A.  That is correct.

9      Q.  Instead, it specifically makes reference to

10 service and collections, correct?

11     A.  Yes, that's correct.

12     Q.  Do you want to keep looking through that

13 document?

14     A.  That's the end of the document.

15     Q.  Okay.  Are you aware -- I'll ask this again:  But

16 are you aware of any language that Greenway has ever

17 used in any of its service agreements that specifically

18 makes reference to prerecorded marketing messages?

19     A.  No, I am not.

20     Q.  Just give me five minutes.  I'm going to call my

21 co-counsel.

22         (Whereupon, a break was taken from 1:12 p.m.

23     to 1:16 p.m.)

24         MR. HIRALDO:  I'm all set.  Mr. Agner, thank

25     you for your time.  I have no further questions.

Page 114

1         MR. MAGRUDER:  I have, just very brief.

2                    CROSS-EXAMINATION

3    BY MR. MAGRUDER:

4      Q.  We've had a chance to look at the deal jacket

5    that you were discussing with plaintiff's counsel

6    earlier.

7         Just for the record, it's the Quintero, Victor.

8    The -- the specific Bates numbers that plaintiff's

9    counsel asked you about were 907 and 938.

10        Have you identified any other places in that deal

11   jacket whereby Greenway makes any disclosures regarding

12   the use of phone numbers or other personal information

13   to customers?

14     A.  Yes.  915 and -- 914 and 915 are part of one

15   document.  And in 915, it does, in fact, disclose that

16   we are going to use and contact the customer -- using

17   the information they've given us.  It specifically talks

18   about their information.  And Mr. Quintero did sign

19   that.

20     Q.  And maybe to preempt plaintiffs' followup here:

21   Neither of those two Bates numbers that you mentioned

22   specifically reference ringless voicemails, correct?

23     A.  They do not.

24     Q.  But they provide a general disclosure regarding

25   specifically promotional and marketing contact that

1   Greenway may make to customers, correct?

2      A.   They do.

3          MR. MAGRUDER:  Okay.  That's all I have.

4          MR. HIRALDO:  I have nothing else.  We'll order

5      just an e-tran.

6          MR. MAGRUDER:  We'll take a copy, e-tran.

7          He'll read.

8          (Thereupon, the proceedings concluded at

9      1:18 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OATH

2

3   STATE OF FLORIDA:

4   COUNTY OF ORANGE:

5

6      I, Jazzmin A. Musrati, RPR, CRR, Notary Public, State

7   of Florida, do hereby certify that CHARLES AGNER

8   personally appeared before me on July 1, 2019, and was

9   duly sworn and produced driver's license/I.D. as

10  identification.

11

12               Signed on July 14, 2019.

13

14

15  _____

    Jazzmin A. Musrati, RPR, CRR

16  Notary Public - State of Florida

    My Commission No. FF984627

17  My Commission Expires:  April 21, 2020

18

19

20

21

22

23

24

25

Page 117

1           CERTIFICATE OF REPORTER

2   STATE OF FLORIDA:

3   COUNTY OF ORANGE:

4

5      I, Jazzmin A. Musrati, RPR, CRR, Notary Public, State

6   of Florida, certify that I was authorized to and did

7   stenographically report the deposition of CHARLES AGNER;

8   that a review of the transcript was requested; and that

9   the foregoing transcript, Page 1 through 119, is a true

10  and accurate record of my stenographic notes.

11      I further certify that I am not a relative, employee,

12  or attorney, or counsel of any of the parties, nor am I

13  a relative or employee of any of the parties' attorneys

14  or counsel connected with the action, nor am I

15  financially interested in the action.

16

17           DATED:  July 14, 2019.

18

19

20  _____

        Jazzmin A. Musrati, RPR, CRR

21      Registered Professional Reporter

        Certified Realtime Reporter

22

23

24

25

1                    ERRATA SHEET

2        DO NOT WRITE ON TRANSCRIPT-ENTER CHANGES HERE

3                IN RE:    PICTON V. GREENWAY
                 CASE NO:  6:19-CV-00196-GAP-DCI

4                DATE:     JULY 1, 2019
                 DEPONENT: CHARLES AGNER

5

6    PAGE NO.    LINE NO.   CORRECTION & REASON

7    _____     _____    _____

8    _____     _____    _____

9    _____     _____    _____

10   _____     _____    _____

11   _____     _____    _____

12   _____     _____    _____

13   _____     _____    _____

14   _____     _____    _____

15   _____     _____    _____

16   _____     _____    _____

17   _____     _____    _____

18   _____     _____    _____

19   _____     _____    _____

20   _____     _____    _____

21   _____     _____    _____

22   Under penalties of perjury, I declare that I have read
     the foregoing document and that the facts stated in it

23   are true."

24

     _____

25   DATE                                    CHARLES AGNER

```
 1   07/16/2019
 2   CHARLES AGNER
     c/o G. BROCK MAGRUDER, III, Esq.
 3   Gray Robinson
     301 East Pine Street
 4   14th Floor
     Orlando, Florida 32801
 5   brock.magruder@gray-robinson.com
 6   In Re:  July 1, 2019, Deposition of CHARLES AGNER
 7   Dear CHARLES AGNER:
        This letter is to advise that the transcript for the
 8   above-referenced deposition has been completed and is
     available for review.  Please contact Veritext at
 9   305.376.8800 to make arrangements for read and sign or
     sign below to waive review of this transcript.
10
        It is suggested that the review of this transcript be
11   completed within 30 days of your receipt of this letter,
     as considered reasonable under Federal Rules*; however,
12   there is no Florida Statute to this regard.
13      The original of this transcript has been forwarded to
     the ordering party and your errata, once received, will
14   be forwarded to all ordering parties for inclusion in
     the transcript.
15                            Sincerely,
16
                             Jazzmin A. Musrati, RPR, CRR
17                           Registered Professional Reporter
                             Certified Realtime Reporter
18
     cc:  MANUEL S. HIRALDO, Esquire
19       G. BROCK MAGRUDER, III, Esquire
20   Waiver:
21   I,_____, hereby waive the reading and signing
     of my deposition transcript.
22
23
     _____    _____
24   Deponent Signature           Date
25   *Federal Civil Procedure Rule 30(e)/Florida Civil
     Procedure Rule 1.310(e)
```

**&**

**&** 118:6

**0**

**0001** 27:4
**00196** 1:3 118:3
**07/16/2019** 119:1

**1**

**1** 1:14 3:10 7:18,19
 73:14,14,20,24
 116:8 117:9 118:4
 119:6
**1.310** 119:25
**1/2** 14:3
**10** 3:22 46:8 84:25
 85:10 86:10,24
 90:3,6
**10,000** 92:23
**100** 20:24
**101** 4:4,6
**10:41** 1:15 5:4
**11** 4:1 87:5 96:15
 96:16
**11,000** 20:21 24:7
**114** 3:4
**116** 3:5
**117** 3:6
**118** 3:6
**119** 3:7 117:9
**11:52** 68:5
**12** 4:2 20:5 41:8
 49:16 73:14 97:22
**1200** 2:7
**12:00** 68:6
**12:52** 105:11
**12:57** 105:12
**13** 4:4 44:24 49:13
 49:16 100:24 101:2
**14** 4:6 49:11 52:7
 56:9 101:14,16
 116:12 117:17

**1400** 2:3
**14th** 1:16 2:12
 119:4
**15** 68:10,13
**15,000** 69:13 74:7
**150,000** 20:19
**1504** 107:4
**15th** 15:23
**1843** 20:10 23:12
**19** 3:11
**19099** 112:15
**1950** 2:8
**1989** 13:25
**1:00** 98:21
**1:02** 91:18
**1:12** 113:22
**1:16** 113:23
**1:18** 1:15 115:9

**2**

**2** 3:11 19:20,22
 26:19 59:8 74:21
 81:18 87:5
**2,000** 91:20,22
**2/2/2018** 3:23
**2/21** 94:3,19
**2/23/2018** 4:2,4
**20** 10:3
**20,000** 103:9
**2006** 81:22
**2014** 60:5 75:1
 81:21,21 85:12
**2018** 15:24 18:2,4
 18:11,20 19:11
 20:9 21:10,14
 23:13 40:4,6,22
 50:19 51:14 54:14
 88:20 91:4,17
**2019** 1:14 54:14
 116:8,12 117:17
 118:4 119:6

**2020** 116:17
**20539** 112:19
**20816** 116:14
 117:19
**21** 18:2 20:8 21:10
 101:1 116:17
**21,000** 98:22
**211-6060** 25:4
**2124** 101:1
**23** 101:1
**24** 24:4
**24th** 98:17
**25** 3:12 91:3 92:21
 92:25
**26th** 98:21
**270** 61:14
**27th** 66:12
**28** 18:4 23:13
**283** 61:19
**284** 61:18
**287** 61:20
**28th** 24:1
**29** 73:14 87:21
**2979** 101:1

**3**

**3** 3:12 25:20,22
 26:20 31:16 46:8
 78:2
**3,800** 91:19
**30** 119:11,25
**301** 1:16 2:12 119:3
**305.376.8800** 119:9
**321** 76:15
**32801** 1:17 2:13
 119:4
**33131** 2:8
**33301** 2:4
**37** 73:15
**375** 61:20 66:3
**38** 61:2,13 68:22
 101:17

**3800** 91:19
**3rd** 85:12

**4**

**4** 3:13 35:5 41:8
 45:24 46:1 49:10
 79:6 84:4
**4,000** 91:20,22,23
**40,000** 69:8
**401** 2:3
**407** 21:5,6 22:15
 24:9,13 25:4 99:16
**407.204.3100** 2:13
**41** 101:18
**43** 61:13
**44** 20:6
**449** 101:18
**46** 3:13 9:7,8 23:11
**47** 23:20

**5**

**5** 3:2,3,3,15 14:3
 57:8,12 60:18
 68:13,14,16,16
 81:11 83:6 91:17
**5/7/2018** 4:7
**50** 25:3
**51** 25:6
**57** 3:15

**6**

**6** 3:17 4:5 61:6,7,12
 62:3 63:1,6,21
 68:18 69:1 83:7
**605-5908** 24:9,13
 99:16
**61** 3:17,18
**6:19** 1:3 118:3

**7**

**7** 3:10,18 26:4 46:5
 61:6,9,17 64:13
 69:1 83:14

**70** 3:19
**704-2962** 21:5,6 22:15
**72** 20:23
**73** 3:21
**741** 61:2,21 68:22
**742** 70:10
**743** 70:10
**744** 90:8,10
**746** 91:2
**747** 91:16
**75** 92:20,24
**750** 92:11
**752** 93:6,11
**756** 93:1,10
**786.496.4469** 2:9
**792** 93:14
**7932** 104:10
**796** 94:1

**8**

**8** 3:19 70:5,7 71:8 71:12 72:16 84:17
**801** 96:5
**809** 90:8
**810** 96:14
**811** 96:14
**851** 96:14
**852** 97:21,25
**861** 98:15
**862** 97:21 99:10

**9**

**9** 3:21 73:12,16 84:19
**90** 3:22
**9001** 8:14,20
**907** 106:20,25 107:5,6,6 114:9
**914** 114:14
**915** 114:14,14,15

**938** 108:10,15 114:9
**954.400.4713** 2:4
**96** 4:1
**960-1843** 76:15
**97** 4:2

**a**

**a.m.** 1:15 5:4 68:5
**abbate** 112:14
**ability** 89:10,13,15
**able** 20:24 24:3 30:21 42:19 44:3 48:14,22,23 77:25 84:11
**abreast** 29:14
**abs** 85:14,14
**accept** 24:6
**access** 109:13,20
**accident** 109:7
**account** 47:18 77:18
**accounting** 74:11 92:19
**accurate** 117:10
**acknowledge** 110:2
**acquired** 52:9,11 108:18
**act** 55:1,4
**action** 3:11 19:20 117:14,15
**actively** 16:20
**activities** 35:12,20 39:15,19
**actual** 72:2
**ad** 14:22
**add** 104:5
**added** 40:4 65:7
**addition** 58:18
**additional** 20:19 24:2 37:2 79:24 81:4 107:16

**address** 8:13 47:8 52:18 59:10,18 60:22 77:15 80:9 103:25 104:16,21 105:8 107:10 112:25
**addresses** 62:9 64:16
**advantage** 20:24 23:23
**advertisers** 52:23
**advertising** 3:19 25:8
**advice** 40:12
**advise** 109:14 119:7
**advisor** 85:24 86:1
**affirm** 5:7
**affirmed** 5:13
**afternoon** 20:14
**agencies** 108:22
**agents** 98:3
**aggregate** 77:16
**agner** 1:13 3:2,2 5:12,19,20 6:13 19:10,25 28:21 32:16 40:11 55:23 61:15 73:8 83:5 105:14 111:11 113:24 116:7 117:7 118:4,25 119:2,6,7
**ago** 6:20 54:7 58:14
**agree** 16:24 53:15 60:8 80:3,8 107:8,9 112:3,4,21
**agreed** 4:16 36:4 59:22 87:8 93:17
**agreement** 28:8 56:6 80:18
**agreements** 113:17

**agrees** 53:19
**ahead** 75:16
**alert** 32:4 33:1
**alesia** 92:12,16
**alfa** 90:17
**allegation** 20:8 22:14 23:16 25:6 25:12
**alleged** 18:1 23:19 69:23 89:25
**alleges** 23:11 88:19 88:24
**allen** 3:23 4:3,7 19:8,13,16 23:21 28:12 74:12,13 90:13 91:4,17 92:11 93:19,22 94:2 98:1,18 99:12
**allocation** 92:22
**allows** 37:13,23 48:20 80:7,7 112:24
**amended** 3:11,14 19:20 45:24
**annotation** 77:18
**answer** 9:10 10:1 11:4 13:4 16:14 17:3,8,24 21:15,17 22:11,20 24:15,20 27:20 31:13 34:9 34:18,25 35:11 36:8,21 37:17 38:10,12,20 39:10 39:23 40:23,24 41:7,16 42:5,23 43:9 44:21 45:20 50:23 51:17 52:4 53:6 55:2 57:25 60:13,14 62:14 64:6,11 67:9 70:2 74:17 75:10 76:20

79:3,18,19 82:7,22
86:13,22 87:12
88:7 96:6,24 98:10
104:22
**answered** 26:15
32:11 99:23
**answers** 3:12,14
7:14 21:18 25:21
45:24
**anticipate** 12:24
**anybody** 105:3
**apologies** 13:5
**apparently** 79:2,4
**appear** 66:25 78:8
80:22,24,25 81:10
83:8 85:16 93:8
107:22
**appeared** 116:8
**appearing** 2:5,10
2:14
**appears** 22:1 62:5
62:7 64:15,19
65:13 74:1,22 78:9
78:10 83:17 84:13
85:3,3,13,17,18,19
87:24 92:17 93:2
93:17 96:20 104:9
104:17
**append** 104:2,7,20
**appointment** 21:4
**appointments** 4:3
94:3,4,6,16,18 95:2
98:1,5,6
**appropriate** 73:2
**approve** 75:15
82:12 93:19,22
**approved** 93:24
**approximately**
14:1 24:4 51:2,3
54:14

**april** 116:17
**arbiter** 52:5
**archived** 79:22
**area** 56:10
**arrangements**
119:9
**artificial** 80:5
112:22
**aside** 53:17 57:7
**asked** 7:8 11:25
26:23 36:7,20
114:9
**asking** 6:21,22
31:12 34:3 41:7
49:15,17 50:3,5
52:7 58:18 94:10
**asks** 60:18
**assisting** 86:1
**associated** 77:4
87:17
**assume** 22:12 40:25
74:9,18
**atlanta** 8:16,22
9:14
**attached** 58:6
**attaching** 97:10
**attempt** 72:25
**attempted** 64:10
**attend** 20:16 22:2
**attorney** 7:23 11:1
36:22 38:22 117:12
**attorneys** 117:13
**audible** 32:4 33:1
**audits** 54:20,23
**august** 70:20
**authorize** 86:9
**authorized** 74:13
94:10,11 117:6
**automated** 3:20
70:14

**automatic** 80:6
112:23
**automobile** 9:18
**automobiles** 15:7
**automotive** 3:19
9:19 14:6 88:3
**autotrader** 52:24
59:11,16,21 76:22
77:1,21
**available** 119:8
**avenue** 2:7
**aware** 8:12 16:2,5
16:8,15 19:4 27:16
29:1,13 36:9 55:1,3
64:12 69:3 72:18
73:9 86:21 87:20
90:23 92:1,7
108:18 113:15,16

**b**

**b** 1:9 112:14,14
**bachelor's** 13:23
**back** 22:15 37:8
40:1 56:9 79:10
82:2,20,20,21
86:14,14,19,20
87:2 94:21,22
99:25,25 100:16
**based** 14:11 74:18
79:17,19 94:8
96:21 97:8,19
**basic** 14:13 17:19
46:22
**basically** 26:16
43:25 106:16 110:8
**bates** 27:4 61:2,13
61:14,18 68:22
70:10 73:14,20,22
73:24 74:21 78:2
79:6 81:11,18 83:6
83:14 84:17,19,25
85:10 86:10,23

87:5,21 90:7,8,10
91:2 92:11 93:1
96:14 101:1,17
107:6 108:15 114:8
114:21
**bathroom** 105:9
**bdc** 3:24 4:3 11:11
11:14,16,20,24
17:7,16,17 18:11
18:18 23:10 27:11
28:3 58:3,18 62:11
62:18,23,24 63:3
64:3,7,8,9 69:19,22
73:10 74:2 90:21
91:3,8 92:6 93:2
94:3 95:17 97:3,10
97:13 100:2,5,8,10
100:13,24 101:10
101:17 102:3 103:7
103:10,17 104:4,13
**bdc's** 17:14 104:15
**bear** 13:2
**began** 5:3 47:2
**begins** 75:14
**behalf** 1:4 2:5,10
2:14 7:9 18:19 35:7
94:16
**beings** 96:1
**believe** 10:3 12:3
15:23 50:5 51:7
52:21 54:6 58:5
64:5 71:16,17
91:13 92:9 94:21
100:13 108:12
**believes** 50:6
**belong** 99:8
**best** 23:9 24:20
38:11,12 39:13
40:14 42:14 45:12
50:21 51:22 55:21
64:5 71:18 79:4

82:11,13 98:10
104:2,14,22 112:8
**better** 39:7,7 56:7
57:5
**bigger** 106:21
**biggest** 21:5
**bill** 92:18
**binding** 7:14
**bishop** 20:14 21:3
21:22
**bit** 40:10,17 51:5,9
108:10
**blank** 19:7 67:23
67:25 82:6
**blanket** 80:15,18
**bottom** 73:21
**boulevard** 2:3
**box** 53:15,18,21,23
54:19
**break** 7:5 68:3,5
105:10,11 113:22
**brickell** 2:7
**brief** 13:20 114:1
**briefed** 55:21
**briefing** 55:15
**briefings** 55:14
**brock** 2:11 119:2
119:19
**brock.magruder**
2:14 119:5
**brought** 60:2
**business** 5:23 8:13
14:12,14 35:12,20
36:24,24 37:9,12
37:12 39:15,17,19
41:1,4 51:8,18
63:23 80:20 84:16
94:7,15 100:9

**c**

**c** 2:1 3:1 5:1 65:16
65:16 119:2
**call** 20:11 21:4 27:8
27:21 28:13 31:10
31:17,20,22 32:4
33:13,16,25 34:7
34:13,14,15,16,17
34:19 35:2 36:18
43:14,17 44:2 72:4
95:24 99:21 100:13
113:20
**callbacks** 99:14
**called** 16:8 20:9
23:12 60:23 99:22
103:17 105:16
106:24 107:3,12
112:14
**calling** 20:16 30:13
37:15 38:1,8 45:18
60:12 96:1,2
**calls** 33:19 36:5
42:2,21 43:6,7
53:19 56:22 57:3
57:23 59:23 60:9
71:7 87:9,11,18
94:24 95:3,20 96:9
97:5 107:25 108:2
108:17
**campaign** 16:15
93:18 94:8 95:6,12
95:12,16,17,24
98:8,8 99:20
100:19
**campaigns** 13:12
16:5,10 17:11
18:11,19 19:3,14
29:9 73:9 74:15
90:24 92:2,5,5
**capacities** 13:25

**capacity** 14:3
**capital** 73:2
**car** 21:1 92:24,25
**carried** 58:7
**carrier** 30:14,15,18
31:3 32:11,13
**carrier's** 30:23
**cars.com** 52:24
**case** 1:3 5:21 13:12
16:6,11 17:12,18
17:25 18:15 19:21
29:10 39:9 43:12
49:20 70:23 77:7
90:25 118:3
**category** 99:9
**caught** 73:22
**cause** 85:6
**cc** 119:18
**ccelli** 4:5
**cell** 30:19 65:11,13
76:14,23 80:10
99:7 100:6 107:11
113:1
**cells** 98:21
**cellular** 20:9 21:9
47:16 53:20,25
59:23 60:9 69:24
82:17 87:9,19 99:5
110:23 111:5 112:5
**center** 94:7,16
99:25 100:9
**certain** 27:7 39:12
51:11 77:25 91:5
105:5 109:1
**certainly** 71:22
**certificate** 3:5,6
116:1 117:1
**certified** 1:20
117:21 119:17
**certify** 116:7 117:6
117:11

**chance** 114:4
**change** 103:25
104:16 105:7
**changed** 104:21
**changes** 56:3 118:2
**channel** 110:15
112:10
**channels** 14:16
73:1
**charge** 75:12 80:11
92:24
**charles** 1:13 3:2,2
5:12,19 116:7
117:7 118:4,25
119:2,6,7
**check** 40:1 52:5
53:15,23 54:21
93:2 95:19
**checking** 54:22
**checks** 53:18
**chief** 8:25 9:1 14:1
14:7 39:11
**choose** 34:18 38:25
43:11 46:20
**chrysler** 1:9,10
5:22,23 6:3 9:20
20:15,18 21:4
83:25 84:1,4,7,24
90:16,17,20,23
**civil** 119:25,25
**clarification** 51:4
70:24 71:4
**clarifications** 50:25
51:13,22 56:4
**clarified** 39:12,14
40:6,7,9 55:19 71:3
83:6
**clarify** 40:15 50:22
94:9
**clarifying** 51:9

**class** 3:11 19:20
**classed** 95:12
**clause** 108:13
**clear** 38:14 69:16
  77:17 94:9 95:2,4
**clearly** 42:8 99:6
**client** 11:1 17:25
  88:14
**clients** 48:21,23,24
**clifton** 1:4 66:10,10
  66:13 74:24
**closing** 106:7
**clue** 65:21
**coach** 14:10
**coaching** 14:14
**code** 8:15
**codes** 65:22
**collect** 80:16
**collected** 35:8
  108:20
**collection** 80:1,14
  107:13,15 108:5
**collections** 113:10
**colonial** 8:14,20
**column** 64:24
  65:11,14,23,24
  66:19 67:22,24
  96:22
**come** 22:7 24:17,23
  25:16 31:7 77:1
  83:20 102:5,7,8,19
**comes** 53:8 64:19
  108:20
**comma** 107:4
**commence** 82:10
**commenced** 76:4
**commencing** 55:24
  86:6
**commission** 116:16
  116:17

**communicate**
  38:25 71:18
**communication**
  11:22 44:17 46:21
  48:11 59:17 71:14
  89:3 97:10 101:21
**communications**
  11:2 15:5 37:14,24
  37:24 38:18 39:8
  40:22 41:19 42:18
  42:20 43:4 44:10
  45:9 50:19 56:16
  58:10
**companies** 72:25
  109:9
**company** 8:25 12:3
  14:6,15 15:21,22
  16:1 19:10 27:3,10
  29:5 36:10 39:12
  41:5 50:6,6 55:13
  55:16,18,22 56:2
  71:1,1 72:1 74:16
  112:7
**company's** 40:14
  40:14
**compile** 106:13,14
**complained** 85:8
**complaint** 3:11
  19:21 23:11 25:3
  27:14,18 69:23
  85:20
**complete** 36:1
  61:25
**completed** 35:24
  75:7 85:21,24 86:1
  119:8,11
**completely** 57:16
  95:12
**compliance** 46:19
  55:10

**complies** 71:1
**comply** 55:16,19
  109:24
**component** 95:24
**composite** 73:13
  90:7 96:13 97:20
  100:25 101:21
**comprised** 105:23
**concern** 85:6,8
**concluded** 115:8
**conclusion** 31:12
  34:4,24 36:7,20
  37:16 38:2,9 42:3
  42:22,24 43:8
  45:19 60:12 87:11
**concur** 83:12
**conditions** 35:16
**conducted** 73:10
  100:20
**confidential** 84:3
**connected** 117:14
**connection** 35:24
  36:2 44:9
**consent** 36:13,17
  38:5,15,18,24
  39:21 40:3 41:10
  41:16,25 42:12
  44:25 45:6 49:24
  50:6 53:11 54:5
  76:5,6 108:13
  110:3
**consenting** 53:24
**consents** 89:20
**consider** 31:9 34:6
**considered** 119:11
**consisted** 95:18
**consisting** 73:13
  90:7 101:1
**constitutes** 40:18
**construe** 110:10

**consumer** 15:13
  16:21,25 24:23
  25:16 30:19 32:9
  36:12,17,18,23,25
  37:14 38:11 42:24
  43:10,17,18 44:6
  47:7,19 52:17 53:8
  53:12,18 55:1,4
  66:1 67:14 71:18
  72:4 73:3 79:16
  80:18,19 89:14,20
**consumer's** 16:19
  16:19 40:16 106:8
**consumers** 14:17
  15:5,8,20 16:2,10
  17:22 21:14 37:25
  43:3 49:25 50:7
  89:1
**contact** 45:15
  52:18 58:20,22
  72:24 76:23 77:20
  80:4,8,11,16,19
  90:21 106:21 107:8
  107:10,15 109:10
  112:21,25 114:16
  114:25 119:8
**contacted** 37:1
  45:6 59:15
**contacting** 58:18
**contacts** 52:17 80:1
  80:14 107:13 108:5
**contain** 36:3 65:10
**contained** 56:23
  91:12
**containing** 40:3
**content** 21:24
**context** 37:5,18
  39:1 80:17
**continuation** 84:17
**contract** 3:22 27:3
  30:15 57:6

**contracts** 56:10,14
  56:17,25 74:13
  107:21 109:7
  112:12
**control** 104:9
**conversation** 48:10
  58:4,7 73:4 108:11
**conversations** 11:3
  11:6
**coordinating** 19:3
**copied** 11:24 58:4
  58:10
**copy** 75:6 115:6
**cordially** 20:16
**corner** 63:9 73:21
**corporate** 5:25 6:3
  7:12 9:9,11 11:25
  12:7 14:13 58:5
**corporation** 7:15
  20:18
**correct** 6:5 9:21,22
  11:21 15:9,10,14
  19:11,12 27:9,11
  28:14 32:5 34:22
  35:1,17 37:14,25
  40:5 42:20 44:11
  44:19,22 45:10,17
  50:1,10,11,15,16
  50:19 60:6,7 66:20
  66:23 72:5,12
  76:12 83:11 88:4
  88:23 89:20 90:14
  90:16 95:18,23
  96:9,11 107:14,18
  111:24 113:4,5,7,8
  113:10,11 114:22
  115:1
**correction** 85:6
  118:6
**correspondence**
  57:23

**cost** 92:24
**counsel** 4:17 11:10
  11:25 12:7,9,22
  14:10 26:13 37:19
  40:12 52:5 57:23
  58:5,6,8,11 71:4
  73:7 83:6 113:21
  114:5,9 117:12,14
**count** 69:7
**country** 9:2
**county** 88:1 116:4
  117:3
**couple** 107:2
**course** 55:5
**court** 1:1 88:1
**cover** 85:5
**coverage** 83:19
  84:23,23
**covered** 69:8 87:3
**created** 37:12 48:7
  48:8,10
**credit** 108:21,21
  110:5
**crm** 46:13,16,22
  47:1 65:9
**cross** 3:4 114:2
**crr** 1:19 116:6,15
  117:5,20 119:16
**crrt** 65:17,18 67:22
**crt** 65:16
**csv** 91:4
**current** 21:1 55:14
  89:23
**currently** 91:20
**customer** 22:2
  35:23 40:20 43:16
  44:6 46:18,24 47:5
  48:2,13 63:15 65:3
  67:11,17,20 72:24
  74:23 75:8,15 76:3
  76:7,11 77:5,14,15

78:13 79:12 81:9
  82:5,12 85:7,8,8
  86:12 99:21,22
  109:13 110:1,11
  114:16
**customer's** 44:2
  51:15 86:7
**customers** 10:10
  27:7 48:21 63:2,5,7
  63:13,21 64:4
  65:13 75:13 78:21
  82:9 86:5 96:2
  104:13 106:3 109:4
  114:13 115:1
**cv** 1:3 118:3

**d**

**d** 1:9 5:1 46:9
**d.c.** 14:4
**data** 91:5
**database** 48:22
  84:12 95:9 104:16
**date** 1:14 58:14
  65:25 66:1,18 67:3
  70:17 74:25 81:17
  81:20,22 96:22
  98:21 99:3 118:4
  118:25 119:24
**dated** 85:13,19
  91:3,17 98:17
  117:17
**days** 4:6 119:11
**dci** 1:3 118:3
**deal** 56:18,19
  105:19,21,22,23,24
  106:2 110:21
  111:11,15,17,19
  114:4,10
**dealer** 84:3 105:19
**dealership** 23:9
  25:8 59:15,17,18
  65:4 83:23 84:16

94:17 100:1 108:19
  108:22
**dealerships** 15:9
  71:24 88:17
**dealing** 63:24
**dealings** 41:1
**deals** 24:4 105:16
**dear** 119:7
**december** 54:14
**decided** 23:25
**decision** 56:4 71:19
  72:19
**declare** 118:22
**dedup** 103:18
  104:2,7
**default** 32:25 33:4
**defendant** 1:11
  2:14 20:9 23:12
  27:2 35:12,13,15
  41:17 45:8 59:9
**defendant's** 3:12
  3:14,16 25:8,20
  45:24 57:12 88:22
**defined** 37:9
**definitely** 102:1
**definition** 28:15,17
  31:20,22 34:17,19
  35:2 38:14
**degree** 13:23
**delineated** 98:11
**delineation** 96:11
**deliver** 17:4
**delivered** 16:18,19
  25:14 30:14,17
  33:20 97:13,15
**delivery** 28:9 81:22
**department** 75:25
  82:15 92:24,25
  100:2,10,12,14
  109:12

depend 47:6
depends 32:11,12
deployment 98:20
  99:7
deponent 4:17
  118:4 119:24
deposition 1:13
  3:10 4:18 6:6,13
  7:22 8:1 10:23
  13:15,18 19:17
  117:7 119:6,8,21
describe 26:24 35:6
  41:9 44:25
designee 5:25 7:12
desk 97:2 100:4
detail 26:24 35:6
  82:14
details 47:9
determine 79:17
  84:21
development 14:15
  94:7,15 100:9
device 30:20
diagnostic 78:10
dial 31:23 34:18
dialed 32:1
dialing 80:6 112:24
dials 34:21
different 47:3
  55:19 59:19 69:10
  72:23,24 88:18
differently 95:13
digital 14:18,20
direct 3:3 5:15
  14:18,25 95:22
  96:3 104:19 105:4
direction 11:3
directly 12:9 13:9
  30:14,15 53:9 58:7
  106:14

discipline 82:14
disclose 11:1
  114:15
disclosed 89:9
disclosure 86:10
  111:20 112:20
  113:2,6 114:24
disclosures 114:11
discounted 20:20
discounts 24:2,6
discovery 59:7
  62:16 102:12 103:1
discusses 82:16
discussing 18:13
  93:18 100:22 114:5
discussion 6:10
  83:2
dismissed 89:25
display 14:22
dispute 18:6 21:8
  21:13 23:16 25:12
distance 64:24 65:3
distinction 31:25
  33:12
district 1:1,1
dive 94:22
division 1:2
document 7:24
  19:25 46:6 57:14
  62:4 67:18 73:25
  78:7 79:12 83:17
  85:2,10,21 86:3,20
  87:16,23 90:6,22
  96:13,19 100:23,24
  101:16 104:4,12
  111:2 113:13,14
  114:15 118:22
documentation
  12:1 39:25 41:5
  83:8 112:2

documents 13:14
  13:15 41:1 57:18
  57:21 58:4,19
  60:18 68:19 86:15
  87:2,6,7,13 105:15
  106:7
dodge 1:9,9 5:22,23
  6:4 8:20 9:20 20:15
  21:3 23:22 60:2
  74:2 88:15 92:16
  94:12,12 100:11
  103:17
doing 5:22 6:22
dominate 20:18
dot 107:5
downloaded 97:14
draw 34:4 36:7
drawing 19:7
draws 33:13
drive 15:8
driver's 116:9
due 63:23
duly 5:13 116:9

**e**

e 2:1,1 3:1 5:1,1,19
  46:9,9 107:4
  112:14 115:5,6
  119:25,25
earlier 8:22 93:4
  107:17 114:6
easier 40:10,17
  66:6 106:12,22
east 1:16 2:3,12
  8:14,20 119:3
education 13:21
effect 71:7 110:6
effective 71:17
efficiently 106:6
efforts 98:2
either 9:14 15:13
  78:9 84:14

elead 46:9,25 47:2
  47:4 48:14 64:18
  65:2 77:1,8 89:10
  89:19 101:25
eleads 101:24
  102:8
electronic 109:23
electronically
  33:20 52:17 76:7
  102:22
eligibility 84:21
eligible 84:22
elimination 20:17
  22:5 23:24
email 3:23 4:2,4,7
  11:24 12:2,18
  14:24 33:21 47:9
  48:10 52:18,19
  58:3 59:10,18,18
  60:22 80:4,19
  88:17 90:10 91:2
  91:16 92:11 93:16
  94:1,5 97:9,25
  98:17 99:12 101:5
  101:20 112:22
employed 11:11
  90:13
employee 117:11
  117:13
employees 70:12
  109:21
employment 13:21
  13:22 55:24 110:5
empty 66:19 67:3
encompass 14:21
encountered 81:3
encourage 22:7
  24:17,23 25:16
engage 37:24 39:15
  42:19 71:13 88:25
  92:4

**engaged** 13:24
15:19 35:12 39:19
71:20
**engages** 15:4
**enhance** 109:5
**enhances** 40:16
**enjoyable** 109:19
**enter** 74:13 118:2
**entering** 48:8
**entire** 51:16,17
**entirely** 111:14
**entities** 9:8,9,9 88:4
109:1
**entitled** 85:10
**entity** 6:3 13:10
**errata** 3:6 118:1
119:13
**esq** 119:2
**esquire** 2:2,6,11
119:18,19
**essentially** 107:21
**event** 3:22 20:17
22:2,3,5 23:24
46:20 74:1
**exact** 10:4 18:15
50:23 58:14 64:8
70:17
**exactly** 8:18 17:24
29:16 32:13 40:18
59:25 60:15 69:17
88:11 100:22 103:6
**examination** 3:3,4
5:15 8:3 114:2
**examined** 5:13
**example** 77:1
**excel** 12:14 91:4
102:10 103:7,16
**exception** 87:6
**exchange** 12:18
**exhibit** 3:9,10,11
3:12,13,15,17,18

3:19,21,22 4:1,2,4
4:6 7:18,19 19:20
19:22 25:20,22
45:24 46:1 57:8,12
61:7,9,12,17 62:3
63:1,6,21 64:13
68:16 70:5,7 71:8
71:12 72:16 73:12
73:13,16 90:3,6
96:15,16 97:20,22
100:24,25 101:2,14
101:16,21
**exhibits** 3:8 61:5
69:1
**existed** 52:2
**expense** 92:22
**experience** 109:6
109:18
**expires** 116:17
**explain** 9:16
**explicitly** 60:8
**expound** 40:15
56:7
**expounded** 40:9
51:5,8
**express** 36:13 38:5
38:15,17,24 39:21
40:3 41:16,25
42:11 45:5 49:24
**expressly** 37:3
**extend** 23:25
**extent** 10:24 31:11
34:3 36:6,19 38:8
42:2 57:22,24
60:11 87:10
**extra** 98:2

**f**

**f** 104:9
**facebook** 14:23
**fact** 33:7 74:18
76:6 91:8 92:10

114:15
**factory** 84:23
**facts** 118:22
**fair** 62:2 64:2
**familiar** 17:10
18:12,17 20:3
28:19 30:6 57:16
100:21 101:23
102:23
**far** 41:23 103:13
104:23
**fca** 90:16
**fcagroup.com**
90:11
**february** 18:2,4,11
18:20 19:11 20:8
21:10,14 23:13
24:1 91:3,17 98:17
98:21
**federal** 55:17 71:2
109:24 119:11,25
**feel** 11:4 57:24
**felt** 23:9 73:1
**ff984627** 116:16
**fiat** 8:19 90:16,17
90:20,23
**field** 8:23 9:12,15
13:24 14:6,14
47:11,14,16 77:22
**fields** 91:5
**file** 77:8,14,15 83:7
91:4 102:12,22,23
103:4,11 107:3
112:14
**filed** 5:21 87:25
**files** 103:14
**filled** 35:14
**finance** 10:17
110:8,9
**financially** 117:15

**financing** 10:18
20:22 109:2 110:4
**fine** 21:18,21
**finish** 12:24
**first** 3:11,13,14,16
5:13 11:23,23 17:6
19:20 20:4,24
25:21 28:24 45:25
49:13 52:15 54:25
55:8,12 57:13 59:4
61:5 62:3 82:22
84:17 90:9 96:22
97:25 102:19
111:17
**five** 6:19 68:3
113:20
**flew** 8:21
**flip** 98:15 112:16
**floor** 1:16 2:12
119:4
**florida** 1:1,17 2:4,8
2:13 13:23 116:3,7
116:16 117:2,6
119:4,12,25
**folder** 105:16
106:17
**folders** 106:14
**following** 20:10
60:19 98:6
**follows** 5:14 101:5
101:20
**followup** 114:20
**font** 78:3,11
**foregoing** 117:9
118:22
**forever** 77:3
**form** 3:22 16:12
17:2 18:8,25 22:10
24:19 25:13 30:25
32:6 33:2,15,22
34:2,23 36:6,9,14

37:15 38:1 41:22
42:21 43:7 44:12
44:20 45:18 50:2
50:20 53:1 54:5
60:15 63:22 66:24
67:7 69:12 70:1
86:21 87:10 96:10
97:11 98:9 111:6
**format** 101:23
103:4
**forms** 35:14 36:3
60:2,8,16
**fort** 2:4
**forward** 24:10
**forwarded** 119:13
119:14
**found** 41:2,6
106:23
**free** 11:4 57:24
**friday** 20:17 23:24
**front** 61:25 82:19
82:20 86:14,15,17
**ftc** 51:7
**full** 54:7
**fulton** 88:1
**further** 113:25
117:11
**future** 109:16,20
**fwd** 4:5

**g**

**g** 2:11 5:1,19 119:2
119:19
**gap** 1:3 118:3
**general** 19:5 23:21
24:22 25:15 31:6
36:22 37:18 42:24
43:10 55:20 114:24
**generally** 47:8
**generated** 83:9,21
83:22 94:3,7,16,18
95:6 96:8 98:1

103:6,11
**gentleman** 12:3
35:22 59:14 88:13
**georgia** 88:1
**give** 5:8 6:24 8:13
12:23 13:3,20
36:12 37:4 38:12
50:23 51:19 52:18
53:10 57:15 64:6
77:20 83:16 88:10
94:23 98:10 103:7
109:25 113:20
**given** 11:23 47:8
51:6 76:6,24 81:6
83:9 86:16 102:25
114:17
**gives** 36:23 47:7
**giving** 36:13 38:14
38:23,24
**go** 29:19 37:2,8
40:1 44:2 75:16
82:25 94:22 99:25
**goals** 14:12
**goes** 60:1
**going** 7:17 12:9
19:19 45:23 53:16
57:11 61:5 98:3
102:9 108:7,12
113:20 114:16
**good** 5:17 20:14
68:2
**google** 14:22,22
**gotcha** 68:17
**gotten** 75:6
**gray** 1:16 2:11,14
119:3,5
**greenway** 1:8,9
3:17,18,19 4:5,8
5:22,23,25 6:2,3
7:10,12 9:4,6,17,20
9:21 10:5,5 11:8

13:22 14:2,9,16
15:4,9,19 16:3 17:6
17:16,17 18:6,10
18:19,22 19:2
20:15 21:3,8,11,13
21:15 22:8,19
23:16,22 24:17
25:12 26:23 27:4
27:16,25 28:10
29:8 30:8,22 31:3,9
31:25 33:13,13
34:6 35:20 36:16
37:13,23 38:5
39:16,20,21 41:25
42:11 43:6,14,18
43:23 44:11,17
45:16 46:25 47:2
47:20 48:13 49:3
49:18,23,25 50:17
52:1,9,11,20,25
53:3,13 54:4,25
55:3,3,8,10,24
56:15 57:17,20
58:15,19,22 59:1,4
59:21 61:1,2,13
62:13,16,18,21,23
63:2,5,7,12,14,20
64:3,6,9 66:3,23
67:6 69:10,11,16
69:19,22 70:16
71:20 72:9,16
73:13 74:2,8 75:13
76:2,17,25 80:13
80:18,19 82:9,18
83:9,10 84:11 86:5
87:6,16 88:3,4,8,25
89:25 90:7,13,20
91:8 92:3,4,16
93:22 94:11,12,12
95:5,8,8 97:3,5
98:5 100:10,16

101:9 102:7,25
103:3,7,11,13,17
105:15 107:5,20
110:14 111:1,24
112:3 113:16
114:11 115:1 118:3
**greenway's** 16:16
17:20 30:12 31:20
34:19 37:11,21,22
38:17 39:4,21
42:18 43:2,15 44:7
45:14 46:13 47:5
52:3 56:1 63:21
68:24 70:10 83:7
**group** 14:4 84:5
**guard** 109:24
**guess** 63:20 103:8,9
104:3,14
**guessing** 54:15
**guide** 14:10
**guidelines** 14:13

**h**

**hand** 5:5 7:17
19:19 25:20 45:23
57:11 61:5 63:9
73:21 101:12
**handbook** 71:9
**handed** 12:22 71:3
75:3
**handled** 58:11
69:18
**handwritten** 85:15
**happen** 4:6 21:12
23:18 43:12 91:24
**happened** 98:13
**happens** 30:18
**happy** 21:1 24:8
**hard** 108:16
**he'll** 115:7
**head** 22:18 57:4

**health** 109:7
**hearing** 24:10
**held** 6:10 29:3 83:2
**help** 14:12,13 15:7
  26:11 96:24 108:19
  109:2
**hi** 23:21
**highest** 24:7
**highlighted** 66:6
**hiraldo** 2:2,2,6 3:4
  5:16,20 6:9,12 7:17
  7:21 11:7 15:12,17
  16:13 17:5 18:9
  19:1,24 22:13 25:1
  25:18 26:1,18 31:2
  31:15 32:8 33:6,17
  34:5,11 35:3 36:15
  37:6,20 38:4,16
  39:2 41:24 42:4,10
  42:15 43:1,13
  44:14,23 45:22
  46:4 50:9,24 53:2
  57:10 58:9 60:17
  61:11 64:1 67:1,12
  68:4,7 69:14 70:3,9
  73:18 83:4 87:1,15
  90:5 96:12,18
  97:16,24 98:14
  101:4,16,19 105:9
  105:13 106:16
  107:1 111:10
  113:24 115:4
  119:18
**hiraldolaw.com**
  2:5
**hired** 27:2
**historical** 63:15,16
**history** 13:21 47:18
  83:24,24 110:5
**holistic** 49:9

**home** 47:12 63:10
  63:18,19 98:20
  99:5,7
**honestly** 49:7
**hope** 82:15 109:18
**huge** 23:24
**huh** 35:10 49:12
  51:21 53:14 55:7
  60:4,21 61:19
  77:12 78:1 80:2
  88:2 92:15
**human** 72:3,4 96:1
**hybrid** 14:9

**i**

**i.d.** 116:9
**idea** 95:7 102:21
**identification** 7:20
  19:23 25:23 46:2
  57:9 61:8,10 70:8
  73:17 90:4 96:17
  97:23 101:3,15
  116:10
**identified** 25:3
  27:14,18 69:1 74:3
  76:15 97:6 100:15
  114:10
**identifies** 67:19
**identify** 56:1,3
  68:20 85:4,7 108:9
**identifying** 60:19
**ignacio** 2:6
**iii** 2:11 119:2,19
**ijh** 2:7
**ijhiraldo** 2:9
**ijhlaw.com** 2:9
**implemented** 70:16
  70:22
**inboxes** 27:7
**incentive** 24:4,5
**incentives** 20:19

**incidence** 17:10
  89:3
**include** 49:1 72:19
**included** 64:5
**includes** 108:21
**including** 36:11
  59:10 109:6
**inclusion** 119:14
**incoming** 32:5
**incredible** 20:25
**indication** 35:15
  77:8 95:9
**indicator** 95:14
**individual** 31:4
  47:22,25 48:2,12
  89:6
**individual's** 27:8
  27:21 28:14 111:4
**individually** 1:4
**individuals** 45:6,15
  49:2,5,19 62:10
  67:2 68:25 69:7
  97:6,17 106:3
**industry** 105:19
**inform** 58:5 110:11
**information** 3:24
  26:11 37:4 38:24
  47:4,6,7 51:10,11
  51:24 53:10,21,23
  59:10 60:19 62:17
  63:4,12,14 64:17
  65:2,9 71:10 76:22
  77:9,16 84:11 91:9
  104:5,6 108:18,20
  108:23,25 109:2,3
  109:8,10,11,14,15
  109:21,22,25 110:1
  110:6,12 114:12,17
  114:18
**informed** 37:3

**initially** 59:9
**initiated** 55:12
**initiation** 71:21
  72:9,15
**inquired** 67:15
**inside** 43:25 48:17
  82:14
**inspected** 79:11
**instances** 67:13
**instructing** 24:5
  49:25
**insurance** 109:8
**intended** 80:15
**interacted** 47:19
**interest** 40:15,19
**interested** 117:15
**internal** 83:17
**internally** 43:16
  83:21 102:24
**internet** 29:15
  48:10 88:16 100:12
  100:14
**interrogatories**
  3:13,15 25:21
  26:12 45:25
**interrogatory**
  26:20 31:16 35:5
  41:8 42:1 44:24
  46:8 49:10 56:9
**introduced** 29:17
  29:18,21
**inventory** 22:4
  23:23 25:9
**investigation** 110:5
**invite** 20:16 22:1
**invoice** 74:4,8,10
  81:13 93:4,9,10
  95:1 107:17,17,23
**invoices** 82:10
**involved** 13:11
  19:5 74:16

**involvement** 16:1
**iphone** 32:17
**iphones** 32:24
**issue** 13:12 16:5,10
   17:11,18 29:9
   49:20 70:23 90:24
**issues** 56:1,3

**j**

**j** 2:6
**jacket** 105:23,24
   110:21 114:4,11
**jackets** 105:19,21
   105:22 106:2
   111:11,15,18,19
**january** 18:19
   19:11 54:14
**jazzmin** 1:19 116:6
   116:15 117:5,20
   119:16
**jeep** 1:9,10 5:22,23
   6:3 9:20 20:15 21:4
**job** 29:14 104:15
**jobs** 29:3
**johnson** 88:3,11,19
   89:7,22
**johnson's** 88:8
**july** 1:14 116:8,12
   117:17 118:4 119:6
**june** 15:23 40:4,6
   40:22 50:19 51:1,2
   51:3,14 70:18
**justin** 12:4

**k**

**keep** 37:3 43:15
   76:25 105:25 108:7
   113:12
**keeper** 52:6
**kept** 47:4 79:23
**kia** 88:14

**kind** 32:16 34:16
   47:18 77:4
**kindly** 83:6
**know** 7:3,6 8:14
   9:10 10:1 11:14
   13:8,9 17:8,9,24
   18:7,22 21:11,15
   21:18,20,23 22:18
   22:20,20,21,22,25
   23:2,3,4,6,7,17
   24:15,20,21 25:14
   27:25 28:1,18,20
   28:21 30:22 31:3
   32:19,19,24 33:3,3
   33:4 38:5,10 39:23
   40:23,24 41:6,23
   52:4,25 53:3,16
   54:8 57:24 58:14
   58:25 59:1,21,25
   60:14 62:12,14,14
   64:3,11,19,21 65:1
   65:6,8,15,21,22,24
   67:23,24,24 69:4
   69:21,22 70:2
   73:22 75:10,12,17
   76:20,21 78:19
   79:14,18,19 82:7,8
   82:22 86:22 88:7
   88:10 89:9 90:23
   91:1,14,24 92:1,10
   95:5 96:6,7 97:4,5
   97:8,12,13,15,19
   98:5,11,13 99:24
   100:3,15,17,21
   101:7,11 102:2,4
   103:3,6 104:24
   105:1,3,5 108:9
   109:22 111:19,22
   111:23 112:1,7,8
   112:11,16

**knowing** 64:7
   69:16 100:3
**knowledge** 20:3
   23:9 29:11 38:11
   39:13 45:12 50:21
   55:21 72:10 74:19
   82:11 90:2 97:7
   111:7 112:9
**knows** 103:13

**l**

**l** 4:15 46:9
**labeled** 61:13 96:14
   101:17
**lane** 75:16 85:4
**language** 54:3
   107:15,16,20,23,23
   110:17 111:20
   113:16
**laptop** 102:11
**las** 2:3
**latest** 32:19
**lauderdale** 2:4
**law** 2:7 80:7,7
   105:25 112:24
**lawsuit** 12:19 54:11
   58:16 87:24,25
   88:6 89:22,23,24
**layperson** 9:16
**lead** 76:25 77:5,19
   77:22 95:9 96:22
   97:2,3
**leading** 13:21
   15:11
**leads** 4:5 77:24
   88:16 95:6 96:7,25
   96:25 100:16
**learn** 28:24 59:4
**learned** 29:12 59:6
**lease** 56:10,14
**left** 85:6 101:12

**legal** 31:12 34:4,23
   36:7,20 37:16 38:2
   38:7,9 42:3,22 43:8
   45:18 60:12 87:11
**legally** 9:11
**lenders** 108:22
**length** 102:11
**letter** 3:7 107:5
   119:7,11
**level** 37:2
**license** 84:4 116:9
**light** 85:14,14
**limited** 11:5 34:20
   109:6
**line** 31:14 81:8 82:5
   94:2 104:10 118:6
**list** 43:14 48:12,24
   49:6 61:25 62:13
   62:22 63:1,2,2,6,21
   64:4,9 67:2 77:24
   91:11,13 97:3,6,10
   97:18 100:23 101:5
   101:20,22 102:2,4
   104:8,24 105:1,3,6
**listen** 30:21
**listens** 16:25
**lists** 12:12,12 44:5
   63:24 69:8 91:14
**little** 40:10,17 51:5
   51:8 66:19 68:15
   70:19
**live** 72:2,3 94:24
   95:3,20,24 96:1,9
   97:5 98:2,8
**llc** 84:5
**local** 55:16 71:2
**locate** 57:20
**located** 9:13,23
   83:7
**location** 9:25 10:2
   10:5

**locations** 9:4,6,8,21
**log** 4:1 61:14 96:20
  96:20 97:2
**logo** 83:10
**long** 10:2 39:6
  46:25 54:3 76:25
**longer** 44:3,4 54:7
  54:9
**look** 24:10 49:8,10
  49:13,16 52:7
  56:24 59:8 60:15
  60:15 64:13 68:8
  70:4 74:20 75:19
  78:2 83:14 84:2,19
  84:25 85:6 87:21
  92:11 93:5,14 94:1
  94:21 96:5 102:9
  105:14,18 111:15
  112:12 114:4
**looked** 81:18 91:11
  93:4 107:24 111:11
  113:3,6
**looking** 26:19 56:9
  63:6 68:18 71:8
  73:12,24 79:17,20
  81:19 87:2 96:21
  97:8,19 103:16
  106:23 107:2,3,7
  107:12 108:15
  110:22 113:12
**looks** 49:9 75:1
  79:10 82:1 83:18
  83:24 84:13 85:5
  87:25 103:10
  107:16
**lot** 61:25 72:24
  98:2
**lump** 95:13

**m**

**m** 107:5
**m1044691a** 102:13
**magistrate** 88:1
**magruder** 2:11 3:5
  10:24 15:11,16
  16:12 17:2 18:8,25
  22:10 24:19 25:13
  26:15 30:25 31:11
  32:6 33:2,15 34:2,8
  34:23 36:6,19
  37:15 38:1,7,19
  41:22 42:2,6,13,21
  43:7 44:12,20
  45:18 50:2,20 53:1
  57:22 60:11 63:22
  66:24 67:7,9 68:2
  69:12 70:1 82:25
  86:23 87:10 96:10
  97:11 98:9 106:13
  106:18 111:6 114:1
  114:3 115:3,6
  119:2,19
**mail** 14:19,25 15:2
  96:3,4 104:19
  105:4,6,7
**mailers** 95:22
  104:18
**mailing** 12:11,12
**maintain** 15:1
  46:17 52:1 63:12
  63:14 65:2 109:23
**making** 27:8,21
  31:17,25
**management** 24:6
  43:16 46:24 83:23
**manager** 19:5
  23:22
**managers** 109:12
**manifest** 15:2 62:5
  62:6,7 64:15

**manuel** 2:2 5:20
  119:18
**manufacturer**
  54:17 84:8,9,12
  90:18
**manufacturers**
  109:3
**march** 18:20 19:11
  99:14 100:19,20
**mark** 44:2 70:4
**marked** 7:18,19
  19:19,22 25:22
  45:23 46:1 57:8,11
  61:7,9 70:7 72:16
  73:16 90:3 96:16
  97:22 101:2,14
**market** 14:4,17
  20:18 29:2 51:20
  63:10,13,18,19
  104:22
**marketed** 62:25
  110:11
**marketing** 8:25 9:1
  11:19 14:2,7,12,18
  14:20,23,23,24
  27:3,10 28:19,20
  29:14 36:14,18
  37:1,5,13,22,24
  38:15,18 39:1,11
  40:22 41:19 42:18
  42:19 43:4,5,21
  44:4,5,10,17,19
  45:9 50:1,18 53:19
  56:16,22 57:3
  59:22 60:9 71:7,21
  71:22,25 72:25,25
  80:22 87:8,18
  88:22,25 106:9
  107:25 108:13
  110:23 111:4,21
  112:5,10,18 113:4

  113:18 114:25
**marketplace** 59:11
  59:16 76:22 77:10
  77:11,19,21
**marking** 7:18
**mass** 89:15
**match** 93:12
**matches** 93:13
**matt** 20:14 21:3,22
**mcwhite** 92:13,14
  92:16
**mean** 13:17 14:25
  18:14 37:7 40:7
  42:1 52:16 54:13
  59:13 64:25 65:12
  65:23,25 67:5
  80:13 84:7 86:20
  92:21 98:24 100:8
**meaning** 17:11
  32:3 47:22 66:22
  89:18
**means** 15:1 46:16
  59:14 65:24
**media** 14:23
**mentioned** 114:21
**message** 16:19,25
  17:4,21 20:13 21:8
  21:9,13,16,24,25
  22:1,6,7,23,25 23:2
  23:5,8,13,19,21
  24:16,23 25:15
  30:17,18,20,21,24
  31:17 33:20,21,23
  33:24,25 34:6
  68:25 88:20,25
  89:6,18 93:23
  94:19 98:7 99:2,3
  105:2 107:9,9
**messages** 3:20,20
  18:1 25:7,14 26:25
  27:7,13,14,16,17

27:20 41:12,13
45:1,2 49:19,20
52:10 60:20 62:11
64:4,8,10 68:20
69:4,17,19,23
70:14,14,23 72:6,8
80:5,6 89:11,16,21
95:5 96:8 97:17
106:4 110:14,16,19
110:23 111:4,21,25
112:5,18,23,23
113:7,18
**method** 26:24 28:9
35:6
**methods** 71:14
72:23 73:1
**mhiraldo** 2:5
**miami** 2:8
**middle** 1:1
**migrations** 54:16
**mind** 102:17
**minute** 68:3 94:23
**minutes** 113:20
**missed** 20:15
**mobile** 30:20
**model** 32:18 64:22
**moment** 57:15
83:16 88:10
**monday** 1:14 98:21
**money** 80:16 98:2
**months** 20:23 54:6
54:8,13 58:14
**mopar** 84:24,24
**morning** 5:17
**motor** 20:18
**mouse** 106:11
**multiple** 29:19
76:23 112:21
**musrati** 1:19 116:6
116:15 117:5,20
119:16

**n**

**n** 2:1 3:1,1 4:15 5:1
5:19 107:4
**name** 5:18,20 21:3
47:6,8 60:22 66:7
66:13,16 77:15
91:12 93:23 94:11
102:12,22 103:5,11
103:20,24 104:9
**names** 62:7,9 64:15
88:18 102:23
103:10 109:6
**narrow** 73:3
**national** 103:24
104:16
**ncoa** 103:18,24
**need** 24:3 105:7
109:21
**needed** 26:10 36:17
79:1 92:18
**needs** 14:12
**negotiating** 91:25
92:9
**neither** 114:21
**network** 29:25 30:6
30:23
**never** 11:20 20:2
29:4 31:14 49:7,7
101:12 103:21
**new** 10:6,19,20
15:14 21:1 47:22
48:5 92:20,24
111:2
**newsletter** 109:11
**nine** 14:5
**noise** 33:5
**nonpublic** 109:21
109:25
**normal** 84:15
**normally** 29:19
85:7 103:5

**notary** 116:6,16
117:5
**notated** 48:4,6
**note** 43:23 48:7
77:4 110:15,16
**noted** 81:22
**notes** 79:11,15
117:10
**notice** 3:10 7:22 8:1
11:23 13:17 30:19
32:12 44:1 71:4
108:11 110:10,13
110:18
**notification** 54:24
84:14
**notified** 32:9,14
**notifies** 31:3
**november** 81:20,21
81:23
**number** 10:4 20:10
21:6 22:15,17,19
22:21 23:12 24:13
24:13 25:2 26:20
27:4 31:16 33:8
34:18 35:5,13,16
36:13,14,23 41:8
41:17 42:7,17
43:19,20 44:2,3,9
44:18,19,24 46:8
47:9,11,12,14,16
50:1,7,8 51:15,19
52:19,24 53:13,20
53:25,25 54:15
59:8,10,17,19,20
59:24 60:2,18
64:23 68:18,20
69:7 71:16 72:23
73:20,23 74:21
76:14,18,24 78:12
79:6 80:9,10,11
82:17 86:11,23

87:9 88:9,15,17,18
98:25 99:3,13,16
99:18,19,20,22
100:7,15 106:8
107:11 108:20
109:4,7 113:1,1
**numbers** 32:1 43:5
45:7,16,17 52:9,10
60:22,23 61:2 62:8
62:10 64:16 65:11
65:13 69:24,25
88:17 99:8 101:12
114:8,12,21
**numerous** 36:1,11

**o**

**o** 3:1 4:15 5:1 107:4
119:2
**oath** 3:5 116:1
**object** 10:24 16:12
17:2 18:8,25 22:10
24:19 25:13 30:25
31:11 32:6 33:2,15
34:2,23 36:6,19
37:15 38:1,8 41:22
42:21 43:7 44:12
44:20 50:2,7,20
53:1 57:22 60:11
63:22 66:24 67:7
69:12 70:1 87:10
96:10 97:11 98:9
111:6
**objection** 15:11,16
34:8 38:19 41:18
42:2,6,13,17 45:8
**objections** 43:3
**obligated** 110:6
**obtain** 62:13 88:8
109:2
**obtained** 35:8
41:10 45:1 60:23
64:17 76:17

obtaining 110:6
occasion 14:24
occur 58:13 71:23
occurs 71:24
october 60:5 75:1
81:19,21,25 82:2
85:12 88:19
offer 109:4
offers 24:6
office 8:14,17,18,19
8:19 47:14
officer 8:25 9:1
14:2,7 39:11
oh 43:25 66:10
68:14
okay 6:18 7:1,17
8:21 9:12 10:14,22
13:1 15:22 17:14
17:23 18:5,16,21
20:12 21:7 25:2,24
26:6,17 27:25 29:8
30:17 32:18,24
33:25 34:19 40:13
44:15 45:5 46:15
48:4 49:14 54:18
54:25 56:14 57:20
59:1,20 61:17 62:9
63:1 64:24 66:4,15
68:12 69:9,15 70:6
71:20 73:22 74:20
74:23 75:2,23
76:17 77:7 78:2
79:1,6,7,21 81:14
81:17 82:24 84:6
84:25 87:22 90:12
92:20 97:9 98:16
99:11,15 102:14,25
103:19 104:1,11,12
104:24 105:17
106:2,18 107:20
112:12 113:15

115:3
olas 2:3
old 86:21
once 30:17 119:13
ones 27:17 37:18
69:2,2
ongoing 39:17
51:18
online 52:15 53:9
open 10:2 54:5
84:15
operate 14:14
operated 9:21
operation 11:9
operational 82:14
opinion 40:16
54:24
opportunity 20:25
21:2 24:10
opt 38:25 42:25
43:10 46:20
option 110:5
opts 43:17 89:14
orange 116:4 117:3
order 3:22 19:16
29:2 36:17 43:5
57:20 74:1,22,25
75:2 76:3 78:9
79:10 85:11 86:6
109:2 115:4
ordering 119:13,14
orders 57:5 75:14
75:19,20
organization 9:19
original 77:20
81:20 119:13
originally 58:2
59:15 73:6 81:19
102:21 104:12
origination 51:7

orlando 1:2,17 2:13
9:13,14,23 10:6
88:14 119:4
outbound 99:1
outcome 88:6
outcomes 64:9
outlined 71:11
outside 11:3,10
12:18
ownership 109:5

**p**

p 2:1,1 4:15 5:1
p.a. 2:2
p.m. 1:15 68:6
91:18 98:21 105:11
105:12 113:22,23
115:9
package 56:18,19
page 3:9 8:2 20:5
26:4,9,19 35:4,4
41:8 46:5,8 49:10
61:14,20 74:20
78:2,4,17 79:6 81:8
81:11 82:16 83:10
84:17 86:17,19
90:9 91:16 96:14
97:25 99:10 101:18
117:9 118:6
pages 98:6
paid 69:11 93:2
paper 62:1,1
paperwork 35:24
36:1 81:6 94:22
105:24
paragraph 20:6
23:11,20 25:3,6
paraphrase 52:8
part 10:17 27:20
39:7,7,25 52:17
55:15,18 56:18
78:8 79:22 80:20

81:6 84:15,24
91:18,25 93:24
94:15 95:15,15,15
95:15 98:20 114:14
partial 106:20
partially 111:13
participation 110:4
particular 79:14
80:24
parties 4:17 110:1
117:12,13 119:14
partners 51:12
parts 10:13 16:23
party 9:17 11:18
27:3,10 45:7 52:23
52:23 53:9 69:18
119:13
passed 73:6
patterns 63:16
paul 66:11,13
pay 74:8 78:23
92:18,23 98:4
paying 91:20,22
payment 74:11
78:24 93:7,8,10
pdf 107:5
peak 24:7
penalties 118:22
people 9:25 37:3
38:23 49:8,9 51:23
62:25 64:20 96:1
99:4 104:22
percent 20:22
92:20,21,24,25
perfectly 21:21
perform 48:19
performed 16:3
54:20 85:12 95:17
performing 48:17
54:23

**peripherally** 59:6
**perjury** 118:22
**permission** 41:10
  44:25 49:16,17
**permitted** 45:14
**person** 19:4 72:1,1
  92:17
**personal** 74:19
  100:5 109:25
  114:12
**personally** 28:21
  76:7 116:8
**pertinent** 58:4
**phone** 17:1 22:21
  28:14 30:20 31:8
  31:22,23,23,23
  32:1,2,3,4,12,16,21
  32:22 33:4,10,16
  34:13,14,16,16,17
  34:21,21 35:2,13
  35:15 36:13,14,23
  41:17 42:7,16 44:2
  44:3 45:7,17 47:8
  47:11,12 50:7,8
  51:19 52:19 53:25
  53:25 59:10,17,19
  60:2,22 64:16
  65:13 76:9,24
  88:17 98:25 99:7
  99:13,19,20 100:6
  107:11 113:1
  114:12
**phones** 32:24
**phrase** 56:8
**phrasing** 57:5
**physical** 109:23
**physically** 48:8
**pick** 31:22 34:17
**picks** 34:20
**picton** 1:4 18:15
  36:4 39:15,19

42:20 59:20 60:8
  66:7,13,23 67:19
  67:22 74:24 75:3
  76:21 77:7 81:3,14
  82:1,18 83:8 85:22
  85:25 86:3 87:8
  89:23 118:3
**picton's** 76:18
  91:12 104:9
**piece** 15:2 105:6
**pieces** 36:1 55:19
**pine** 1:16 2:12
  119:3
**place** 1:16 12:1
  46:18 50:22 56:6
  59:7
**placed** 28:13 97:5
  99:20
**places** 36:11 100:7
  114:10
**placing** 72:4
**plaintiff** 3:8 5:21
  7:19 17:25 19:22
  20:11 24:17,22
  25:22 35:11,13,14
  41:11,17 42:7,16
  46:1 49:18,24 57:8
  59:9,15 61:7,9
  68:15 70:7 73:16
  89:24 90:3 96:16
  97:22 101:2,14
**plaintiff's** 3:12,14
  3:16 20:9 21:9
  23:12 25:21 35:8
  45:25 57:12 66:6
  114:5,8
**plaintiffs** 1:6 2:5,10
  114:20
**platform** 46:25
  64:18 65:2 89:10
  101:25

**play** 28:25
**please** 5:6,17 6:24
  20:5 24:9 57:15
  66:3 68:18 87:21
  87:23 91:2 93:1
  98:15 119:8
**plus** 20:22
**point** 12:21,22 44:3
  54:15 58:6 75:18
  79:8,13 87:7 106:6
**pointing** 66:5
**points** 76:23
**policies** 14:13 37:3
  37:22 39:13,24
  41:6 52:2 55:14,20
**policy** 3:19 36:10
  37:23 39:3,20 40:3
  40:8,21 42:9 50:15
  50:17,22 51:1,6,17
  53:17,17 54:1
  55:10,15,20 56:2,6
  56:18,19,21 70:12
  70:16,22,24,25
  71:3,6,7,11,13,21
  72:9,11,15,16,20
  73:5,8 76:2
**position** 8:24 37:11
  37:21 42:19 43:2
  45:14 68:24
**possession** 78:22
**possible** 40:15
  75:11 92:8 106:6
**possibly** 79:14
**postal** 15:3 96:4
  105:7
**posturing** 92:8,9
**potentially** 49:2
**practice** 79:5 82:13
**pre** 3:20
**preempt** 114:20

**preexisting** 37:9
**premise** 51:18
**preparation** 11:5
**prepare** 10:22 11:9
  19:16
**prepared** 8:7
**preparing** 13:15
**prerecord** 41:11
**prerecorded** 13:11
  18:1 20:11 23:13
  25:7 26:25 27:6,13
  27:17 41:12 45:1,2
  49:19 52:10 60:20
  62:11 64:3,10
  68:20,24 69:4,23
  70:14,22 72:6,8,13
  80:5,20 94:19 95:4
  95:5 96:8 97:17
  98:7 104:25 106:4
  110:14,16,18,23
  111:3,21,25 112:4
  112:18,22 113:18
**pretty** 86:21
**previous** 41:1,4
  70:24,25
**previously** 91:12
  111:8
**price** 108:23
**pricing** 3:24
**primarily** 11:5
  14:18,22
**primary** 110:4
**printed** 97:14
**prior** 6:6,14 14:5
  16:1 29:9 40:22
  41:12 45:2 47:2
  50:19 55:24 71:6,8
  72:15 78:17 92:5
**privacy** 36:10
  37:23 39:3,13,20
  39:24 40:3,8,21

41:6 42:9 50:14,17
50:22,25 51:6 52:2
53:17,17 54:1
56:18,19,21 106:24
108:11 110:10,13
110:17
**private**  14:4
**probably**  41:2 56:7
**procedural**  109:23
**procedure**  119:25
119:25
**proceedings**  5:3
115:8
**process**  13:2 26:24
35:7
**produced**  27:3
38:22 44:4 62:16
75:20 82:21 102:12
102:22 105:15
111:12 116:9
**product**  51:16
**production**  3:16,17
3:18 57:13,21
61:12 68:9 70:10
71:5 73:14 90:8
**products**  109:4,8,9
**professional**  1:19
104:3 117:21
119:17
**promote**  25:8
**promotion**  94:15
**promotional**  80:25
87:9,18 108:2
113:7 114:25
**promotions**  3:24
11:12,14,16,24
17:7 23:10 24:3
27:11 28:3 62:18
73:10 74:2 90:21
91:3 93:3 103:17
104:4 108:12,13

109:15,16
**prospect**  4:1 67:15
88:15 96:20
**prospects**  48:20
**protection**  55:1,4
**protective**  46:19
**proud**  109:12
**provide**  8:11 10:10
10:17 11:19,25
12:10,16 26:11
31:12 36:20 43:3,4
43:18 80:10 91:8
109:9 114:24
**provided**  12:11
35:13 41:17 42:7
42:16 44:18 45:7
45:15 59:9,20 60:1
63:5 78:13 79:12
79:16 82:18 83:18
83:25 84:1,3 86:11
97:3 100:24 101:9
104:4,13 107:11
110:12
**provider**  53:10
**providers**  52:15,22
52:23,24 53:7,8
**provides**  53:12
**providing**  35:15
**public**  14:5 116:6
116:16 117:5
**published**  36:10
42:8
**publishing**  37:2,22
**pull**  48:12 77:24
84:12
**punching**  33:7
**purchase**  25:16
47:23,25 56:10,14
63:15,16 66:25
67:5,16,20 106:3
108:19 109:5,8,17

**purchased**  49:2
63:3 64:4,20,23
66:2,22 102:2
105:25 110:7
**purchasers**  20:24
**purchases**  49:6
**purchasing**  109:19
**purpose**  15:5,13
16:21 17:4 21:25
24:22 25:15 28:2
**purposed**  63:17
**purposes**  16:24
22:6,8 24:16,18
37:1 50:1 104:18
106:9 110:23 111:4
112:18
**put**  25:19 54:10
57:7 106:17

**q**

**question**  7:2 12:24
13:3 17:8 21:17
26:15,23 31:13
35:6 40:23,24 41:7
41:9 46:22 50:4,5
51:17 53:5 55:2
62:15 64:11 70:2
82:7 86:13 92:3
96:24 106:5
**questions**  6:21,22
113:25
**quick**  105:9
**quickly**  94:23
**quintero**  107:4
114:7,18
**quite**  106:23
108:10
**quoted**  23:19

**r**

**r**  2:1 5:1,19 107:4

**radius**  104:2,7,20
**radiusappend**
103:18
**raise**  5:5
**raised**  58:2
**ram**  20:15 21:4
**rbms**  98:3
**reach**  24:9
**read**  3:7 22:5 23:20
29:15 65:15 66:21
78:14,15 80:3 88:5
106:22 108:16
115:7 118:22 119:3
**reading**  4:18 21:24
108:16 119:21
**real**  94:23
**really**  11:5 40:19
74:17
**realtime**  1:20
117:21 119:17
**reason**  52:21 118:6
**reasonable**  22:12
119:11
**rebates**  20:19
**recall**  6:21 12:17
29:16,23 39:10,10
40:8 54:7 57:4
70:17,21 89:8
**recalling**  88:14
**recalls**  84:15
**receipt**  36:4 59:22
60:9 75:6 78:8,10
78:10 87:8 119:11
**receipts**  78:21
**receive**  20:22 30:19
31:7 32:12,21
38:18 43:5 44:10
44:15,16 53:19
89:21 108:25 112:4
**received**  18:1 31:4
32:10 33:1 44:1

**49:**18 55:14 58:15
62:10 88:20 105:1
110:2 119:13
**receiving** 41:18
42:18 45:9
**recipient** 22:7
**recipients** 45:1
60:20
**recognize** 7:24
19:25 25:2 26:2
57:14 96:19 101:5
101:20,22 102:15
103:20
**recollection** 12:11
42:14 51:23
**record** 5:18 6:11
23:20 48:7 61:12
79:22 82:25 83:3,5
99:1 107:3 114:7
117:10
**recorded** 3:20
17:21 20:13 22:25
67:10,14
**records** 46:18 52:1
69:13 104:5
**reduction** 78:15
**refer** 37:19 38:21
55:6 105:18
**reference** 40:21
46:9 50:14,18
52:14 54:1 56:15
56:21 57:3 61:1
68:21 72:11 87:18
100:18 106:7
107:24 108:2,4,12
110:13,18 111:3
112:11 113:3,7,9
113:18 114:22
**referenced** 27:11
66:2 85:14 119:8

**references** 52:14
85:20 110:22
**referred** 53:3 93:11
95:1
**referring** 6:3 34:15
35:20 73:20 89:2
92:22 94:4,6,14,24
100:11
**reflect** 77:18
**reflected** 98:6
**regard** 119:12
**regarding** 3:20
60:19 71:7 72:17
86:10 109:14,15,17
111:25 114:11,24
**registered** 1:19
117:21 119:17
**regularly** 71:24
**regulations** 55:17
71:2 109:24
**related** 47:19 70:13
78:11
**relates** 65:4
**relationship** 37:10
37:13 39:17 40:17
41:4 43:16 46:24
49:9 51:8,19 80:21
**relationships** 40:18
47:9
**relative** 117:11,13
**relying** 39:21
**remainder** 58:7
**remember** 109:19
**remove** 104:6
**repair** 9:19 57:5
74:22,25 75:2,14
75:19,20 76:3,18
78:9 79:10 85:11
86:6 87:17
**rephrase** 7:3

**report** 84:21 117:7
**reported** 1:19
**reporter** 1:19,20
3:6 117:1,21,21
119:17,17
**reporting** 108:21
108:21
**represent** 5:21
61:24 75:21 89:24
104:8
**representation**
28:3
**represented** 28:2,8
**represents** 62:24
62:24 64:8
**request** 3:16 12:6
57:13,17,21 59:8
60:18 68:8,19
85:11
**requested** 58:3
117:8
**requesting** 91:4
**requests** 86:6
**require** 75:13 82:9
82:12 86:5
**required** 75:17
78:21,23 79:5
105:25
**requirements**
54:17
**requires** 76:3 86:8
**reread** 26:10
**research** 29:19
37:8
**researched** 31:14
**reserved** 4:19
**residential** 69:24
**resides** 65:3
**respect** 8:7 63:23
**respective** 4:17

**respond** 12:6 26:11
**responded** 12:7
**response** 3:16 6:25
12:10 27:2 42:1
45:5 49:23 52:22
53:4 57:12 61:1
68:21 100:25
101:17
**responsibilities**
14:8
**responsibility** 14:9
**responsible** 19:2
**responsive** 57:21
**restrict** 50:8
109:20
**restriction** 41:18
43:19 45:8,17
51:20
**restrictions** 42:8,17
43:3 44:7
**result** 54:10 94:19
96:8 98:7
**results** 80:11
**retail** 20:23
**retailer** 9:18
**review** 13:14
111:16 117:8 119:8
119:9,10
**reviewed** 107:17
111:17
**right** 5:5 8:20 9:16
18:18 26:14,19
35:4 46:10 49:10
63:9,20 65:15,15
66:2 68:1,13 73:19
73:21,24 76:13
77:23 78:18 82:1
84:18,19 87:2 90:6
91:16 93:15 94:1
98:24 100:23
105:22 108:14

**ring** 31:24 32:2,4,7
32:14 33:10,18,19
33:20
**ringing** 16:20
**ringless** 3:21 16:8,9
16:17,22 23:4 28:4
28:13,15,17,21
29:6,8,12,21 30:9
30:22 31:4,9 33:14
33:16 70:15 72:11
72:13,17,19 73:9
74:3,14 90:24
91:19,23 92:4
95:18 99:13 100:18
100:19 104:25
114:22
**rings** 34:22
**robert** 3:23
**robinson** 1:16 2:11
119:3
**robinson.com** 2:14
119:5
**robocalls** 3:20
70:13 72:13
**rolled** 20:19
**romeo** 90:17
**roughly** 69:8
**row** 66:18
**rpr** 1:19 116:6,15
117:5,20 119:16
**rule** 119:25,25
**rules** 12:23 119:11
**run** 75:25
**rung** 99:25
**runs** 12:3

**s**

**s** 2:1,2 3:1 4:15,15
5:1 119:18
**safeguards** 109:24
**sale** 21:5 47:22,25
65:25 66:18 67:3

67:10,14 111:2
**sales** 4:1 10:20
16:23 19:5 23:21
88:22 89:4 96:20
99:25 100:4
**sample** 75:19
111:12
**sampling** 106:2
**saturday** 20:17
**save** 21:2
**saying** 28:5 73:20
98:12 99:7
**says** 20:14 23:21
31:16 41:25 44:24
53:24 59:9 63:10
64:24 65:11,14
80:1,3 84:2 91:18
92:20 94:16 96:22
98:1,20 99:13
108:17 110:8 112:3
**scenario** 34:20
44:16
**screen** 102:16
106:11
**script** 22:22 93:17
93:19,24
**scroll** 102:16
**search** 48:17,18,19
48:19,20,22
**searchable** 106:19
**searching** 84:15
**second** 6:9 20:4
26:9 61:6,17 74:20
83:1
**section** 36:3 67:3
81:4 84:4
**see** 8:5 20:5 23:14
25:10 27:23 31:18
35:9,18 41:14 45:3
49:21 52:12 56:12
59:8 60:24 61:3,15

61:22 63:9 66:5,9
66:10,10,16 67:22
68:22 75:21 76:14
78:3,16 79:24
81:23,23 82:19
83:16 84:6 86:14
91:6,18 96:22
111:23 112:17,19
**seeing** 81:5 82:23
**seen** 20:2 26:7 75:4
101:12 103:21
112:20
**segregate** 48:20
**selection** 14:11
**sell** 10:6,8,13 15:7
72:25 109:25
**selling** 15:13 22:8
24:18
**send** 12:2 15:2 23:5
27:6 36:17 37:13
41:11,11 49:20
64:7,9 89:6,13,18
109:11
**sending** 16:21
24:16 41:12 45:2
104:18
**sense** 56:5 82:15
**sent** 11:24 17:1,22
18:11,19 21:9,13
21:16 24:22 26:25
27:17,21 28:13
31:17 39:9 49:19
52:10 58:3 62:11
62:17 64:3 68:20
68:25 69:5,17,20
69:24 70:23 72:8
93:20 94:19 96:4
97:17 99:3 104:25
105:3 106:3
**separate** 9:9 81:17

**september** 81:24
81:25,25 82:2
**sequester** 46:18
**served** 14:3
**service** 10:10,13
15:3,7,15,18 16:23
35:23,25 36:2
40:20 48:2,13,21
48:22,23,24 57:1
67:11,16,19 75:13
75:16,25 79:12
80:16,17 81:17
82:3 83:24,24
85:11,12,24 86:1,5
86:6 87:17 96:4
109:7,12,15,20
112:2,12 113:10,17
**serviced** 60:5
**services** 11:19 17:7
**servicing** 80:1,13
107:13,15 108:5
**set** 3:13,14 14:13
25:21 32:25 45:25
113:24
**setting** 32:25
**settings** 33:4
**seventh** 8:2
**share** 7:23 51:24,24
109:1,3
**shared** 109:1,9
**sharing** 51:11,25
**shaun** 3:23 4:3,7
19:7,8 23:21 28:11
28:12 74:12 90:13
91:4 92:11 94:2,10
98:1,18 99:1,12,19
**sheet** 3:6 85:5
118:1
**short** 55:6
**shortly** 58:15

**show**  102:10
**shown**  77:13
**side**  25:19 82:19,20
  101:13
**sign**  3:7 53:15
  74:10 75:14,18
  76:1,3,6,11 78:21
  81:9 82:9 85:25
  86:6 114:18 119:9
  119:9
**signature**  26:4,9
  46:5 75:8,9 81:8
  82:5,13 110:3
  116:14 117:19
  119:24
**signatures**  75:21
  79:1
**signed**  28:8 36:9
  59:21 75:12 78:16
  86:3 116:12
**signing**  4:18 119:21
**signs**  53:19
**silos**  46:19
**similar**  14:3 25:15
  33:21 107:16
**similarly**  1:5
**simple**  56:4
**simply**  38:22 44:1
  50:22 51:5,8 56:7
  71:13 79:15 83:24
  91:25 102:21 112:9
**sincerely**  119:15
**sir**  13:19 15:25
  17:13 23:15 26:22
  28:16 50:13 84:10
  91:10 103:15 108:8
**sit**  55:4
**situated**  1:5
**six**  54:6,8,13
**skip**  83:13

**small**  78:3,11,14
**social**  14:23
**software**  30:13
  44:1 46:11,17,24
  47:3 84:4
**sold**  48:21
**solicit**  16:9,23
**solicitations**  15:20
  16:2 17:18
**somebody**  34:20
  37:11 74:8 100:2
  100:16
**sonic**  14:6
**sorry**  8:15,21 19:7
  20:15 41:3 50:3
  53:5 67:8 68:14
  69:22 81:25 85:16
  106:21
**sort**  11:2
**sorted**  104:4
**sound**  32:22
**source**  77:5,20,22
  95:9 97:1
**sources**  29:20
  52:15 60:22 77:25
  108:20
**speak**  11:8,11
  12:25 19:13,16
  82:13 112:19
**speaking**  8:22 9:11
**specht**  4:3,5,7 12:4
  12:18,19 28:6,8,12
  91:3,17 93:20 94:2
  97:25 98:12,17
  99:2,12
**specht's**  94:15
**special**  109:14
**specific**  18:15
  24:21 37:18 45:16
  47:5 53:23 54:1
  71:10 72:11,16

**76:2** 82:15 87:18
  89:2 95:14 111:3
  114:8
**specifically**  21:16
  24:21 28:1 36:12
  38:13,23 43:20
  44:18 50:18 56:15
  62:24 64:7 70:13
  89:4 94:11 97:4
  99:24 100:4,11
  101:11 108:4
  110:15,16,22 111:9
  111:25 112:19
  113:9,17 114:17,22
  114:25
**specifics**  112:6
**specify**  96:21
**specifying**  99:8
**speculate**  65:8
**spell**  5:17
**spelled**  38:13
**spent**  98:2
**spirit**  56:5
**spoke**  11:20
**spoken**  12:19 13:6
  13:10
**spreadsheet**  91:5
  102:10,20 103:7,16
**spreadsheets**  12:13
  12:14
**sprinter**  60:3
**stand**  102:17
**standard**  54:19,24
  107:20
**standpoint**  30:8
**stands**  46:22
  103:24
**start**  15:22 73:19
**started**  23:24 56:2
**starting**  90:9

**state**  5:17 13:23
  55:16 71:2 116:3,6
  116:16 117:2,5
**stated**  14:11 70:25
  118:22
**statement**  80:15
  106:21,24,25
**states**  1:1 27:20
  36:12
**statute**  119:12
**stay**  29:14
**stays**  77:3
**stenographer**  5:5
**stenographic**
  117:10
**stenographically**
  1:18 117:7
**stipulated**  4:16
**stipulates**  87:14
**stop**  6:9 24:3
**store**  8:18,19 39:5
  88:14,15 100:11
**stores**  88:16 89:4,5
**stratics**  29:25 30:6
**street**  1:16 2:12
  119:3
**strictly**  34:20 84:2
**strike**  17:15 55:9
**string**  3:23 4:2,4,7
**structure**  9:11
**stuff**  63:24
**subject**  3:24 4:3,5,8
  41:11,12 94:2
**submit**  53:22
**submitted**  53:6
  76:21 77:8 88:16
**subparagraph**
  107:12
**subpoena**  100:25
**success**  23:25

**sued** 89:25
**sufficient** 68:19
**suggest** 90:20
**suggested** 119:10
**suite** 2:3,8
**sum** 95:13
**summary** 13:20
  83:18,20
**sunday** 20:17
**supposedly** 94:7
**supposition** 92:10
**sure** 7:4 9:18 23:23
  24:7 58:1 68:4
  88:12 106:10
**swear** 5:7 103:9
**switching** 30:23
**sworn** 5:13 116:9
**symbol** 68:15
**system** 30:13 43:23
  48:4,6,7,17 49:8
  67:10,13 77:2 80:6
  83:23
**systems** 112:24

**t**

**t** 3:1,1 4:15,15
  107:4 112:14
**tactic** 91:25
**take** 20:24 63:20
  64:13 68:2,8 70:4
  78:22 82:24 104:4
  105:9 115:6
**taken** 59:7 68:5
  105:11 113:22
**talked** 26:16
**talks** 53:6 108:17
  111:20 112:17
  114:17
**tcpa** 55:6,10,24
  56:1 90:1
**team** 24:6 88:22

**technically** 31:6
**technician** 79:11
**technician's** 79:15
**technicians** 109:13
**technological** 30:8
**technology** 16:9
  23:4 28:24 29:6,9
  29:13,17,18,19,22
  30:10,23
**telemarketing**
  20:11 25:7 36:5
**telephone** 2:6
  15:19 16:2,20
  17:15,17 20:9 21:9
  22:15 24:13 25:2
  27:8,22 33:8 35:8
  43:5,19,20 44:9,18
  45:16 47:16 51:15
  52:8,9 53:12,20
  55:1,4 59:23,23
  60:10,23 62:8,10
  69:24,25 71:21,22
  71:25 76:18 78:12
  80:6,9,10 82:17
  86:11 87:9 88:8
  100:12 106:8
  107:10 111:5 112:5
  112:23,25
**telephones** 87:19
  99:5 110:24
**telephonically**
  76:10
**telepointcomm.c...**
  4:5
**tell** 9:10 32:13
  50:17 53:16 62:3
  63:7 64:13 65:8
  70:11 73:25 74:21
  75:8,24 76:1 79:8
  81:11 82:5 83:14
  84:19 87:23 93:1

93:16 97:1,12
  102:5,5,18 103:21
**telling** 92:23 98:12
  99:2
**tells** 38:23
**term** 28:19 38:7
  48:18
**terms** 13:14 14:11
  17:17 31:6 43:10
  51:9 79:24 81:4
  107:16
**testified** 5:14 6:6
  6:13
**testify** 8:7 111:8
**testifying** 7:9
**testimony** 3:2 5:7
  8:11 18:18 40:2
**text** 3:20 33:23,24
  33:25 34:6 38:21
  70:14 72:13 80:5
  80:20 88:20,25
  89:3,6,11,15,18,21
  107:9 112:23
**thank** 21:6 24:11
  113:24
**thing** 94:10 102:9
**things** 27:6 39:12
  40:17 74:14 107:3
  109:7
**think** 7:8 50:3
  65:16,17 98:3
**thinking** 20:25
**thinks** 42:11
**third** 11:18 27:3,10
  45:7 52:23,23 53:9
  69:18 110:1
**thought** 8:21 31:14
**three** 29:1
**time** 1:15 6:18 8:23
  17:6 36:12 42:25
  55:8 68:2 71:16

75:18 82:22,24
  89:19 108:16
  109:13,13 111:17
  113:25
**times** 6:16 17:23
  59:19 112:21
**today** 6:7,14 8:2
  11:9 55:4 59:2
  111:23
**today's** 10:22 13:15
  19:17
**told** 28:12 55:15
**tonight's** 98:2
**tool** 43:17 46:19
**tools** 29:14
**top** 22:18 57:4 63:9
  66:12 78:3,11
  83:10
**topic** 58:2
**topics** 8:3,8,10 51:5
**total** 68:20 69:7
  98:22
**touch** 102:16
  106:11
**trade** 20:23 24:7
  59:11,16 76:22
  77:10,11,21
**traditional** 32:4
**traditionally** 32:25
**tran** 115:5,6
**transaction** 79:13
**transactions** 47:10
**transcript** 4:19
  117:8,9 118:2
  119:7,9,10,13,14
  119:21
**transmission** 23:8
  30:24
**transmit** 89:11,15
**transmitted** 20:10
  23:2

**travel** 9:1
**tried** 49:7,7
**true** 18:23 41:21
45:11,13 117:9
118:23
**truth** 5:8,8,9
**try** 80:4 106:5
107:8,9 112:21,24
**trying** 21:17 51:16
70:21 86:13
**turn** 8:2 20:5 26:19
35:4 41:8 46:8 58:3
58:19 66:3 91:2
**twice** 6:17
**two** 12:11 61:5
67:17 69:8 91:14
114:21
**type** 17:14 22:3
32:22 36:16 41:9
44:25 47:4 49:15
54:19 71:20 87:16
103:4 108:23
**typed** 85:15
**types** 15:4 49:17
52:2
**typically** 8:17,19
29:16 48:5 49:4,8
52:19 66:1 67:11
81:5 83:22 85:24
103:12

**u**

**u** 4:15 107:4
**u.s.** 15:3
**uh** 35:10 49:12
51:21 53:14 55:7
60:4,21 61:19
77:12 78:1 80:2
88:2 92:15
**unable** 8:10
**underneath** 110:17

**understand** 5:24
6:2,24 7:2,8 26:6
28:5 31:19 40:10
40:18 50:4 53:5
57:17 73:19 94:13
103:2
**understanding**
11:16 12:8 16:16
17:14,16,19,20,21
18:10 30:9,12
35:22 36:16,23
38:17 39:18,24
40:2 43:11 46:16
50:4 55:23 62:21
62:23 63:4 69:10
98:25
**understood** 7:16
**united** 1:1
**university** 13:24
**unsold** 4:5
**update** 104:15
**use** 36:13 37:4
43:16,19 44:19
45:17 46:19 48:18
49:25 51:6,14
52:21 53:11,24
72:6,24 73:2,10
78:12 82:17 86:11
93:18,19,22 94:10
94:11 99:13 102:23
103:5 105:6 106:8
106:11 109:10
110:14,22 111:3,20
112:4,10 114:12,16
**uses** 30:23 56:15

**v**

**v** 118:3
**value** 24:7 63:10,13
63:19
**values** 63:18

**various** 9:4 13:25
14:16 35:14 52:1
52:14 88:4 107:21
**vehicle** 15:14 20:20
21:2 22:9 24:18
25:9,17 28:20 49:3
64:20 66:2,22 67:6
67:16 75:5 79:11
81:15 82:10 83:19
84:22 85:4 86:7
106:1 108:19,23
109:5 110:4,7,7
111:2
**vehicles** 10:6,8,19
56:11 57:1 78:22
109:16,17,19
**vendor** 11:18 13:11
14:11 23:7,10 28:2
29:18,21 30:4 45:7
58:20 69:18
**vendors** 14:12
43:15 70:13 74:14
**verbal** 6:24 33:22
**verbally** 76:7
**veritext** 119:8
**vet** 14:12
**victor** 107:4 114:7
**vin** 64:23
**violation** 90:1
**virtue** 49:24
**voice** 27:7,13 34:15
80:5,20 99:1,3
105:2 107:8 112:23
**voicelogic** 13:6,8
30:2 58:22 59:1,5
**voicemail** 3:21 16:9
16:17,18,20,22
23:4 27:7 28:4,15
28:18,22 29:6,8,12
29:22 30:9,14,22
31:5,7,9 32:10,15

32:21 33:1,14,16
70:15 72:12,13
73:9 74:14 90:24
92:4 100:19 104:25
**voicemails** 28:13
72:17,20 74:3
91:19,23 95:18
99:14 100:19
114:22
**vs** 1:7

**w**

**waiting** 30:20
32:15 75:16
**waive** 119:9,21
**waiver** 119:20
**walked** 48:9
**want** 7:5 15:8
48:12 62:1 94:9
104:22 108:7,9
113:12
**wanted** 23:22
48:23 73:3 77:24
106:19
**warranty** 83:18
84:14,22,23
**washington** 14:4
**waste** 62:1
**water** 7:5
**way** 18:22 21:11,15
21:20 22:5 23:6,17
24:20 29:17 31:6
35:1 36:24 49:5,8
56:8 64:7 66:21
69:16 71:18 78:12
97:7,19 98:11 99:8
100:3 101:11
**ways** 51:9 52:8
80:9 107:10 112:25
**we've** 23:25 72:15
86:16 112:20 114:4

**website** 37:23
38:22 39:4,22 40:4
52:3,20 53:13 54:4
54:23
**websites** 36:11
38:13 39:5 40:9
54:16,20 112:11
**wednesday** 24:1
**weed** 49:5
**week** 18:18
**weekend** 20:20
23:25 98:3
**welcome** 102:15
**went** 71:3
**wholesaler** 9:18
**william** 4:2,4,7
91:3
**williamroberts**
90:11
**williams** 3:23
**willis** 88:3
**window** 36:25 37:7
**wished** 99:19
**witness** 5:10 26:17
58:1 67:8 86:24
**word** 52:22 80:22
80:25 106:19
**words** 14:22
**work** 9:25 14:10
70:25 75:4,6,14,15
76:3,5,12,18 81:14
82:10,12 86:7,9
87:17
**worked** 29:5 89:4
92:18
**working** 14:6 56:2
**works** 30:10
**write** 6:25 12:25
118:2
**writing** 80:4,19
112:22

**written** 38:5 41:16
41:25 42:11 45:5
49:24 56:10,17,25
57:6 71:6
**wrote** 22:22 73:5,8

### y

**yeah** 10:21 17:4
38:12 46:22 58:12
65:19 66:8,14
68:11,14,15,15
78:5,25 88:21
93:25 107:14
**year** 14:1 15:23
21:5 39:7 47:2 51:1
51:3 54:7,21 70:17
70:18,20 71:2
**years** 6:19 10:3
14:3,5 28:25 29:1
29:24
**yep** 85:1 93:12
96:23

### z

**zero** 20:22
**zip** 8:15 65:16

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under
rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.