Page 1

1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
2                     ORLANDO DIVISION
                      CASE NO.:  6:19-cv-00196-GAP-DCI
3
    CLIFTON PICTON,
4   individually and on behalf
    of all others similarly
5   situated,
6          Plaintiff,
7   vs.
8   GREENWAY
    CHRYSLER-JEEP-DODGE, INC.,
9   d/b/a GREENWAY DODGE
    CHRYSLER JEEP,
10
          Defendant.
11
    _____/
12
    DEPOSITION OF:      SHAUN ALLEN
13
    DATE:               TUESDAY, JULY 2, 2019
14
    TIME:               11:57 A.M. - 1:38 P.M.
15
    PLACE:              GRAY ROBINSON
16                      301 EAST PINE STREET, 14TH FLOOR
                        ORLANDO, FLORIDA 32801
17
18  STENOGRAPHICALLY
    REPORTED BY:        JAZZMIN A. MUSRATI, RPR, CRR
19                      Registered Professional Reporter
                        Certified Realtime Reporter
20
21
22
23
24
25

```
 1    A P P E A R A N C E S:
 2    MANUEL S. HIRALDO, ESQUIRE
      OF: Hiraldo, P.A.
 3        401 East Las Olas Boulevard
          Suite 1400
 4        Fort Lauderdale, Florida 33301
          954.400.4713
 5        mhiraldo@hiraldolaw.com
          APPEARING ON BEHALF OF THE PLAINTIFFS
 6
      IGNACIO J. HIRALDO, ESQUIRE - via telephone
 7    OF: IJH Law
          1200 Brickell Avenue
 8        Suite 1950
          Miami, Florida 33131
 9        786.496.4469
          ijhiraldo@ijhlaw.com
10        APPEARING ON BEHALF OF THE PLAINTIFFS
11    G. BROCK MAGRUDER, III, ESQUIRE
      OF: Gray Robinson
12        301 East Pine Street
          14th Floor
13        Orlando, Florida 32801
          407.204.3100
14        brock.magruder@gray-robinson.com
          APPEARING ON BEHALF OF THE DEFENDANT
15
16
17
18
19
20
21
22
23
24
25
```

1                          C O N T E N T S

2      TESTIMONY OF SHAUN ALLEN

3            DIRECT EXAMINATION                          4

       BY MR. HIRALDO

4            CROSS-EXAMINATION                           78

       BY MR. MAGRUDER

5            CERTIFICATE OF OATH                         82

             CERTIFICATE OF REPORTER                     83

6            ERRATA SHEET                                84

             READ AND SIGN LETTER                        85

7

8                          E X H I B I T S

9                          (None marked.)

10

11

12

13

14

15                      S T I P U L A T I O N S

16          It is hereby stipulated and agreed by and between

17     the counsel for the respective parties and the deponent

18     that the reading and signing of the deposition

19     transcript be reserved.

20                          ------

21

22

23

24

25

Page 4

1                      P R O C E E D I N G S

2                           *********

3            (Whereupon, the proceedings began at

4      11:57 a.m.)

5            THE STENOGRAPHER:  Raise your right hand,

6      please.

7            Do you swear or affirm that the testimony you

8      are about to give will be the truth, the whole truth

9      and nothing but the truth?

10           THE WITNESS:  Yes, I do.

11   Thereupon,

12                          SHAUN ALLEN,

13   having been first duly sworn or affirmed, was examined

14   and testified as follows:

15                      DIRECT EXAMINATION

16   BY MR. HIRALDO:

17     Q.  Good afternoon.  Would you please state and spell

18   your name for the record.

19     A.  Shaun Allen, S-H-A-U-N, A-L-L-E-N.

20           MR. MAGRUDER:  Manny, do you want to call in

21      your partner?

22           MR. HIRALDO:  No, I already called him.  Thank

23      you.  Because I called earlier because I knew I'd

24      forget.

25

Page 5

1   BY MR. HIRALDO:

2      Q.  Mr. Allen, my name is Manuel Hiraldo.  I

3   represent the plaintiff in a punitive class action that

4   has been filed against Greenway Chrysler Jeep Dodge,

5   Inc.

6          When I refer to -- when I say the word

7   "Greenway," do you understand I'm referring to the

8   entity Greenway Chrysler Jeep Dodge, Inc.?

9      A.  Yes.

10     Q.  So I don't want to keep saying the whole name

11  throughout the deposition.

12     A.  Perfect.

13     Q.  So I'll refer to it as Greenway.

14         Have you sat for a deposition prior to today?

15     A.  I have been, yes.

16     Q.  How many times?

17     A.  Just once.

18     Q.  How long ago?

19     A.  I would say 10 to 12 -- 8 to 12 years ago.

20     Q.  So it's been a while.

21     A.  Yeah.

22     Q.  Just like you're doing now, I'm going to ask you

23  some questions.  Please let me finish my question before

24  you give me a response.  You may anticipate what I'm

25  going to ask you, which is common.  But she can't write

1   down when we're speaking over each other.  If you don't

2   understand my question, just let me know.  If you do

3   understand it, just give me a response.

4        And then if you need a break, just let me know.

5     A.  Perfect.

6     Q.  Okay.  If you would, give me your business

7   address.

8     A.  9051 East Colonial Drive, Orlando 32817.

9     Q.  What is located at the address?

10    A.  Greenway Chrysler Jeep dealership.

11    Q.  How long have you worked for Greenway?

12    A.  17 years.

13    Q.  So you started in approximately 2002?

14    A.  Yep.

15    Q.  When you started at Greenway in 2002, what was

16  your position?

17    A.  Sales consultant.

18    Q.  For how long did you hold the sales consultant

19  position?

20    A.  Six months.

21    Q.  Okay.  And were you promoted?

22    A.  Yes.

23    Q.  To what?

24    A.  F and I.

25    Q.  What does that mean?

Page 7

1       A.   Finance and insurance manager.

2       Q.   And how long did you hold the F and I position?

3       A.   Three months.

4       Q.   What did you do after that?

5       A.   I was promoted to a sales manager.

6       Q.   And how long did you hold that position?

7       A.   Roughly three to four years.

8       Q.   Okay.  What did you do after that?

9       A.   Promoted to new car director.

10      Q.   In what year were you promoted to the new car

11   director position?

12      A.   I don't know the exact year.

13      Q.   Okay.  Can you give me a rough estimate?  I'm not

14   going to hold you to it.

15      A.   I'm going to say somewhere around 2010, maybe

16   2009, somewhere around there.

17      Q.   Okay.  And how long did you hold that position?

18      A.   I think officially, probably three to four years.

19      Q.   Okay.  And then you became the general sales

20   manager?

21      A.   General sales manager.

22      Q.   And that's referred to internally as "GSM."

23      A.   Yes.

24      Q.   So you became the general sales manager sometime

25   in 2014?

1    A.  Roughly, yeah.

2    Q.  So you've been the general sales manager at

3    Greenway for the past five years?

4    A.  Yes.

5    Q.  What are your responsibilities as the general

6    sales manager?

7    A.  I do everything from inventory management to

8    training sales people, sales process, to marketing.

9    Q.  Does Greenway have a separate marketing

10   department?

11   A.  Not at our store.

12   Q.  So the marketing responsibilities fall on you as

13   the GSM?

14   A.  Correct.

15   Q.  Have you always been responsible for marketing

16   since you've held the GSM position?

17   A.  Yes.

18   Q.  What are the various ways in which Greenway

19   markets to consumers?

20   A.  It has changed.  It changes over time.  It's not

21   consistently the same every month.  But a typical

22   example would be radio, television could be an example,

23   digital marketing, online would be another example.

24        We have done things like direct mail in the past,

25   email campaigns.  I mean, that pretty much is a pretty

Page 9

1  broad coverage of marketing.

2      Q.  When Greenway engages in marketing to the

3  consumer, what is the purpose of that message?

4      A.  Awareness, whether it be a special incentive

5  that's available is -- is typically the one we advertise

6  for awareness.

7      Q.  Is one of the goals of that marketing in which

8  Greenway engages to get consumers to come into the

9  dealership?

10          MR. MAGRUDER:  Object to the form.

11          You can answer.

12      A.  Obviously, the end result, we want them to come

13  to the dealership.  Sometimes that's typically -- these

14  days, a lot more happens online and over the phone prior

15  to that.  But to take delivery of a vehicle, most of the

16  time requires someone to come to the dealership.

17  BY MR. HIRALDO:

18      Q.  Right.  And what does Greenway -- how does

19  Greenway make money?

20      A.  By selling and servicing vehicles.

21      Q.  Selling new vehicles?

22      A.  Yeah, new or preowned.

23      Q.  And selling used vehicles?

24      A.  Correct.

25      Q.  And then providing services for those vehicles

1   themselves, correct?

2       A.   Correct.

3       Q.   Correct?

4       A.   Yes.

5       Q.   Let's take a step back.

6            What did you do to prepare for today's

7   deposition?  And one of the instructions I didn't give

8   you earlier on is that any communications you've had in

9   the presence of either your in-house or outside

10  attorneys is privileged.  So don't tell me about those.

11  But communications you've had with other employees of

12  Greenway in which counsel was not present, you can tell

13  me about those.

14      A.   Correct.

15      Q.   Is that understood?

16      A.   Yes.

17      Q.   Okay.  Did you speak with anyone to prepare for

18  today's deposition other than your attorneys?

19      A.   No.

20      Q.   Okay.  Did you speak with Matt Bishop?

21      A.   Just about scheduling of the depo.

22      Q.   What about Justin Specht?

23      A.   We have not spoken about anything related to

24  this.

25      Q.   Who is Mr. Specht?

1    A.   Justin works -- or I assume owns BDC Promotions.

2    Q.   And what is BDC Promotions?

3    A.   It is a marketing company.

4    Q.   And you have not spoken to Mr. Specht about this

5  deposition?

6    A.   Not about this deposition.

7    Q.   Have you spoken to Mr. Specht about this lawsuit,

8  generally?

9    A.   No.

10   Q.   At no point in time?

11   A.   No.

12   Q.   Have you spoken with anyone about this lawsuit

13  other than your attorneys?

14   A.   No.

15   Q.   Did you review any documents to prepare for

16  today's deposition?

17        MR. MAGRUDER:   So objection.

18        Based on his instructions, if you've looked at

19     anything outside of what we've shown you and what

20     we've talked about, you can answer.

21   A.   Yeah, I've done nothing outside of...

22  BY MR. HIRALDO:

23   Q.   Did you speak with anyone from VoiceLogic?

24   A.   No.

25   Q.   Do you know what VoiceLogic is?

Page 12

1    A.  I do not.

2    Q.  Have you ever heard of the name?

3    A.  I have not heard of them prior to this -- this

4    scenario here.

5    Q.  Just give me a brief history of your education

6    and then employment history leading up to when you

7    started working at Greenway in 2002.

8    A.  I was in college.

9    Q.  Okay.  So when did you go to college?

10   A.  1998 to '02.

11   Q.  Okay.  Where did you go?

12   A.  Middleton, SC State.

13   Q.  And then you started working for Greenway right

14   out of college?

15   A.  When I came -- when I moved to Orlando, correct.

16   It was right when Greenway opened.

17   Q.  Did you have any marketing background when you

18   started working at Greenway in 2002?

19   A.  From school.

20   Q.  Okay.

21   A.  Some classes from school, obviously.  And -- but,

22   no, I was -- school and then to Greenway.

23   Q.  Okay.  Do you know what a ringless voicemail is?

24   A.  I do.

25   Q.  When did you first learn of ringless voicemail

1  technology?

2     A.   That would be probably January or February of

3  2018.

4     Q.   And how is it that you first became aware of

5  ringless voicemail technology?

6     A.   Through Mr. Specht, through the -- introduction

7  through Mr. Specht.

8     Q.   How is it that you were introduced to Mr. Specht?

9     A.   From Chrysler FCA.

10    Q.   The manufacturer?

11    A.   Yes.

12    Q.   Okay.  So the manufacturer suggested that you

13  contact BDC Promotions?

14    A.   Correct.

15    Q.   And for what purpose?

16    A.   To do a marketing campaign with BDC Promotions,

17  in which they would subsidize some of the cost of it in

18  hopes that they would obviously create more business

19  with us.

20    Q.   Is that a common occurrence where the

21  manufacturer is recommending marketing vendors to you?

22    A.   Yes.

23    Q.   Okay.  And when Fiat Chrysler recommended BDC

24  Promotions to you, did they do so in an email,

25  telephone, or both?

1    A.   Definitely an email.  Possibly a phone call as

2   well.

3    Q.   And who at Fiat Chrysler made the recommendation?

4    A.   Definitely Robert Williams.  And then my rep at

5   the time -- my district rep at the time was Mike

6   Coffino.  I'm confident that we had conversations about

7   that.

8    Q.   Can you spell Mike's last name?

9    A.   Yeah.  It's Michael Coffino, C-O-F-F-I-N-O.

10    Q.   And Mike Coffino is with FCA?

11    A.   FCA, correct.

12    Q.   When you say "FCA," that means Fiat Chrysler,

13   correct?

14    A.   Yes.

15    Q.   And Mike Coffino's your district manager, you

16   said?

17    A.   He was at the time, correct.

18    Q.   When were these recommendations made to you by

19   Fiat Chrysler to contact BDC Promotions?

20    A.   It would have been either January or February of

21   2018.

22    Q.   During any of the communications, was ringless

23   voicemail technology mentioned to you by either of these

24   two individuals employed by the manufacturer?

25    A.   It was definitely recommended by the

Page 15

1  manufacturer.  I know that they were sending out

2  communications that had ringless voicemails listed as a

3  third-party marketing opportunity.

4      Q.  Was that something that was in writing to you?

5      A.  I would have to do more research.

6      Q.  Are you aware of Fiat Chrysler engaging in

7  ringless voicemail campaigns directly?

8      A.  I don't know.

9      Q.  When they mentioned ringless voicemails, what did

10  they say to you?

11      A.  My understanding, it was in a -- kind of a

12  monthly flyer of, you know, here's your opportunity for

13  third-party marketing support, and here's the different

14  companies, here's the packages, and that type of

15  listing.

16      Q.  Okay.  And what is co-op advertising?

17      A.  Co-op is -- general co-op for any FCA dealership,

18  you get a certain amount of incentive -- not incentive,

19  but you get a payment based off of your sales.  Per sale

20  would equal a certain amount, right?  So the more that

21  you sell, the more that you earn.  And you have to spend

22  a 1 to 1 portion on advertising for part of it.  And

23  then the second part, you have to spend -- it's a 2

24  to 1.

25          So if you spend -- I'm just using real numbers.

1    If you spend $10,000, they would provide 5,000, for

2    example.

3         So the more you sell, the more you earn.

4    Q.  Okay.

5    A.  It has to be used on advertising.

6    Q.  Okay.  The flyer that you mentioned that was sent

7    to you by FCA in which ringless voicemails were

8    mentioned, did -- was that part of a co-op

9    advertisement -- advertisement -- strike that.

10        The flyer that you mentioned where ringless

11   voicemails were noted, was that part of a co-op

12   advertisement material sent to you by FCA?

13   A.  Yes.

14   Q.  Did FCA ultimately contribute towards the

15   ringless voicemail campaign that was executed by BDC on

16   behalf of Greenway?

17   A.  Yes.

18   Q.  How much did they pay?

19   A.  I'd have to do further research.

20        Typically -- typically, I would say a third of

21   the cost is typically what's offered in that scenario.

22   Q.  Is there any documentation reflecting this

23   payment that was made by FCA?

24   A.  I would have to do research on that -- or have

25   someone do research on that.

1    Q.  Was FCA apprised of the ringless voicemail

2  campaigns that were performed by BDC Promotions?

3    A.  Were they aware?

4    Q.  Yes.

5    A.  I can't answer for them, but I would assume that

6  they understand.

7    Q.  Well, it was a poor question.

8       Did you at some point alert FCA that you were, in

9  fact, going to do these ringless voicemail campaigns

10  through BDC?

11    A.  Sure.

12    Q.  How did you do that?

13    A.  Because they introduced us to BDC Promotions,

14  they already knew what he was doing at other stores for

15  FCA.  So they already knew that that was part of the

16  package part, was direct mail and ringless voicemails.

17  So they obviously knew that prior to introducing us.

18    Q.  So BDC was doing ringless voicemail campaigns for

19  other Fiat Chrysler dealerships?

20    A.  Yes.

21    Q.  Do you know how many?

22    A.  I don't.

23    Q.  Did you ever tell Mr. Coffino that you were using

24  BDC to send ringless voicemails?

25    A.  Either it was known because of the introduction

1    or, you know, we had a conversation about it, but he was

2    aware that that was going on, for sure.

3        Q.  Did you ever send any emails to anyone at FCA

4    advising them that Greenway was going to send ringless

5    voicemails using BDC?

6        A.  I don't think those -- that wording would have

7    been in there.

8        Q.  Did you ever seek approval for the content of the

9    ringless voicemail messages from FCA before sending

10   them?

11       A.  That would be a responsibility on BDC Promotions.

12   So they send -- when you do third-party marketing

13   events, they send the creative to FCA for pre-approval.

14       Q.  And I saw the creative that was sent for the

15   mailers --

16       A.  Yes.

17       Q.  -- and the production.  We'll go over that in a

18   little bit.

19            Was part of what was sent to FCA by BDC scripts

20   for these prerecorded messages?

21       A.  I don't think so.

22       Q.  Would that have been something that BDC was

23   required to send?

24       A.  I don't know.

25       Q.  I'm going to hand you what we've marked

1    previously as Exhibit 2.

2            Do you recognize this document?

3        A.  Yes.

4        Q.  When was the first time that you saw this?

5        A.  I have not read through this, but I'm aware of

6    the complaint.

7        Q.  Okay.  When Greenway was first served with this

8    lawsuit, did anyone come and talk to you about it --

9        A.  No.

10       Q.  -- that was not an attorney?

11       A.  No.

12       Q.  Okay.  If you flip over to Page 12, please.

13           And over on Paragraph 44 -- I've been doing that

14   for the past few days -- Paragraph 44, do you see there

15   the allegation is that on or about February 21, 2018,

16   this prerecorded message that has been transcribed here

17   in Paragraph 44 was sent to the plaintiff's telephone

18   number?

19       A.  Yes.

20       Q.  Do you recognize the message that's reflected

21   here in Paragraph 44?

22       A.  It's a version of a script, yes.

23       Q.  Who prepared the script for that message?

24       A.  Mr. Specht.

25       Q.  Did you approve it?

1    A.  I'm not sure if I gave official approval.

2  Typically, he -- or a third-party marketing company will

3  do the script.  Typically, it's not done from the

4  dealership.

5    Q.  Did you review it before Mr. Specht sent it?

6    A.  Yes.  Yes.

7    Q.  Did you allow Mr. Specht to use Greenway's name

8  in the message?

9    A.  Yes.

10    Q.  Okay.  The telephone number that's identified

11  here in the message, (407) 704-2962, what number is

12  that?

13    A.  That's a dealership number that sales managers

14  were answering.

15    Q.  Did you tell Mr. Specht to include that telephone

16  number in the message?

17    A.  Yes.

18    Q.  Had you instructed -- if you would have

19  instructed Mr. Specht to not send this message, would he

20  have followed your instructions?

21        MR. MAGRUDER:  Object to the form.

22        You can answer.

23    A.  I can't answer on his behalf.  But I would hope

24  that he would listen to, you know...

25

1  BY MR. HIRALDO:

2     Q.  If you had any changes to the script of this

3  message, would Mr. Specht have made those changes?

4           MR. MAGRUDER:  Same objection.

5     A.  I would expect him to.

6  BY MR. HIRALDO:

7     Q.  Do you know how this message was recorded?

8     A.  I know Justin handled that.  Mr. Specht handled

9  that.

10    Q.  My -- well, based on the testimony of

11 Mr. Specht -- based on the testimony of Mr. Specht from

12 a few weeks ago, my understanding is that there were

13 four ringless voicemail campaigns conducted by BDC on

14 behalf of Greenway; is that correct?

15          MR. MAGRUDER:  Object to the form.

16          You can answer.

17    A.  I know that we did more than one.  That sounds

18 like an accurate number.

19 BY MR. HIRALDO:

20    Q.  Okay.  Was there a ringless voicemail message

21 sent by BDC on behalf of Greenway in January of 2018?

22    A.  My understanding is February is the first time we

23 did business.

24    Q.  February was the first one?

25    A.  I believe so.

1    Q.  There were no January messages?

2    A.  That's not my recollection.

3    Q.  Okay.  Do you know how many messages were sent

4    or -- do you know how many messages BDC attempted to

5    send on February 21, 2018?

6    A.  How many different scripts?

7    Q.  No.  How many messages were sent to unique

8    telephone numbers.

9    A.  I don't know that number.  I know that we were

10   contracted for 15,000.  However, I can't prove that he

11   sent those 15,000.

12   Q.  Okay.

13   A.  It could have been 2,000.  I don't...

14   Q.  Did Mr. Specht ever show you any kind of

15   disposition log showing the outcome of each attempted

16   voicemail?

17   A.  Ringless voicemail?

18   Q.  Yes.

19   A.  No.

20   Q.  Do you know why not?

21   A.  My understanding is it wasn't available.  You

22   know, it's not -- it's not unusual to not get your

23   money's worth, for lack of a better word, with a

24   third-party vendor, especially something that we can't

25   track.  So if this is something that cost him money, and

Page 23

1   I wouldn't know the difference, I'm not so sure that

2   15,000 went out.

3       Q.   What about FCA?  When they're paying co-op

4   dollars towards marketing, would they not require proof

5   that marketing was actually done?

6            MR. MAGRUDER:  Object to the form.

7       A.   For the mail.

8   BY MR. HIRALDO:

9       Q.   For the mail?

10      A.   Correct.

11      Q.   But not for anything else?

12      A.   No.

13      Q.   Okay.  This February 21, 2018, prerecorded

14  message, was that the first time that Greenway had used

15  ringless voicemail technology?

16      A.   That's my understanding.

17      Q.   Had you used ringless voicemail technology for

18  any other purpose prior to this date?

19      A.   I don't believe so.

20      Q.   Okay.  When -- let's back up a little bit.

21           When after you were introduced to Mr. -- or you

22  were -- after it was suggested to you that you contact

23  BDC Promotions, did you, in fact, reach out to them?

24      A.   Yes.

25      Q.   How did you do that?

1    A.   I don't remember how the initial contact

2  happened.  Just may have -- Mr. Specht may have reached

3  out to me.  He may have gotten my phone number from

4  Chrysler or I could have called him.  I'm not sure which

5  one -- which one happened.

6    Q.   Okay.  Did Mr. Specht ever come to the

7  dealership?

8    A.   He has been to the dealership, yes.

9    Q.   Have you ever been to BDC Promotions?

10   A.   No.

11   Q.   When was the first time that Mr. Specht visited

12  the dealership?

13   A.   My memory is Justin used to also work the events.

14  So I would have to make sure.  But I'm pretty sure that

15  he was there for the weekend of this event.

16   Q.   When you say "this event," what do you mean?

17   A.   So there was dates on the mail, the event dates.

18  Typically, he would work, like, a Thursday, Friday,

19  Saturday, sometimes Sunday.

20   Q.   What would he do when he would come to the

21  dealership to work these events?

22   A.   Greet customers and -- that had received the

23  notification.  And he was kind of the contact person for

24  those days when these customers came in to look at the

25  offers that were sent to them.

1     Q.  So the first -- as far as you can remember, the

2   first time that Mr. Specht came to the dealership was on

3   or about February 21, 2018 --

4     A.  Correct.

5     Q.  -- for this event?

6     A.  Correct.

7     Q.  Did the event have a name?

8     A.  I don't remember this -- this one.  It's probably

9   on the direct mail.

10    Q.  So this event took place on Friday, Saturday, and

11  Sunday.  When did this message go out, what day of the

12  week?  Do you know?

13    A.  I don't know.

14    Q.  I'm looking at the calendar.  I'll represent to

15  you that February 21, 2018, was a Wednesday.

16        Does that sound right?

17    A.  Sure.

18    Q.  So the message was sent out a day before the

19  event started?

20    A.  I don't know.

21    Q.  The event -- what was the purpose of this event

22  that's mentioned here in the message?

23    A.  For awareness of the offers that were available

24  at that time.

25    Q.  Would you consider this message to be part of the

1    marketing responsibilities for which you were assigned

2    as the GSM?

3         A.  Yes.

4         Q.  Do you consider this message to be marketing?

5              MR. MAGRUDER:  Object to the extent that you're

6         calling for a legal conclusion under TCPA.

7              But you can -- you can respond.

8         A.  It's awareness, sure.

9    BY MR. HIRALDO:

10        Q.  So yes?

11        A.  Yeah.

12        Q.  The telephone number that's mentioned in this

13   message you said was being answered by Greenway

14   employees?

15        A.  Yes.

16        Q.  For what purpose?

17        A.  To make sure that customers that were interested

18   in the offers were getting to someone that's

19   knowledgeable about the incidents.

20        Q.  Do you know how many people called that number as

21   a result of receiving this message?

22        A.  I don't.

23        Q.  Was that tracked by Greenway?

24        A.  I don't believe so.

25        Q.  When you first learned of ringless voicemail

1 technology from someone at FCA, what did they tell you

2 about the technology?

3  A.  The conversation would have went like, we're

4 seeing good success with this company at other stores

5 and we'd like you guys to try it.

6  Q.  Did you have a choice?

7  A.  Sure.  Yes.

8  Q.  Okay.  So you were not required by FCA to use the

9 technology?

10  A.  Correct.

11  Q.  Okay.  Did -- do you know what the Telephone

12 Consumer Protection Act is?

13  A.  Yes.

14  Q.  So I'll refer to it as the "TCPA," for short.

15      When did you first learn of the TCPA?

16  A.  Third quarter of 2018, so maybe June/July.

17  Q.  Okay.  How was it that you became aware of the

18 TCPA?

19  A.  Through corporate notification.

20  Q.  From FCA?

21  A.  No, from Greenway.  I'm sorry.

22  Q.  Greenway.

23      And who at corporate sent this notification?

24  A.  This probably would have been from Chuck or a

25 combination of corporate employees.

1    Q.  Chuck Agner?

2    A.  Yes.

3    Q.  Did Greenway have a TCPA policy prior to June or

4  July of 2018?

5    A.  Not related to ringless voicemail.

6    Q.  Related to something else?

7    A.  Following, you know, laws for advertising and

8  marketing, correct.

9    Q.  Okay.  And what was the policy that was initiated

10 regarding ringless voicemails by Mr. Agner sometime in

11 June or July of 2018?

12   A.  To discontinue any use of them.

13   Q.  Do you know why he initiated that policy?

14       MR. MAGRUDER:  Object to the form.

15       You can answer.

16   A.  I don't.

17 BY MR. HIRALDO:

18   Q.  Okay.  Do you know if the directive came from

19 FCA?

20   A.  I do not know that.

21   Q.  Why was Matt Bishop's name used in this message?

22   A.  We wanted to give a good contact of the sales

23 manager that's working during that time because we don't

24 want to falsify -- we don't want to give in -- incorrect

25 information or falsify an event or a sales and a

1    consumer cannot reach someone, have a contact person.

2    You know, this scenario is giving a specific sales

3    manager's name with a call back number at which, you

4    know, they answered.  So if you had -- if there was

5    interest, you can get to someone that is knowledgeable.

6       Q.  Did anybody tell Matt Bishop that his name was

7    being used?

8       A.  Yes.  He was working.  He was answering calls.

9       Q.  Answering calls from people that were receiving

10   this message?

11      A.  Yes.

12      Q.  So he was told that his name was going to be put

13   in this message?

14      A.  Yes, that's my understanding.

15      Q.  Who told him?

16      A.  I would bet that I did.

17      Q.  Was Mr. Bishop involved at all in setting up

18   these ringless voicemail campaigns through BDC?

19      A.  No.

20      Q.  Was anybody else at Greenway, other than you,

21   involved?

22      A.  No.

23      Q.  Now, has Greenway alerted FCA of this lawsuit?

24      A.  No.

25      Q.  Nobody at Greenway has said, Hey, we have been

1  sued for the ringless voicemails you suggested we send

2  out?

3      A.   Not that I know of.  I haven't.

4      Q.   Do you know why not?

5           MR. MAGRUDER:  Object to the form.

6      A.   It's above my pay grade.

7  BY MR. HIRALDO:

8      Q.   Fair enough.

9           Turning back to the complaint, which is

10 Exhibit 2, Paragraph 46 and 47 talk about another

11 ringless voicemail message that was sent to our client

12 on or about February 28, 2018.

13          Do you see that message there?

14     A.   Yes.

15     Q.   Okay.  Who recorded that message?

16     A.   I don't remember.  It's not typical for me to

17 record it.

18     Q.   Mr. Specht testified that you wanted to record

19 that second message and that you did so without a

20 transcript -- or a script, rather.

21     A.   That would be incorrect.

22     Q.   Did he record it?

23     A.   I don't remember.  But I typically -- I wouldn't

24 want to do something like this.  And I definitely

25 wouldn't have made the script.  That's his expertise.

1    Q.  Okay.  If he recorded this message, would you

2    have authorized him to use your name?

3    A.  Yes.

4    Q.  And would have you authorized him to use the

5    Greenway name?

6    A.  Yes.

7    Q.  If you wanted to make changes to the script,

8    would Mr. Specht have followed those instructions?

9         MR. MAGRUDER:  Object to the form.

10   A.  Yes.

11   BY MR. HIRALDO:

12   Q.  Do you know how many messages were sent to unique

13   telephone numbers on February 2018 -- February 28, 2018?

14   A.  I don't.

15   Q.  Okay.  Do you consider this message that's on

16   Paragraph 47 to be marketing?

17        MR. MAGRUDER:  Object to the extent that it

18      calls for a legal conclusion.

19        But you can answer.

20   A.  Again, yes, it's awareness, like the previous

21   one.

22   BY MR. HIRALDO:

23   Q.  Was one of the purposes of this message to get

24   consumers to come into the dealership?

25        MR. MAGRUDER:  Object to the form.

1    A.   The purpose is to give customers that are

2  interested in upgrading a vehicle at the time, or

3  whatever the offer is, to have a contact person to call

4  us and have them come...

5  BY MR. HIRALDO:

6    Q.   The messages that are reflected here in

7  Paragraphs 44 and 47 of the complaint, was one of the

8  purposes of those messages to get consumers to come in

9  and purchase a vehicle from Greenway?

10           MR. MAGRUDER:   Object to the form.

11           You can answer.

12    A.   The purpose is, if they're interested in buying a

13  vehicle, to understand that we've got discounts and

14  incentives that can help them and give them a contact

15  person to be reached at.

16  BY MR. HIRALDO:

17    Q.   Now, we've looked at two different messages that

18  were sent on February 21, 28.

19           Were there any other ringless voicemail messages

20  sent by BDC on behalf of Greenway?

21    A.   I don't know.

22    Q.   Do you know if there were messages sent in

23  between February 21st and 28th?

24    A.   I don't know.

25    Q.   Do you know if there were any messages sent in

Page 33

1    March of 2018?

2        A.  Yes.

3        Q.  Okay.  How many?

4        A.  I don't know.

5        Q.  On how many dates?

6        A.  My -- my memory is about the second week of

7    March, Justin made a mistake with this first event, and

8    to make up for it, basically did a -- an additional sale

9    for us.

10       Q.  What was the mistake?

11       A.  My memory is that the names and addresses were

12   crossed and there was something wrong with the mail, and

13   I believe it wasn't doing what Justin expected it to do.

14   And so he felt like we paid for something that we didn't

15   get the correct outcome on.  So he did a make-good.

16       Q.  Do you remember -- were you at the dealership

17   after the first -- during the event after the first

18   message was sent?

19       A.  Sure.

20       Q.  Do -- do you recall the turnout?

21       A.  We had people that were interested in the offers,

22   yes, that were calling back in and setting appointments.

23       Q.  Do you know how many?

24       A.  I don't.

25       Q.  In addition to these ringless voicemail messages,

1    was anything else done by BDC in connection with these

2    promotions?

3        A.   They also had a call center that was making live

4    calls and setting appointments.

5        Q.   What about direct mail?

6        A.   Direct mail, yeah.

7        Q.   Anything else?

8        A.   That's it.

9        Q.   Okay.  So was it a three-tiered marketing

10   campaign?

11       A.   Yes.

12       Q.   And this was -- was this all co-op marketing?

13       A.   Yes.

14       Q.   I'll take that back from you.  Thanks.

15            Did you, Mr. Allen, do anything to locate

16   documents to produce in discovery in this lawsuit?

17            MR. MAGRUDER:  Object to the extent that any of

18       the information or answer to this question would be

19       in relation to conversation with lawyers.

20            But to the extent that you did anything, you

21       can answer the question without disclosing any of

22       those communications, feel free to do so.

23       A.   Correct.  I didn't.

24   BY MR. HIRALDO:

25       Q.   Did you search through your email box?

1    A.   Just as instructed through attorney.

2    Q.   When you searched through your email box, did you

3  look for specific terms?

4    A.   Yes.

5    Q.   What did you look for?

6    A.   Justin's email address.

7    Q.   Besides looking for Justin's email, did you look

8  for anything else?

9    A.   Just anything related to BDC.

10   Q.   Did you turn over all the emails that you located

11 in that search?

12   A.   Yes.

13   Q.   Okay.  My understanding is that -- and we'll look

14 at some documents more closely -- but that you sent

15 Mr. Specht a list of Greenway customers; is that

16 correct?

17   A.   Correct.

18   Q.   That list consisted of either individuals that

19 had purchased a vehicle from Greenway, correct?

20   A.   Yes.

21   Q.   And also individuals that had had service done on

22 their vehicles at Greenway; is that correct?

23   A.   Yes.

24   Q.   When you sent that list of customers to

25 Mr. Specht, how was that transmitted to him?

1      A.   It was sent through an employee of Greenway

2   corporate through a secured file.

3      Q.   Not in an email?

4      A.   Correct.

5      Q.   The secure file, was it something like a Dropbox

6   or an FTP site?

7      A.   Similar, yes.

8      Q.   FTP?

9      A.   Yes.

10      Q.   Is there a record of that transmission?

11      A.   I don't know.

12      Q.   Okay.  How many lists did you send to Mr. Specht?

13      A.   How many individuals?

14      Q.   No.

15      A.   Oh, lists.

16      Q.   How many lists, yeah.

17      A.   One list.

18      Q.   One single list?

19      A.   Yes.

20      Q.   How many individuals were identified on that

21   list?

22      A.   I don't know the exact number.

23      Q.   Okay.  Was it 20,000?

24      A.   At least, yes.

25      Q.   Okay.  Was it 35,000?

1      A.   I'm not sure.

2      Q.   How did you compile the list?

3      A.   I didn't.  The corporate employee did.

4      Q.   Which corporate employee?

5      A.   Jean Demers.

6      Q.   Can you spell her name?

7      A.   J-E-A-N, Demers, D-E-M-E-A-R-S [sic], maybe.

8      Q.   Where is Ms. Demers located?

9      A.   She works at the corporate offices I'm referring

10   to where my building is, where the Ford store is.

11     Q.   What's the address of the corporate office?

12     A.   9001 East Colonial Drive.

13     Q.   And did you request for Ms. Demers to put the

14   list together?

15     A.   Yes.

16     Q.   When you made that request, was it in an email or

17   over the phone?

18     A.   Email.

19     Q.   What did your email say to Ms. Demers?

20     A.   I would have forwarded Mr. Specht's email to her,

21   based off of what he asked for.

22     Q.   Mr. Specht sent you -- sent you an email with

23   specific information that he needed?

24     A.   Correct.

25     Q.   And then you forward that -- you forward that on

1    to Ms. Demers?

2        A.   Yes.

3        Q.   And did she, in fact, put together that list?

4        A.   Yes.

5        Q.   Do you know how she did that?

6        A.   I don't.

7        Q.   Did she pull it from the eLead platform?

8        A.   No.

9        Q.   Did she pull it from a different platform?

10       A.   Yes.

11       Q.   Which one?

12       A.   It would be our DMS.

13       Q.   What is DMS?

14       A.   It's a software that we use that houses service

15   customers and sales -- sales customers --

16       Q.   Okay.

17       A.   -- that did business with us.

18       Q.   The DMS platform, does it have separate databases

19   for service and sales customers?

20       A.   Yes.

21       Q.   Okay.  How does it segregate -- how does the DMS

22   platform segregate sales and service customers?

23       A.   I'm not sure exactly the technical answer to

24   that.  But I just -- I deal with sales and the service

25   guys only have access to service.  So that would be

1  above my knowledge.

2      Q.  What does DMS stand for?

3      A.  I can't remember what the acronym is.

4      Q.  But it's a software?

5      A.  Yeah.

6      Q.  And you access that on a computer?

7      A.  Yes.

8      Q.  And so if I go into DMS and I want to pull up a

9  list of all of the service customers that Greenway has

10  had, can I do that?

11      A.  I can't, no.  Jean can.

12      Q.  Well, I'm not saying you or I, but I'm saying --

13      A.  Yes, someone.

14      Q.  Someone can, correct?

15      A.  Yes.

16      Q.  She can pull up a list of everybody who has been

17  a service customer?

18      A.  Correct.

19      Q.  And what information is available for each one of

20  those -- those individuals?

21      A.  I don't know exactly, but information that we've

22  collected from a customer.

23      Q.  Okay.  Would that information that Greenway has

24  collected include the first and last name of a customer?

25      A.  Yes.

Page 40

1      Q.   Their home address?

2      A.   If they volunteered it, yes.

3      Q.   Their cell phone?

4      A.   If they volunteered it.

5      Q.   Their home phone?

6      A.   If they volunteered it.

7      Q.   Their email address?

8      A.   Yeah.

9      Q.   And so that search that I do for service

10   customers, that's something that I can punch in and say,

11   I want only service customers, give me the list?

12     A.   That's my understanding, yes.

13     Q.   And then I can also go into DMS and say, I want

14   purchase customers --

15     A.   Correct.

16     Q.   -- give me the list?

17          And would I get the same information for those

18   service -- for those purchase customers as I would for

19   the service customers?

20     A.   Any information the customers have volunteered to

21   us.

22     Q.   First and last name?

23     A.   Yes.

24     Q.   Home address?

25     A.   Yes.

Page 41

1    Q.  Et cetera?

2    A.  Yes.

3    Q.  How far back does that database go?

4    A.  I don't know the exact answer.  I would assume

5    that it -- I don't know the answer.

6    Q.  Okay.  When you sent the request to Ms. Demers,

7    did you tell her you wanted both sales and service

8    people?

9    A.  I would have just forwarded exactly what Justin

10   said, so yes.  Specifically, yes, for certain fields.

11   Q.  Did Mr. Specht ask you for both sales and service

12   people?

13   A.  Yes.

14   Q.  So then Ms. Demers pulled this information from

15   the DMS platform and then uploaded it to some secure FTP

16   site, correct?

17   A.  Correct.

18   Q.  And then Mr. Specht downloaded that list,

19   presumably?

20   A.  Yes.

21   Q.  Okay.  Were ringless voicemail -- was it

22   Greenway's instruction that ringless voicemails be sent

23   to those telephone numbers in that list?

24   A.  No.  That was Justin's -- the list has addresses

25   on it for the direct mail.

1    Q.   Okay.

2    A.   And, again, the ringless voicemail was not our

3    idea or anything that we had experienced.  And so we

4    were trusting his expertise with that agreement for

5    marketing.

6    Q.   Okay.  FCA suggested that you use ringless

7    voicemails, correct?

8    A.   They suggested that we do business with BDC

9    Promotions.

10   Q.   And then one of the things that was in that flyer

11   that you mentioned earlier was a mention to ringless

12   voicemail, correct?

13   A.   I have seen that, yes.

14   Q.   And then BDC suggested that you do ringless

15   voicemail?

16   A.   Yes.

17   Q.   And did you authorize that?

18   A.   Yes.

19   Q.   Okay.  The campaign that was sent on February 21,

20   2018, was -- were those -- was that prerecorded message

21   sent to the individuals on the customer purchase/service

22   list that we have been discussing?

23        MR. MAGRUDER:  Object to the form.

24        You can answer.

25   A.   That's my understanding.

1    BY MR. HIRALDO:

2       Q.   Do you know if Mr. Specht targeted only cellular

3    telephone numbers?

4       A.   I don't how that works.

5       Q.   Did you discuss with Mr. Specht ever whether he

6    was going to send messages only to cell numbers, to home

7    numbers, or both?

8       A.   I don't think we had that conversation.

9       Q.   Do you know if, in addition to the list that

10   we've been discussing, Mr. Specht sent ringless

11   voicemails to individuals in a different list?

12      A.   Yes.

13      Q.   How do you know that?

14      A.   Because, again, there was a mistake, I believe,

15   with the mail from Justin.  And in an effort to make

16   good, he said that he has access to a conquest list that

17   qualifies for, you know, the ringless voicemail campaign

18   that he was going to give to us to help make up for the

19   mistake that he made.

20      Q.   The -- did you ever see the conquest list

21   yourself?

22      A.   No.

23      Q.   Did BDC ever send Greenway the conquest list?

24      A.   No.

25      Q.   Do you know how many people were on that conquest

1   list?

2       A.  My understanding was it was going to be 20,000

3   people, I believe.

4       Q.  And you don't recall how many were on the

5   customer -- the Greenway customer list?

6       A.  My understanding, based off the date ranges, it

7   would be a large amount.  And then they would scrub for

8   accuracy and do not call lists and things like that with

9   the information.

10      Q.  All right.  So I just want to make sure we're not

11  getting confused.

12          We have what we've been calling the conquest

13  list?

14      A.  Uh-huh.

15      Q.  Yes?

16      A.  Yes.

17      Q.  Which is the list that BDC purchased, correct?

18      A.  That they did not get from us.

19      Q.  Does Greenway know from where BDC got the

20  conquest list?

21      A.  No.  I know now based off your mention of Core

22  Logic -- or Call Logic or --

23      Q.  VoiceLogic?

24      A.  VoiceLogic.

25      Q.  I'll represent that VoiceLogic was the actual

Page 45

1   platform that was used --

2       A.  Then, no, I don't know.

3       Q.  -- to send the messages.

4       A.  I have no idea where that came from.

5       Q.  So there's the conquest list, and then there's

6   what I'll call the Greenway customer list?

7       A.  Yes.

8       Q.  We discussed that there was three campaigns,

9   correct?

10      A.  (Nods head.)

11      Q.  February 21st, February 28th, and then sometime

12  in the first week or two of March, correct?

13      A.  You're referring to campaigns as ringless

14  voicemail drops?  Because it was just --

15      Q.  Let's call them "drops."

16          It's one campaign, three drops, correct?

17          MR. MAGRUDER:  Object to the form.

18      A.  Yeah.

19  BY MR. HIRALDO:

20      Q.  So there were drops on February 21st, 28th, and

21  sometime in early March?

22          MR. MAGRUDER:  Object to the form.

23      A.  I don't know exactly when they went out.  But,

24  yes, we do -- did do a campaign the week of the 21st.

25

1   BY MR. HIRALDO:

2       Q.  Uh-huh.

3       A.  And then Justin handled -- Mr. Specht handled all

4   of the ringless voicemails.

5       Q.  Do you know, was it Greenway's instruction that

6   ringless voicemails be sent to the individuals on the

7   Greenway customer list on February 21st?

8           MR. MAGRUDER:  Object to the form.

9       A.  Was it our understanding that --

10  BY MR. HIRALDO:

11      Q.  Yeah.

12      A.  Yes.

13      Q.  Was it Greenway's understanding that BDC sent

14  ringless voicemails to the individuals on the Greenway

15  customer list on February 28th?

16          MR. MAGRUDER:  Object to the form.

17          You can answer.

18      A.  Again, I don't know the exact dates.  But, yes,

19  we knew that -- that he was using that list for ringless

20  voicemails during those two weeks.

21  BY MR. HIRALDO:

22      Q.  What about March?  Were ringless voicemails sent

23  to the individuals on the Greenway customer list in

24  early March?

25      A.  I would have to do my research, but that's my --

1   that's my understanding.

2      Q.   What research would you need to do?  What would

3   you need to look at?

4      A.   To make -- what our agreement was for March.

5      Q.   Did you have a separate agreement for March?

6      A.   Yes.

7      Q.   A separate --

8      A.   A separate campaign.  It was not the exact same.

9      Q.   So there was a separate -- the only -- I'll

10   represent to you that the only document that I've seen

11   in production is an invoice for February.

12         Was there a separate invoice from BDC to Greenway

13   for March?

14      A.   Yes.

15      Q.   How many ringless voicemails are reflected on

16   that invoice?

17      A.   I don't know.

18      Q.   Was there -- after that early March 2018 drop,

19   was there -- were there any other ringless voicemail

20   drops done by BDC?

21      A.   Yes.

22      Q.   How many?

23      A.   Potentially -- I don't know the exact amount, but

24   we probably have done four campaigns with them.

25      Q.   Was that other drop also in March?

Page 48

1    A.  I would have to research.

2    Q.  Was that other drop also sent to the individuals

3  in the Greenway customer list?

4    A.  Yes.

5    Q.  Now, as far as the conquest list, do you know if

6  that conquest list was used for drops on February 21st?

7    A.  My recollection is that it was not done the first

8  week, referring to the week of the 21st.

9    Q.  So that first drop on February 21st was only done

10  to the Greenway customer list?

11    A.  That's my understanding.

12    Q.  Now, the drop on February 28th, was that done to

13  the conquest list?

14    A.  My understanding, it was done to the conquest

15  list.

16    Q.  So February 21, only Greenway customer list,

17  correct?

18    A.  That's my understanding.

19    Q.  February 28th, conquest list and Greenway

20  customer list?

21    A.  Yes.

22        MR. MAGRUDER:  Object to the form.

23  BY MR. HIRALDO:

24    Q.  And then what about March, early March?

25    A.  March, my under -- my memory is that it would

1   just be our list.  Because this was a make -- a

2   make-good.  So we weren't spending any additional money.

3       Q.  I see.  So the conquest list was only targeted on

4   March 28th because this was kind of his make-up for the

5   mistake that he made --

6       A.  February --

7       Q.  -- on the mailing?

8       A.  February --

9           MR. MAGRUDER:  Object to the form.

10          Let him finish the question, and then give me a

11      second to object.

12  BY MR. HIRALDO:

13      Q.  You're doing fine.  But, yeah, he's -- we're

14  starting to talk over each other.  She'll throw

15  something at us.

16          So then the March drops were, again, only done to

17  the Greenway customer list?

18          MR. MAGRUDER:  Object to the form.

19          You can answer.

20      A.  Yes.

21  BY MR. HIRALDO:

22      Q.  Okay.  I'm going to hand you what was previously

23  marked as Exhibit 6, which is a composite exhibit

24  consisting of Greenway Documents 38 through 43.  And

25  then I've skipped and printed the last page because just

1    of how many pages there were.

2          Tell me, Mr. Allen, do you recognize this

3    document?

4        A.  I've never seen it before.

5        Q.  Do you know if this is the conquest list?

6        A.  I don't.

7        Q.  Do you see there where it says "home market

8    value"?

9        A.  Yes.

10       Q.  Would Greenway maintain home market values for

11   its customers?

12       A.  I'm not aware of what this is referencing.

13       Q.  So you don't know what this is?

14       A.  I don't.

15       Q.  Okay.  Next document is Exhibit 7, Greenway 283

16   through 287 and then 375 and then the last page, which

17   is 741.

18          Do you recognize this document?

19       A.  I do not.

20       Q.  Is this the Greenway customer list?

21       A.  I don't know.

22       Q.  Did you ever see the Greenway customer list?

23       A.  No.

24       Q.  Who would have seen it?

25       A.  Jean and Justin, Mr. Specht.

1    Q.   Do you know where this information came from?

2    A.   In my hands, this -- I don't know what this is.

3    Q.   Do you see that -- do you see the column that's

4   right to the right of ZIP, where it says "CRRT"?

5    A.   Yes.

6    Q.   What is that?  Do you know?

7    A.   I do not know.

8    Q.   Do you see the column that says "sale date"?

9    A.   Yes.

10    Q.   Do you know what that is?

11    A.   That would reference the date of purchase.

12    Q.   Does Greenway keep information about purchase

13   dates for its customers?

14    A.   Yes.

15    Q.   Okay.  Do you know what percentage of cell phone

16   numbers Greenway has in its DMS platform for its service

17   customers?

18         MR. MAGRUDER:  Object to the form.

19         You can answer.

20    A.   I have no idea.

21   BY MR. HIRALDO:

22    Q.   Do you know what percentage of cell phone numbers

23   Greenway has in its DMS platform for its purchase

24   customers?

25         MR. MAGRUDER:  Same objection.

1           You can answer, if you know.

2      A.  I have no idea.

3  BY MR. HIRALDO:

4      Q.  Thank you.

5          I'm going to hand you what we've previously

6  marked as Exhibit 8, which is Greenway 742 and 743.

7          Do you recognize this document?

8      A.  Yes.

9      Q.  Can you tell me what this is?

10     A.  This was the notice about sending ringless

11 voicemails and automated text messages.

12     Q.  When was this rolled out?  Do you know?

13     A.  My memory was Q3, June/July, something like that,

14 of last year, 2018.

15     Q.  When you "Q3," you mean the third quarter?

16     A.  Yeah.

17     Q.  Of 2018?

18     A.  Yeah.

19     Q.  And this was prepared by Mr. Agner?

20     A.  That's my understanding.

21     Q.  Did you ever discuss -- have you ever discussed

22 ringless voicemails with Mr. Agner?

23     A.  I would -- my memory is the only discussion that

24 we may have had was the fact that we don't do them

25 anymore, but never in a marketing conversation.

1    Q.  Did you ever discuss with him how the

2  manufacturer was recommending ringless voicemails to its

3  two dealerships?

4    A.  No.

5    Q.  Has Greenway engaged in ringless voicemail drops

6  since this policy was rolled out in June or July of last

7  year?

8    A.  No.

9    Q.  Next document is going to be exhibit --

10  previously marked as Exhibit 9, which is Greenway

11  Bates 1 through 37.

12      Can you tell me -- when I say "Bates," I'm

13  referring to this number here on the right-hand corner.

14    A.  Gotcha.

15    Q.  Can you tell me what this first page is, Bates 1?

16    A.  This is an invoice for BDC Promotions for the

17  February 22nd campaign.

18    Q.  Did you -- what's the date on this invoice?

19    A.  Is it right in front of me?

20    Q.  I'm looking at it right here.

21    A.  Oh, I'm sorry.  Dates February 22nd through the

22  25th.

23    Q.  Was this invoice for the February 21st and

24  February 28th campaign?

25    A.  Yes.

Page 54

1     Q.  And there's a separate invoice for the March

2   campaigns, correct?

3     A.  Yes.

4     Q.  Do you know how many ringless voicemails are

5   reflected in that March invoice?

6     A.  I do not.

7     Q.  Now, where it says -- do you see here where it

8   says "co-op website fcapap.com," what does that mean?

9     A.  That is the website where they would submit for

10   pre-approval.

11     Q.  Did this invoice go to you directly?

12     A.  Yes.

13     Q.  Did you send it to accounting and authorize

14   accounting to pay it?

15     A.  Yes.

16     Q.  Okay.  Are ringless voicemails reflected on this

17   invoice?

18     A.  It says "ringless VMS 15,000."

19     Q.  That means ringless voicemails?

20     A.  Yes.

21     Q.  Turn to the next page, please.  Oh, you are

22   there?

23         Do you know what this document is?

24     A.  This is a service RO.

25     Q.  When you say "RO," what does that mean?

1    A.   Repair order.

2    Q.   Are you familiar with the documentation that

3  Greenway customers have to sign during a service

4  transaction?

5    A.   No.

6    Q.   Okay.  Have you ever seen the documentation?

7    A.   That the customer signs, no.

8    Q.   Do you know if customers are, in fact, required

9  to sign anything when they get repair work done?

10    A.   I know currently -- I do know that we do have the

11  customer sign something when they drop their vehicle

12  off, yes.

13    Q.   When did that start?

14    A.   I don't know.

15    Q.   Was that in effect in June of last year?

16    A.   I don't know.

17    Q.   Turn over to Bates 4, please.

18        Do you see here where if says "additional terms"

19  in small print and says "servicing in collection

20  contacts"?

21    A.   Uh-huh.

22    Q.   Have you seen that language before?

23    A.   No.

24    Q.   No?  Do you know what that language is

25  referencing?

Page 56

1      A.   I do not.

2      Q.   Turn over to Bates 29, please.

3           Bates 29 is a complaint that was provided to

4  Greenway by us in discovery.  It appears to be a lawsuit

5  filed by Willis Johnson against various Greenway

6  entities.

7           Are you familiar with this lawsuit at all?

8      A.   No.

9      Q.   Do you know anything about the text messages that

10 Mr. Johnson was complaining of in this lawsuit?

11     A.   I do not.

12     Q.   Has Greenway ever used text messages to

13 advertise, similar to ringless voicemail drops?

14     A.   No.

15     Q.   Are you okay?  Do you want to take a break?

16     A.   I'm good.

17          MR. MAGRUDER:  I wouldn't mind taking a very

18     short break.

19          (Whereupon, a break was taken from 12:54 p.m.

20     to 1:00 p.m.)

21 BY MR. HIRALDO:

22     Q.   Mr. Allen, I'm going to hand you what we

23 previously marked as Exhibit 10, which consists of

24 Greenway Bates 744 through 809.

25          All right.  So looking at the first page, which

is Bates 744, is this -- is this the William Roberts that you mentioned earlier, who is with the manufacturer --
A. Yes.
Q. -- with FCA?
And is this the email in which Mr. Roberts recommended to you that you reach out to BDC Promotions?
A. Yes.
Q. And that was in February -- on February 22, 2018, correct?
A. Yes.
Q. And then attached to this email is what, the pricing information?
A. Yes.
Q. The document that you mentioned earlier that references -- from the manufacturer that references ringless voicemails, what is that document called?
A. It would be referred to as, like, the monthly launch documents, meaning here's the game plan for the month type of thing. And it would be a -- a sheet in there with third party options.
Q. And was that part of this email that was sent to you on February 2nd?
A. No.
Q. Separate email?

1     A.  Yes.

2     Q.  When was that email sent to you?

3     A.  It would be whenever the month started, so either

4  February 1st, if that was a weekday, or February 2nd, if

5  that was the first day of the month.

6     Q.  Okay.  And then you -- did you email Mr. Specht

7  after receiving this email from the manufacturer?

8     A.  Either -- I don't know for sure.  Either

9  myself -- either I called Mr. Specht or he called me.

10    Q.  Okay.  And then there's an email here on

11 Bates 746 from Mr. Specht to you.  Is that -- well, is

12 that to you?  Is that your email address there,

13 shchallen@gmail.com?

14    A.  Yes.

15    Q.  Does Greenway have its own email addresses?

16    A.  Yes.

17    Q.  Why weren't you -- why were you not using

18 Greenway's email?

19    A.  The company email system, I receive hundreds of

20 emails through there a day that are spam and people that

21 I don't associate with or do business with --

22    Q.  Uh-huh.

23    A.  -- because it's readily -- it's available on the

24 websites and things like that.

25    Q.  Uh-huh.

1    A.  It's a lot harder to keep up with.

2    Q.  Okay.  And then this is the list of information

3  that he was requesting that you provide, correct?

4    A.  Yes.

5    Q.  And did you, in fact, provide this information to

6  BDC?

7    A.  I sent it to Jean Demers to prepare, yes.

8    Q.  Do you see Number 5 where it says:  "Email to

9  push appointments to CRM and email BDC/Internet manager

10  who will be confirming the appointments"?

11    A.  Yes.

12    Q.  What does that mean?

13    A.  That would mean we have a CRM similar to eLead.

14  Our current CRM is eLead.  And that's where our

15  appointments get scheduled in.

16    Q.  Uh-huh.

17    A.  So -- also, that's where we receive leads from

18  your website or any third-party vendors.  That's how

19  they notify us of a customer that's interested.  And so

20  they could push the appointments into our CRM.

21    Q.  Okay.  The next page, please, 747.

22        Do you see the email from you dated February 5th

23  where you say, in part:  "Does that say 3,800 for

24  ringless voicemails?  I'm paying less than 2,000 for

25  4,000 currently."

1          Do you see that?

2     A.   Correct.

3     Q.   Is that true?

4     A.   That was probably a negotiating tactic.

5     Q.   So it was not true?

6     A.   I don't -- I don't know if that math is right or

7     not.

8     Q.   Well, were you using anyone for ringless

9     voicemails?

10    A.   We have done ringless voicemails to our leads,

11    someone that sent us an electronic lead that agreed to

12    be transmitted with that way, but not -- nothing like

13    this.

14    Q.   Now, when -- those prior ringless voicemail

15    drops, when did those occur?

16    A.   They would occur for customers that had sent

17    their information to us that we were not in contact

18    with.

19    Q.   What vendor did you use for those prior drops?

20    A.   I would have to research.  I can't remember the

21    name.  I would have to research that.

22    Q.   Okay.  Was that at the recommendation of FCA

23    also?

24    A.   I would have to research and see where the

25    connection came from there.

Page 61

1   Q.  Okay.  So my understanding, from your prior

2   testimony, is that you had not learned about ringless

3   voicemail technology until this contact from FCA in

4   early February of 2018; is that true?

5   A.  Right.  We've done -- we've done calls to our

6   leads, to customers that have sent in inquiries to our

7   website.

8   Q.  When did you first learn about ringless voicemail

9   technology?

10  A.  I would have to -- I would have to look up and

11  see what -- what this is referring to here.  But it

12  wouldn't -- I don't know the time frame of that.

13  Q.  Did you send ringless voicemails -- did any

14  vendor send ringless voicemails on behalf of Greenway in

15  the year 2017?

16  A.  I would have to research.

17  Q.  Did any vendor send ringless voicemails on behalf

18  of Greenway in 2016?

19  A.  I would have to research.

20  Q.  When you say you would have to research, what

21  would you be looking at?

22  A.  What the contact was with the company that was

23  doing the callbacks to the leads that were coming in.

24  Q.  After March of 2018, did Greenway use any vendor

25  to conduct ringless voicemail drops?

1     A.   Yes.

2     Q.   Which vendor?

3     A.   BDC.

4     Q.   How many times?

5     A.   I think about four times, total.

6     Q.   Make sure you're listening to my question.

7          So we've established that there were two drops in

8   February of 2018, correct?

9     A.   That's only one campaign.  February is one

10  campaign.

11          MR. MAGRUDER:  Object to the form.

12  BY MR. HIRALDO:

13    Q.   I understand.

14          There were two drops in February of 2018,

15  correct?

16          MR. MAGRUDER:  Object to the form.

17          You can answer.

18    A.   I don't know that.

19  BY MR. HIRALDO:

20    Q.   At least BDC told you that there was going to be

21  two drops in February, correct?

22          MR. MAGRUDER:  Same objection.

23          You can answer, if you know.

24    A.   I believe the contract clearly states that it was

25  for one weekend or one week or something like that.

Page 63

1    BY MR. HIRALDO:

2        Q.   Right.

3        A.   What I said to you earlier was, they dropped the

4    ball on something, and it created this whole snowball of

5    make up, make up, make up.

6        Q.   Okay.

7        A.   So originally, I don't believe that that was ever

8    intended to be a continuous thing with BDC.

9        Q.   Okay.  How many drops -- how many ringless

10   voicemail drops did BDC do in February of 2018?

11       A.   I don't know.

12       Q.   How many drops did BDC do on behalf of Greenway

13   in March of 2018?

14       A.   How many campaigns?

15       Q.   Drops.

16       A.   I don't know.  I can't prove -- I don't know

17   anything for sure as far as what Mr. Specht was --

18       Q.   What did Mr. Specht tell you in terms of how many

19   drops he did in February of 2018?

20       A.   We -- he said that he was going to deliver 15,000

21   to the database.  Then he said that he was going to get

22   a conquest list together.  And I don't know -- I don't

23   know what that amount was, much less could I ever, you

24   know, know how many were actually sent and how many were

25   home phone numbers versus cell phone numbers.

1       Q.   Did you ever ask?

2       A.   No.

3       Q.   Why not?

4       A.   Because that's not my expertise.

5       Q.   Did you ever ask him how many drops he did in

6    March?

7       A.   I don't remember.

8       Q.   Did you -- did he do any -- did he tell you that

9    he did other drops after March of 2018?

10      A.   We did another campaign with him, yes.

11      Q.   When did that occur?

12      A.   In May.

13      Q.   Okay.  How many -- well, how many drops occurred

14   in May of 2018?

15      A.   I don't know.

16      Q.   Okay.  How many drops did he tell you that he was

17   doing in May?

18      A.   I don't remember.

19      Q.   Okay.  To whom were the voicemail drops in 20 --

20   in May of 2018 sent?

21      A.   To our database.

22      Q.   To the Greenway customer list?

23      A.   Yes.

24      Q.   Okay.  Anybody else?

25      A.   No.

Page 65

1   Q.  Okay.  After May of 2018, did Greenway use
2   ringless voicemail technology for any other type of
3   campaign?
4   A.  No.
5   Q.  Now, the earlier campaigns that you were
6   mentioning to people that provided the information, how
7   was it that Greenway obtained those individuals' names
8   and telephone numbers?
9   A.  Through an Internet lead.
10  Q.  Okay.
11  A.  So they sent us their phone number.
12  Q.  What Internet website did these individuals visit
13  in order to send you their information?
14  A.  Greenwaydodge.com.
15  Q.  On that greenwaydodge.com website, is there a
16  disclosure that talks about prerecorded messages?
17  A.  Yes.
18  Q.  How long has that disclosure been on the website?
19  A.  I'm not -- not sure.
20  Q.  Who is Alesia McWhite?
21  A.  Accounts payable.
22  Q.  All right.  Please turn over to 792.  This is an
23  email from Mr. Specht to you dated February 21, 2018, at
24  3:53 p.m.  And it says:  "Script attached.  Will send
25  audio files shortly."

1        And then the following page, 793, appears to be

2    the script for the February 21st message; is that

3    correct?

4        A.  Yes.

5        Q.  Okay.  Did he send you -- did Mr. Specht send you

6    the script before the February 21st drop for the

7    messages went out?

8            MR. MAGRUDER:  Object to the form.

9            You can answer.

10       A.  Did he send this before the ringless voicemails

11   went out?

12   BY MR. HIRALDO:

13       Q.  Yes.

14       A.  Yes.

15       Q.  Okay.  Why is it that he was emailing you a copy

16   of the script?

17       A.  To show what he was providing.

18       Q.  Did you write him back in response to this?

19       A.  If I did, I'm sure it would be in here somewhere

20   else.  I'm assuming that there's not an email back is

21   why you're asking.

22       Q.  Yeah.

23       A.  I don't recall.

24       Q.  He follows up, if you look at 794, with the

25   actual, it appears, audio of the message; is that

1    correct?

2        A.   Yes.

3        Q.   Did you approve this script and this audio before

4    it went out?

5        A.   I would assume that I did.

6        Q.   Okay.  The following date, Mr. Specht, if you

7    look at 796, he emails you and says:  "BDC appointments

8    generated 2/21."  And then there's -- it looks like an

9    attachment following that with a date, a name, and a

10   contact number.

11            What is that attachment?

12       A.   That is appointments sent by the live call

13   agents.

14       Q.   Are these -- these appointments in any way

15   related to the ringless voicemail drops?

16       A.   No.

17       Q.   All right.  801, please.

18            This is an email on February 23rd where it says:

19   "Appointments generated last night."  And, again,

20   there's a list of individuals with their names and

21   numbers.

22            Are those appointments generated from the live

23   calls?

24       A.   Yes.

25       Q.   Is there a list of any appointments that were

1    generated from the ringless voicemail drops?

2        A.   No.

3        Q.   Okay.  Why not?

4        A.   Good question.

5        Q.   You don't know?

6        A.   I don't know.

7        Q.   Next document would be Exhibit 11, or previously

8    marked as Exhibit 11.

9            Do you recognize this document?

10       A.   Not really.  There's no title on it.

11       Q.   Is this a list of leads that were provided by

12   Greenway to BDC?

13       A.   I don't recall.  Is there any other information

14   missing here?

15       Q.   This is all I have.

16           Did Greenway provide leads to BDC for the purpose

17   of making live calls to those leads?

18           MR. MAGRUDER:  Object to the form.

19           You can answer.

20       A.   If anything was sent to him, other than our

21   customer base, it would have been a list from Chrysler,

22   from FCA.

23   BY MR. HIRALDO:

24       Q.   What do you mean?

25       A.   Either my rep would send me a list to send to BDC

1    or it would have been found from -- which could be the

2    same thing -- could by found from a -- what's called a

3    TDM list, a targeted direct mail is what TDM stands for.

4    But they do give dealerships lists monthly for people

5    that have shown interest in something or -- just giving

6    another example, or someone that's in the market to

7    purchase a vehicle.

8        Q.   Do you know if that's what this is?

9        A.   It would have more of a title on it.

10       Q.   Do you know where this document came from?

11       A.   I don't.

12       Q.   Do you know who at Greenway would know the answer

13   to that?

14       A.   Where did this list come from?

15       Q.   It was produced to us by Greenway in discovery.

16       A.   So it would probably be information on the email

17   that was attached to it.

18       Q.   But as you sit here, you don't know what that is,

19   correct?

20            MR. MAGRUDER:   Object to the form.

21       A.   I don't know.   I would need more information on

22   that.

23   BY MR. HIRALDO:

24       Q.   Next exhibit will be 12, previously marked as 12.

25   It's Bates 852 through 862.

1        The lists that appear in -- in pages 852 through

2    860 -- or strike that -- 853 through 860, are those

3    similar to what we discussed before, these are leads

4    generated from live calls by BDC?

5        A.  Yes.

6             MR. MAGRUDER:  Object to the form.

7    BY MR. HIRALDO:

8        Q.  Now, there's an email on 861 from Mr. Specht to

9    you dated February 24, and the subject line is:  "Please

10   record RBM for Monday."  And in it, he gives you a

11   number to record your, quote, voice cast.

12            What is that?

13       A.  That's Mr. Specht asking myself to call and

14   record a ringless voicemail message.

15       Q.  Okay.  Did you do that?

16       A.  I don't believe I recorded one.

17       Q.  Did you write him back at some point and say,

18   "You record it"?

19       A.  That would be my response if I did record it,

20   which I do not believe I did.

21       Q.  The following page is an email from you to

22   Mr. Speck, and it says:  "This is the number to use for

23   ringless voicemails in March for callbacks,

24   (407) 605-5908."

25            What does this mean?

1    A.   The callback number for customers to call and get

2    in touch with a manager.

3    Q.   Is that a number that was included in the

4    voicemail drops in March?

5    A.   That's what I sent it to him for, yes.

6    Q.   That's a Greenway number?

7    A.   Yes.

8    Q.   Okay.  And then customers who received the

9    ringless voicemail could have called this number and set

10   an appointment with someone at Greenway?

11   A.   Correct.

12   Q.   To come in and look at a vehicle?

13   A.   Sure.

14   Q.   All right.  Next is going to be Exhibit 13,

15   previously marked.  It's Bates 2123, 2124, and the last

16   page, 2179.

17        It's an email from Mr. Specht to someone at

18   telepoint.com.  Do you know what telepoint.com is?

19   A.   No.

20   Q.   And then he says:  "Dial this list tonight."  And

21   attached to it is another list.

22        Do you know what this list is?

23   A.   This is the same as the last one.  So -- I

24   just -- I don't want to guess.

25   Q.   You don't know?

Page 72

1      A.  I don't know.

2      Q.  Last exhibit, 14.  There is a list on Bates 0041,

3  where it starts on 0041.  And then the last page of that

4  list is the following page, which is 449.  It reflects

5  20,001 different individuals.

6          Do you know what this list is?

7      A.  I have not seen this list.

8      Q.  Do you know if this is the conquest list?

9      A.  I don't know, but it's not a Greenway list.

10     Q.  When -- did BDC tell you -- did Specht tell you

11  that he was obtaining a conquest list to send voicemail

12  drops to on February 28, 2018?

13          MR. MAGRUDER:  Object to the form.

14          You can answer.

15     A.  Yes.

16  BY MR. HIRALDO:

17     Q.  Okay.  And did you authorize him to send ringless

18  voicemails to that conquest list on that date?

19     A.  Yes.

20     Q.  Next, I want to show you on my computer a file

21  that was produced to us by Greenway in discovery.  It's

22  called "GDC

23  Promotions-GreenwayDodgeNCOA-dedupe-radiusappend."

24          And I'll just pass you my computer.  Feel free to

25  flip through it.  The computer is touch screen.

1      Can you tell me what that is?

2    A.  My understanding, this list didn't come from me.

3  I don't know what CRRT is, which leads me to believe I'm

4  not sure exactly what this list is, unless it was the

5  customer list that was sent from Jean.

6    Q.  But you never actually saw that customer list,

7  correct?

8      What about this list?  It's called "M1044691A."

9    A.  I am not familiar with lists that have the income

10  symbols on it.

11    Q.  Do you know if it's the conquest list?

12    A.  I don't know.

13    Q.  How much did Greenway pay BDC for voicemail drops

14  in March of 2018?

15    A.  I don't know the exact amount, but I know that --

16  my memory is that we only paid for the cost of the mail

17  because it was a make-good from the -- for the mistakes

18  that Mr. Specht had made in February.  My memory seems

19  to be around a $5,000 invoice for the cost of postage

20  and creating mail.

21    Q.  Did that March invoice reflect how many

22  voicemails --

23    A.  I would have to research.

24    Q.  -- would be sent?

25    A.  I would have to research.

Page 74

1    Q.  When was the last time that Greenway did business

2  with BDC?

3    A.  This month.

4    Q.  Greenway continues to do business with them?

5    A.  Yes.

6    Q.  What was done by BDC on behalf of Greenway for

7  this month?

8    A.  Social media.

9    Q.  Okay.  The ringless voicemails that we've been

10  discussing, was one of the purposes of sending those

11  messages to customers so that they would listen to the

12  message?

13         MR. MAGRUDER:  Object to the form.

14         You can answer, if you can.

15    A.  Yes.

16  BY MR. HIRALDO:

17    Q.  Okay.  And you wanted people to pick up their

18  phone and listen to that message, correct?

19         MR. MAGRUDER:  Object to the form.

20         You can answer, again.

21    A.  Yes.

22  BY MR. HIRALDO:

23    Q.  Has BDC ever sent you a disposition log for a

24  ringless voicemail drop?

25    A.  Have they ever sent us a list of people that they

Page 75

1   dialed?

2      Q.   Yes.

3      A.   Not -- no.

4      Q.   Have you ever asked for one?

5      A.   No.

6      Q.   Is there any reason why not?

7      A.   I actually am not aware that that is a thing.

8      Q.   Okay.  When you -- when you submit -- well,

9   strike that.

10        Who submits to FCA for co-op approval, the -- the

11   invoice?

12     A.   The pre-approval?

13     Q.   No.  The actual final payment approval.

14     A.   Greenway does.

15     Q.   Okay.  When you submit -- did you submit this BDC

16   invoice to FCA for approval?

17     A.   Yes.

18     Q.   When I say this -- "this BDC invoice," it's the

19   only one that we've been discussing, the one for

20   February.  Do you understand that?

21     A.   Yes.

22     Q.   Okay.  How is it that you submitted that invoice

23   to FCA for approval?

24     A.   I -- I don't remember if it was electronic at the

25   time, but it was either FedEx'd with -- actually, it

1   probably was FedEx'd with hard copies of the mail piece

2   attached to it, and then they upload it in their system.

3       Q.  And FCA didn't require you to show any proof of

4   that -- that the ringless voicemail campaign was, in

5   fact, conducted?

6       A.  No.

7       Q.  Do you have an understanding of what type of

8   permission is required from a consumer before a

9   marketing call can be sent to his or her cellular

10  telephone?

11          MR. MAGRUDER:  Object to the extent that it

12      calls for a legal conclusion from a lay witness.

13          But you can answer, if you know.

14      A.  You're speaking of today?

15  BY MR. HIRALDO:

16      Q.  Yes, as you sit here today.

17          MR. MAGRUDER:  Same objection.

18      A.  I just know that we're not reaching out to people

19  that haven't given us their information that is

20  requested to be reached out to.

21  BY MR. HIRALDO:

22      Q.  Do you know what kind of written disclosure must

23  be signed by a consumer before they can be sent a

24  prerecorded message on their cellular telephone?

25          MR. MAGRUDER:  Same objection.

Page 77

1          But you can answer, if you know.

2     A.   I don't know the exact verbiage that it has to

3     be.   Today, we just do not do it.

4     BY MR. HIRALDO:

5     Q.   Okay.   Have you spoken to anyone at any other

6     dealership that has done ringless voicemail drops about

7     this lawsuit?

8     A.   No.

9     Q.   The cell phone numbers that were in the Greenway

10    customer list for service customers, were those all

11    obtained at the point in which these individuals came in

12    and requested to have service done on their vehicles?

13          MR. MAGRUDER:   Object to the form.

14          You can answer, if you know.

15    A.   I don't know the answer to that.

16    BY MR. HIRALDO:

17    Q.   Okay.   Just give me five minutes.

18          MR. MAGRUDER:   Yeah, sure.

19          (Whereupon, a break was taken from 1:32 p.m.

20    to 1:34 p.m.)

21          MR. HIRALDO:   I have no further questions

22    Mr. Allen, for you today.

23          I am going to leave the deposition open.   I

24    don't think we've received all responsive documents,

25    based on testimony today, particularly with respect

1      to emails and campaign information for the March

2      drops.  So we can discuss that some more off record.

3           But if we get additional documents and -- it's

4      not my intention -- it's not my intention to bring

5      you back here again, but if there are documents that

6      I need -- that I have questions about, we are going

7      to reserve our right to do so.  Obviously, it's your

8      right to object to that.

9           But that's all I have for today.

10          MR. MAGRUDER:  I do want to lodge an objection

11     to the deposition remaining open, but agree to talk

12     and see what we can work out off record.

13          MR. HIRALDO:  Okay.

14          MR. MAGRUDER:  I do just have very few

15     follow-up questions.

16                      CROSS-EXAMINATION

17     BY MR. MAGRUDER:

18     Q.  I believe that this is Exhibit 10 that I'm going

19     to be referring to.

20          There's some email exchanges that plaintiff's

21     counsel asked you about earlier, specifically Bates

22     Number 746.  There's -- this is a list of information

23     that it looks like BDC requested from you.  And I

24     believe your testimony was that you asked one of the

25     employees to compile this information and create a list

1    that was eventually transferred to BDC; is that correct?

2        A.   That's one way that we do it.  I don't remember

3    exactly how it was compiled for this.  It would require

4    some more research.

5        Q.   Okay.  But -- but Mr. Specht asked you for work

6    phones, cell phones, and home phones all specifically

7    delineated, correct?

8        A.   Right.

9        Q.   Do you know if the phone numbers on the list that

10   were ultimately transmitted to BDC from Greenway, which

11   we've been generally talking about today -- I think

12   we've been calling it the Greenway customer list or

13   service list -- did that list contain numbers in

14   addition to cell phone numbers?

15       A.   It could.  Sometimes it only has one number.

16   Sometimes it's only a home number.  Sometimes it's only

17   a work number.  I'm not sure what the percentage of cell

18   phones would -- even what the availability of that would

19   be.

20       Q.   Do you know, can you deliver ringless voicemails

21   to work phone numbers or home phone numbers, land lines?

22       A.   No.

23       Q.   So if --

24       A.   It would be just a failed attempt.

25       Q.   So if -- if BDC initiated a call to one of those

1   phone numbers on any of the lists that we've been

2   talking about and that's not a cell phone, that -- a

3   message wouldn't have ended up being delivered to the

4   customer, correct?

5        A.   Correct.  Yes.

6        Q.   When you said -- when we talked about follow-up

7   campaigns for March, were those campaigns related to a

8   different event at Greenway?

9        A.   Yes.

10       Q.   So was the -- the message that was delivered to

11  whoever they were delivered to, if they were ringless

12  voicemails used, was it the same message that we've been

13  discussing at this deposition today?

14       A.   No, it would be different.

15       Q.   They were different scripts?

16       A.   Yes.

17       Q.   But you think that those were sent to the

18  Greenway customer list still?

19       A.   Correct.

20       Q.   Do you know if they were sent to the same people

21  that BDC sent messages to in the February campaign, if

22  you will, that we've been discussing?

23       A.   Yes, in our database.

24       Q.   Right.  But what I mean is, you don't know

25  exactly who -- which customers --

Page 81

1      A.   No.  No.

2      Q.   -- from that database were contacted, right?

3      A.   Right.

4      Q.   So we don't know the numbers, but you paid for

5   15,000.  Do you know that it's the same 15,000 for the

6   subsequent campaigns?

7      A.   I don't.

8      Q.   Okay.  And do you -- you do have email

9   communications related to those subsequent campaigns?

10      A.   Yes.

11      Q.   And they would show that they were different

12   scripts, different messages, different marketing events,

13   correct?

14      A.   Yes.

15          MR. MAGRUDER:  I don't have any further

16      questions.

17          MR. HIRALDO:  Same as before, etranscript.

18          MR. MAGRUDER:  Same order as yesterday.  And

19      he'll read.

20          (Thereupon, the proceedings concluded at

21      1:38 p.m.)

22

23

24

25

Page 82

1                      CERTIFICATE OF OATH

2

3    STATE OF FLORIDA:

4    COUNTY OF ORANGE:

5

6       I, Jazzmin A. Musrati, RPR, CRR, Notary Public, State

7    of Florida, do hereby certify that SHAUN ALLEN

8    personally appeared before me on July 2, 2019, and was

9    duly sworn and produced driver's license/I.D. as

10   identification.

11

12                    Signed on July 17, 2019.

13

14

15   _____

     Jazzmin A. Musrati, RPR, CRR

16   Notary Public - State of Florida

     My Commission No. FF984627

17   My Commission Expires:  April 21, 2020

18

19

20

21

22

23

24

25

Page 83

1                    CERTIFICATE OF REPORTER
2    STATE OF FLORIDA:
3    COUNTY OF ORANGE:
4
5        I, Jazzmin A. Musrati, RPR, CRR, Notary Public, State
6    of Florida, certify that I was authorized to and did
7    stenographically report the deposition of SHAUN ALLEN;
8    that a review of the transcript was requested; and that
9    the foregoing transcript, Page 1 through 85, is a true
10   and accurate record of my stenographic notes.
11       I further certify that I am not a relative, employee,
12   or attorney, or counsel of any of the parties, nor am I
13   a relative or employee of any of the parties' attorneys
14   or counsel connected with the action, nor am I
15   financially interested in the action.
16
17                    DATED:  July 17, 2019.
18
19
20   _____
         Jazzmin A. Musrati, RPR, CRR
21       Registered Professional Reporter
         Certified Realtime Reporter
22
23
24
25

Page 84

```
1                      ERRATA SHEET
2          DO NOT WRITE ON TRANSCRIPT-ENTER CHANGES HERE
3                IN RE:    PICTON V. GREENWAY
                 CASE NO:  6:19-CV-00196-GAP-DCI
4                DATE:     JULY 2, 2019
                 DEPONENT: SHAUN ALLEN
5
6    PAGE NO.    LINE NO.   CORRECTION & REASON
7    _____    _____    _____
8    _____    _____    _____
9    _____    _____    _____
10   _____    _____    _____
11   _____    _____    _____
12   _____    _____    _____
13   _____    _____    _____
14   _____    _____    _____
15   _____    _____    _____
16   _____    _____    _____
17   _____    _____    _____
18   _____    _____    _____
19   _____    _____    _____
20   _____    _____    _____
21   _____    _____    _____
22   Under penalties of perjury, I declare that I have read
     the foregoing document and that the facts stated in it
23   are true."
24
     _____
25   DATE                                    SHAUN ALLEN
```

Page 85

```
 1   07/18/2019
 2   SHAUN ALLEN
     c/o G. BROCK MAGRUDER, III, Esq.
 3   Gray Robinson
     301 East Pine Street
 4   14th Floor
     Orlando, Florida 32801
 5   Brock.magruder@gray-robinson.com
 6   In Re:  July 2, 2019, Deposition of SHAUN ALLEN
 7   Dear SHAUN ALLEN:
         This letter is to advise that the transcript for the
 8   above-referenced deposition has been completed and is
     available for review.  Please contact Veritext at
 9   305.376.8800 to make arrangements for read and sign or
     sign below to waive review of this transcript.
10
         It is suggested that the review of this transcript be
11   completed within 30 days of your receipt of this letter,
     as considered reasonable under Federal Rules*; however,
12   there is no Florida Statute to this regard.
13       The original of this transcript has been forwarded to
     the ordering party and your errata, once received, will
14   be forwarded to all ordering parties for inclusion in
     the transcript.
15                                   Sincerely,
16
                             Jazzmin A. Musrati, RPR, CRR
17                           Registered Professional Reporter
                             Certified Realtime Reporter
18
19
20   Waiver:
21   I,_____, hereby waive the reading and signing
     of my deposition transcript.
22
23
     _____    _____
24   Deponent Signature              Date
25   *Federal Civil Procedure Rule 30(e)/Florida Civil
     Procedure Rule 1.310(e)
```

| & | |
|---|---|
| **&** | 84:6 |

**0**

**00196** 1:2 84:3
**0041** 72:2,3
**02** 12:10
**07/18/2019** 85:1

**1**

**1** 15:22,22,24 53:11
  53:15 83:9
**1.310** 85:25
**10** 5:19 56:23 78:18
**10,000** 16:1
**11** 68:7,8
**11:57** 1:14 4:4
**12** 5:19,19 19:12
  69:24,24
**1200** 2:7
**12:54** 56:19
**13** 71:14
**14** 72:2
**1400** 2:3
**14th** 1:16 2:12 85:4
**15,000** 22:10,11
  23:2 54:18 63:20
  81:5,5
**17** 6:12 82:12 83:17
**1950** 2:8
**1998** 12:10
**1:00** 56:20
**1:32** 77:19
**1:34** 77:20
**1:38** 1:14 81:21
**1st** 58:4

**2**

**2** 1:13 15:23 19:1
  30:10 82:8 84:4
  85:6
**2,000** 22:13 59:24

**2/21** 67:8
**20** 64:19
**20,000** 36:23 44:2
**20,001** 72:5
**2002** 6:13,15 12:7
  12:18
**2009** 7:16
**2010** 7:15
**2014** 7:25
**2016** 61:18
**2017** 61:15
**2018** 13:3 14:21
  19:15 21:21 22:5
  23:13 25:3,15
  27:16 28:4,11
  30:12 31:13,13
  33:1 42:20 47:18
  52:14,17 57:9 61:4
  61:24 62:8,14
  63:10,13,19 64:9
  64:14,20 65:1,23
  72:12 73:14
**2019** 1:13 82:8,12
  83:17 84:4 85:6
**2020** 82:17
**20816** 82:14 83:19
**21** 19:15 22:5 23:13
  25:3,15 32:18
  42:19 48:16 65:23
  82:17
**2123** 71:15
**2124** 71:15
**2179** 71:16
**21st** 32:23 45:11,20
  45:24 46:7 48:6,8,9
  53:23 66:2,6
**22** 57:9
**22nd** 53:17,21
**23rd** 67:18
**24** 70:9

**25th** 53:22
**28** 30:12 31:13
  32:18 72:12
**283** 50:15
**287** 50:16
**28th** 32:23 45:11
  45:20 46:15 48:12
  48:19 49:4 53:24
**29** 56:2,3
**2nd** 57:23 58:4

**3**

**3,800** 59:23
**30** 85:11,25
**301** 1:16 2:12 85:3
**305.376.8800** 85:9
**32801** 1:16 2:13
  85:4
**32817** 6:8
**33131** 2:8
**33301** 2:4
**35,000** 36:25
**37** 53:11
**375** 50:16
**38** 49:24
**3:53** 65:24

**4**

**4** 3:3 55:17
**4,000** 59:25
**401** 2:3
**407** 20:11 70:24
**407.204.3100** 2:13
**43** 49:24
**44** 19:13,14,17,21
  32:7
**449** 72:4
**46** 30:10
**47** 30:10 31:16 32:7

**5**

**5** 59:8
**5,000** 16:1 73:19
**5th** 59:22

**6**

**6** 49:23
**605-5908** 70:24
**6:19** 1:2 84:3

**7**

**7** 50:15
**704-2962** 20:11
**741** 50:17
**742** 52:6
**743** 52:6
**744** 56:24 57:1
**746** 58:11 78:22
**747** 59:21
**78** 3:4
**786.496.4469** 2:9
**792** 65:22
**793** 66:1
**794** 66:24
**796** 67:7

**8**

**8** 5:19 52:6
**801** 67:17
**809** 56:24
**82** 3:5
**83** 3:5
**84** 3:6
**85** 3:6 83:9
**852** 69:25 70:1
**853** 70:2
**860** 70:2,2
**861** 70:8
**862** 69:25

**9**

**9** 53:10

**9001** 37:12
**9051** 6:8
**954.400.4713** 2:4

**a**

**a.m.** 1:14 4:4
**access** 38:25 39:6
 43:16
**accounting** 54:13
 54:14
**accounts** 65:21
**accuracy** 44:8
**accurate** 21:18
 83:10
**acronym** 39:3
**act** 27:12
**action** 5:3 83:14,15
**actual** 44:25 66:25
 75:13
**addition** 33:25 43:9
 79:14
**additional** 33:8
 49:2 55:18 78:3
**address** 6:7,9 35:6
 37:11 40:1,7,24
 58:12
**addresses** 33:11
 41:24 58:15
**advertise** 9:5 56:13
**advertisement** 16:9
 16:9,12
**advertising** 15:16
 15:22 16:5 28:7
**advise** 85:7
**advising** 18:4
**affirm** 4:7
**affirmed** 4:13
**afternoon** 4:17
**agents** 67:13
**agner** 28:1,10
 52:19,22

**ago** 5:18,19 21:12
**agree** 78:11
**agreed** 3:16 60:11
**agreement** 42:4
 47:4,5
**alert** 17:8
**alerted** 29:23
**alesia** 65:20
**allegation** 19:15
**allen** 1:12 3:2 4:12
 4:19 5:2 34:15 50:2
 56:22 77:22 82:7
 83:7 84:4,25 85:2,6
 85:7
**allow** 20:7
**amount** 15:18,20
 44:7 47:23 63:23
 73:15
**answer** 9:11 11:20
 17:5 20:22,23
 21:16 28:15 31:19
 32:11 34:18,21
 38:23 41:4,5 42:24
 46:17 49:19 51:19
 52:1 62:17,23 66:9
 68:19 69:12 72:14
 74:14,20 76:13
 77:1,14,15
**answered** 26:13
 29:4
**answering** 20:14
 29:8,9
**anticipate** 5:24
**anybody** 29:6,20
 64:24
**anymore** 52:25
**appear** 70:1
**appeared** 82:8
**appearing** 2:5,10
 2:14

**appears** 56:4 66:1
 66:25
**appointment** 71:10
**appointments**
 33:22 34:4 59:9,10
 59:15,20 67:7,12
 67:14,19,22,25
**apprised** 17:1
**approval** 18:8,13
 20:1 54:10 75:10
 75:12,13,16,23
**approve** 19:25 67:3
**approximately**
 6:13
**april** 82:17
**arrangements** 85:9
**asked** 37:21 75:4
 78:21,24 79:5
**asking** 66:21 70:13
**assigned** 26:1
**associate** 58:21
**assume** 11:1 17:5
 41:4 67:5
**assuming** 66:20
**attached** 57:12
 65:24 69:17 71:21
 76:2
**attachment** 67:9,11
**attempt** 79:24
**attempted** 22:4,15
**attorney** 19:10
 35:1 83:12
**attorneys** 10:10,18
 11:13 83:13
**audio** 65:25 66:25
 67:3
**authorize** 42:17
 54:13 72:17
**authorized** 31:2,4
 83:6

**automated** 52:11
**availability** 79:18
**available** 9:5 22:21
 25:23 39:19 58:23
 85:8
**avenue** 2:7
**aware** 13:4 15:6
 17:3 18:2 19:5
 27:17 50:12 75:7
**awareness** 9:4,6
 25:23 26:8 31:20

**b**

**b** 1:9 3:8
**back** 10:5 23:20
 29:3 30:9 33:22
 34:14 41:3 66:18
 66:20 70:17 78:5
**background** 12:17
**ball** 63:4
**base** 68:21
**based** 11:18 15:19
 21:10,11 37:21
 44:6,21 77:25
**basically** 33:8
**bates** 53:11,12,15
 55:17 56:2,3,24
 57:1 58:11 69:25
 71:15 72:2 78:21
**bdc** 11:1,2 13:13,16
 13:23 14:19 16:15
 17:2,10,13,18,24
 18:5,11,19,22
 21:13,21 22:4
 23:23 24:9 29:18
 32:20 34:1 35:9
 42:8,14 43:23
 44:17,19 46:13
 47:12,20 53:16
 57:7 59:6,9 62:3,20
 63:8,10,12 67:7
 68:12,16,25 70:4

72:10 73:13 74:2,6
74:23 75:15,18
78:23 79:1,10,25
80:21
**began** 4:3
**behalf** 1:4 2:5,10
2:14 16:16 20:23
21:14,21 32:20
61:14,17 63:12
74:6
**believe** 21:25 23:19
26:24 33:13 43:14
44:3 62:24 63:7
70:16,20 73:3
78:18,24
**bet** 29:16
**better** 22:23
**bishop** 10:20 29:6
29:17
**bishop's** 28:21
**bit** 18:18 23:20
**boulevard** 2:3
**box** 34:25 35:2
**break** 6:4 56:15,18
56:19 77:19
**brickell** 2:7
**brief** 12:5
**bring** 78:4
**broad** 9:1
**brock** 2:11 85:2
**brock.magruder**
2:14 85:5
**building** 37:10
**business** 6:6 13:18
21:23 38:17 42:8
58:21 74:1,4
**buying** 32:12

**c**

**c** 2:1 3:1 4:1 14:9
85:2

**calendar** 25:14
**call** 4:20 14:1 29:3
32:3 34:3 44:8,22
45:6,15 67:12
70:13 71:1 76:9
79:25
**callback** 71:1
**callbacks** 61:23
70:23
**called** 4:22,23 24:4
26:20 57:17 58:9,9
69:2 71:9 72:22
73:8
**calling** 26:6 33:22
44:12 79:12
**calls** 29:8,9 31:18
34:4 61:5 67:23
68:17 70:4 76:12
**campaign** 13:16
16:15 34:10 42:19
43:17 45:16,24
47:8 53:17,24 62:9
62:10 64:10 65:3
76:4 78:1 80:21
**campaigns** 8:25
15:7 17:2,9,18
21:13 29:18 45:8
45:13 47:24 54:2
63:14 65:5 80:7,7
81:6,9
**car** 7:9,10
**case** 1:2 84:3
**cast** 70:11
**cell** 40:3 43:6 51:15
51:22 63:25 77:9
79:6,14,17 80:2
**cellular** 43:2 76:9
76:24
**center** 34:3
**certain** 15:18,20
41:10

**certificate** 3:5,5
82:1 83:1
**certified** 1:19 83:21
85:17
**certify** 82:7 83:6,11
**cetera** 41:1
**changed** 8:20
**changes** 8:20 21:2
21:3 31:7 84:2
**choice** 27:6
**chrysler** 1:8,9 5:4,8
6:10 13:9,23 14:3
14:12,19 15:6
17:19 24:4 68:21
**chuck** 27:24 28:1
**civil** 85:25,25
**class** 5:3
**classes** 12:21
**clearly** 62:24
**client** 30:11
**clifton** 1:3
**closely** 35:14
**coffino** 14:6,9,10
17:23
**coffino's** 14:15
**collected** 39:22,24
**collection** 55:19
**college** 12:8,9,14
**colonial** 6:8 37:12
**column** 51:3,8
**combination** 27:25
**come** 9:8,12,16
19:8 24:6,20 31:24
32:4,8 69:14 71:12
73:2
**coming** 61:23
**commission** 82:16
82:17
**common** 5:25
13:20

**communications**
10:8,11 14:22 15:2
34:22 81:9
**companies** 15:14
**company** 11:3 20:2
27:4 58:19 61:22
**compile** 37:2 78:25
**compiled** 79:3
**complaining** 56:10
**complaint** 19:6
30:9 32:7 56:3
**completed** 85:8,11
**composite** 49:23
**computer** 39:6
72:20,24,25
**concluded** 81:20
**conclusion** 26:6
31:18 76:12
**conduct** 61:25
**conducted** 21:13
76:5
**confident** 14:6
**confirming** 59:10
**confused** 44:11
**connected** 83:14
**connection** 34:1
60:25
**conquest** 43:16,20
43:23,25 44:12,20
45:5 48:5,6,13,14
48:19 49:3 50:5
63:22 72:8,11,18
73:11
**consider** 25:25
26:4 31:15
**considered** 85:11
**consisted** 35:18
**consistently** 8:21
**consisting** 49:24
**consists** 56:23

**consultant** 6:17,18
**consumer** 9:3
  27:12 29:1 76:8,23
**consumers** 8:19 9:8
  31:24 32:8
**contact** 13:13
  14:19 23:22 24:1
  24:23 28:22 29:1
  32:3,14 60:17 61:3
  61:22 67:10 85:8
**contacted** 81:2
**contacts** 55:20
**contain** 79:13
**content** 18:8
**continues** 74:4
**continuous** 63:8
**contract** 62:24
**contracted** 22:10
**contribute** 16:14
**conversation** 18:1
  27:3 34:19 43:8
  52:25
**conversations** 14:6
**copies** 76:1
**copy** 66:15
**core** 44:21
**corner** 53:13
**corporate** 27:19,23
  27:25 36:2 37:3,4,9
  37:11
**correct** 8:14 9:24
  10:1,2,3,14 12:15
  13:14 14:11,13,17
  21:14 23:10 25:4,6
  27:10 28:8 33:15
  34:23 35:16,17,19
  35:22 36:4 37:24
  39:14,18 40:15
  41:16,17 42:7,12
  44:17 45:9,12,16
  48:17 54:2 57:10

59:3 60:2 62:8,15
  62:21 66:3 67:1
  69:19 71:11 73:7
  74:18 79:1,7 80:4,5
  80:19 81:13
**correction** 84:6
**cost** 13:17 16:21
  22:25 73:16,19
**counsel** 3:17 10:12
  78:21 83:12,14
**county** 82:4 83:3
**court** 1:1
**coverage** 9:1
**create** 13:18 78:25
**created** 63:4
**creating** 73:20
**creative** 18:13,14
**crm** 59:9,13,14,20
**cross** 3:4 78:16
**crossed** 33:12
**crr** 1:18 82:6,15
  83:5,20 85:16
**crrt** 51:4 73:3
**current** 59:14
**currently** 55:10
  59:25
**customer** 39:17,22
  39:24 42:21 44:5,5
  45:6 46:7,15,23
  48:3,10,16,20
  49:17 50:20,22
  55:7,11 59:19
  64:22 68:21 73:5,6
  77:10 79:12 80:4
  80:18
**customers** 24:22,24
  26:17 32:1 35:15
  35:24 38:15,15,19
  38:22 39:9 40:10
  40:11,14,18,19,20
  50:11 51:13,17,24

55:3,8 60:16 61:6
  71:1,8 74:11 77:10
  80:25
**cv** 1:2 84:3

**d**

**d** 1:9 4:1 37:7
**database** 41:3
  63:21 64:21 80:23
  81:2
**databases** 38:18
**date** 1:13 23:18
  44:6 51:8,11 53:18
  67:6,9 72:18 84:4
  84:25 85:24
**dated** 59:22 65:23
  70:9 83:17
**dates** 24:17,17 33:5
  46:18 51:13 53:21
**day** 25:11,18 58:5
  58:20
**days** 9:14 19:14
  24:24 85:11
**dci** 1:2 84:3
**deal** 38:24
**dealership** 6:10 9:9
  9:13,16 15:17 20:4
  20:13 24:7,8,12,21
  25:2 31:24 33:16
  77:6
**dealerships** 17:19
  53:3 69:4
**dear** 85:7
**declare** 84:22
**dedupe** 72:23
**defendant** 1:10
  2:14
**definitely** 14:1,4,25
  30:24
**delineated** 79:7
**deliver** 63:20 79:20

**delivered** 80:3,10
  80:11
**delivery** 9:15
**demers** 37:5,7,8,13
  37:19 38:1 41:6,14
  59:7
**department** 8:10
**depo** 10:21
**deponent** 3:17 84:4
  85:24
**deposition** 1:12
  3:18 5:11,14 10:7
  10:18 11:5,6,16
  77:23 78:11 80:13
  83:7 85:6,8,21
**dial** 71:20
**dialed** 75:1
**difference** 23:1
**different** 15:13
  22:6 32:17 38:9
  43:11 72:5 80:8,14
  80:15 81:11,12,12
**digital** 8:23
**direct** 3:3 4:15 8:24
  17:16 25:9 34:5,6
  41:25 69:3
**directive** 28:18
**directly** 15:7 54:11
**director** 7:9,11
**disclosing** 34:21
**disclosure** 65:16,18
  76:22
**discontinue** 28:12
**discounts** 32:13
**discovery** 34:16
  56:4 69:15 72:21
**discuss** 43:5 52:21
  53:1 78:2
**discussed** 45:8
  52:21 70:3

discussing 42:22
43:10 74:10 75:19
80:13,22
discussion 52:23
disposition 22:15
74:23
district 1:1,1 14:5
14:15
division 1:2
dms 38:12,13,18,21
39:2,8 40:13 41:15
51:16,23
document 19:2
47:10 50:3,15,18
52:7 53:9 54:23
57:15,17 68:7,9
69:10 84:22
documentation
16:22 55:2,6
documents 11:15
34:16 35:14 49:24
57:19 77:24 78:3,5
dodge 1:8,9 5:4,8
doing 5:22 17:14
17:18 19:13 33:13
49:13 61:23 64:17
dollars 23:4
downloaded 41:18
drive 6:8 37:12
driver's 82:9
drop 47:18,25 48:2
48:9,12 55:11 66:6
74:24
dropbox 36:5
dropped 63:3
drops 45:14,15,16
45:20 47:20 48:6
49:16 53:5 56:13
60:15,19 61:25
62:7,14,21 63:9,10
63:12,15,19 64:5,9

64:13,16,19 67:15
68:1 71:4 72:12
73:13 77:6 78:2
duly 4:13 82:9

**e**

e 2:1,1 3:1,8 4:1,1
4:19 37:7,7,7 85:25
85:25
earlier 4:23 10:8
42:11 57:2,15 63:3
65:5 78:21
early 45:21 46:24
47:18 48:24 61:4
earn 15:21 16:3
east 1:16 2:3,12 6:8
37:12 85:3
education 12:5
effect 55:15
effort 43:15
either 10:9 14:20
14:23 17:25 35:18
58:3,8,8,9 68:25
75:25
elead 38:7 59:13,14
electronic 60:11
75:24
email 8:25 13:24
14:1 34:25 35:2,6,7
36:3 37:16,18,19
37:20,22 40:7 57:6
57:12,22,25 58:2,6
58:7,10,12,15,18
58:19 59:8,9,22
65:23 66:20 67:18
69:16 70:8,21
71:17 78:20 81:8
emailing 66:15
emails 18:3 35:10
58:20 67:7 78:1
employed 14:24

employee 36:1 37:3
37:4 83:11,13
employees 10:11
26:14 27:25 78:25
employment 12:6
ended 80:3
engaged 53:5
engages 9:2,8
engaging 15:6
enter 84:2
entities 56:6
entity 5:8
equal 15:20
errata 3:6 84:1
85:13
especially 22:24
esq 85:2
esquire 2:2,6,11
established 62:7
estimate 7:13
et 41:1
etranscript 81:17
event 24:15,16,17
25:5,7,10,19,21,21
28:25 33:7,17 80:8
events 18:13 24:13
24:21 81:12
eventually 79:1
everybody 39:16
exact 7:12 36:22
41:4 46:18 47:8,23
73:15 77:2
exactly 38:23 39:21
41:9 45:23 73:4
79:3 80:25
examination 3:3,4
4:15 78:16
examined 4:13
example 8:22,22,23
16:2 69:6

exchanges 78:20
executed 16:15
exhibit 19:1 30:10
49:23,23 50:15
52:6 53:9,10 56:23
68:7,8 69:24 71:14
72:2 78:18
expect 21:5
expected 33:13
experienced 42:3
expertise 30:25
42:4 64:4
expires 82:17
extent 26:5 31:17
34:17,20 76:11

**f**

f 6:24 7:2 14:9,9
fact 17:9 23:23
38:3 52:24 55:8
59:5 76:5
facts 84:22
failed 79:24
fair 30:8
fall 8:12
falsify 28:24,25
familiar 55:2 56:7
73:9
far 25:1 41:3 48:5
63:17
fca 13:9 14:10,11
14:12 15:17 16:7
16:12,14,23 17:1,8
17:15 18:3,9,13,19
23:3 27:1,8,20
28:19 29:23 42:6
57:5 60:22 61:3
68:22 75:10,16,23
76:3
fcapap.com 54:8
february 13:2
14:20 19:15 21:22

21:24 22:5 23:13
25:3,15 30:12
31:13,13 32:18,23
42:19 45:11,11,20
46:7,15 47:11 48:6
48:9,12,16,19 49:6
49:8 53:17,21,23
53:24 57:9,9,23
58:4,4 59:22 61:4
62:8,9,14,21 63:10
63:19 65:23 66:2,6
67:18 70:9 72:12
73:18 75:20 80:21
**federal**  85:11,25
**fedex'd**  75:25 76:1
**feel**  34:22 72:24
**felt**  33:14
**ff984627**  82:16
**fiat**  13:23 14:3,12
14:19 15:6 17:19
**fields**  41:10
**file**  36:2,5 72:20
**filed**  5:4 56:5
**files**  65:25
**final**  75:13
**finance**  7:1
**financially**  83:15
**fine**  49:13
**finish**  5:23 49:10
**first**  4:13 12:25
13:4 19:4,7 21:22
21:24 23:14 24:11
25:1,2 26:25 27:15
33:7,17,17 39:24
40:22 45:12 48:7,9
53:15 56:25 58:5
61:8
**five**  8:3 77:17
**flip**  19:12 72:25
**floor**  1:16 2:12 85:4

**florida**  1:1,16 2:4,8
2:13 82:3,7,16 83:2
83:6 85:4,12,25
**flyer**  15:12 16:6,10
42:10
**follow**  78:15 80:6
**followed**  20:20
31:8
**following**  28:7 66:1
67:6,9 70:21 72:4
**follows**  4:14 66:24
**ford**  37:10
**foregoing**  83:9
84:22
**forget**  4:24
**form**  9:10 20:21
21:15 23:6 28:14
30:5 31:9,25 32:10
42:23 45:17,22
46:8,16 48:22 49:9
49:18 51:18 62:11
62:16 66:8 68:18
69:20 70:6 72:13
74:13,19 77:13
**fort**  2:4
**forward**  37:25,25
**forwarded**  37:20
41:9 85:13,14
**found**  69:1,2
**four**  7:7,18 21:13
47:24 62:5
**frame**  61:12
**free**  34:22 72:24
**friday**  24:18 25:10
**front**  53:19
**ftp**  36:6,8 41:15
**further**  16:19
77:21 81:15 83:11

**g**

**g**  2:11 4:1 85:2
**game**  57:19
**gap**  1:2 84:3
**gdc**  72:22
**general**  7:19,21,24
8:2,5 15:17
**generally**  11:8
79:11
**generated**  67:8,19
67:22 68:1 70:4
**getting**  26:18 44:11
**give**  4:8 5:24 6:3,6
7:13 10:7 12:5
28:22,24 32:1,14
40:11,16 43:18
49:10 69:4 77:17
**given**  76:19
**gives**  70:10
**giving**  29:2 69:5
**gmail.com**  58:13
**go**  12:9,11 18:17
25:11 39:8 40:13
41:3 54:11
**goals**  9:7
**going**  5:22,25 7:14
7:15 17:9 18:2,4,25
29:12 43:6,18 44:2
49:22 52:5 53:9
56:22 62:20 63:20
63:21 71:14 77:23
78:6,18
**good**  4:17 27:4
28:22 33:15 43:16
49:2 56:16 68:4
73:17
**gotcha**  53:14
**gotten**  24:3
**grade**  30:6
**gray**  1:15 2:11,14
85:3,5

**greenway**  1:8,9 5:4
5:7,8,13 6:10,11,15
8:3,9,18 9:2,8,18
9:19 10:12 12:7,13
12:16,18,22 16:16
18:4 19:7 21:14,21
23:14 26:13,23
27:21,22 28:3
29:20,23,25 31:5
32:9,20 35:15,19
35:22 36:1 39:9,23
43:23 44:5,19 45:6
46:7,14,23 47:12
48:3,10,16,19
49:17,24 50:10,15
50:20,22 51:12,16
51:23 52:6 53:5,10
55:3 56:4,5,12,24
58:15 61:14,18,24
63:12 64:22 65:1,7
68:12,16 69:12,15
71:6,10 72:9,21
73:13 74:1,4,6
75:14 77:9 79:10
79:12 80:8,18 84:3
**greenway's**  20:7
41:22 46:5,13
58:18
**greenwaydodge.c...**
65:15
**greenwaydodge.c...**
65:14
**greenwaydodgen...**
72:23
**greet**  24:22
**gsm**  7:22 8:13,16
26:2
**guess**  71:24
**guys**  27:5 38:25

**h**

h 3:8 4:19
hand 4:5 18:25
 49:22 52:5 53:13
 56:22
handled 21:8,8
 46:3,3
hands 51:2
happened 24:2,5
happens 9:14
hard 76:1
harder 59:1
he'll 81:19
head 45:10
heard 12:2,3
held 8:16
help 32:14 43:18
hey 29:25
hiraldo 2:2,2,6 3:3
 4:16,22 5:1,2 9:17
 11:22 21:1,6,19
 23:8 26:9 28:17
 30:7 31:11,22 32:5
 32:16 34:24 43:1
 45:19 46:1,10,21
 48:23 49:12,21
 51:21 52:3 56:21
 62:12,19 63:1
 66:12 68:23 69:23
 70:7 72:16 74:16
 74:22 76:15,21
 77:4,16,21 78:13
 81:17
hiraldolaw.com
 2:5
history 12:5,6
hold 6:18 7:2,6,14
 7:17
home 40:1,5,24
 43:6 50:7,10 63:25
 79:6,16,21

hope 20:23
hopes 13:18
house 10:9
houses 38:14
huh 44:14 46:2
 55:21 58:22,25
 59:16
hundreds 58:19

**i**

i.d. 82:9
idea 42:3 45:4
 51:20 52:2
identification
 82:10
identified 20:10
 36:20
ignacio 2:6
iii 2:11 85:2
ijh 2:7
ijhiraldo 2:9
ijhlaw.com 2:9
incentive 9:4 15:18
 15:18
incentives 32:14
incidents 26:19
include 20:15
 39:24
included 71:3
inclusion 85:14
income 73:9
incorrect 28:24
 30:21
individually 1:4
individuals 14:24
 35:18,21 36:13,20
 39:20 42:21 43:11
 46:6,14,23 48:2
 65:7,12 67:20 72:5
 77:11
information 28:25
 34:18 37:23 39:19

39:21,23 40:17,20
 41:14 44:9 51:1,12
 57:13 59:2,5 60:17
 65:6,13 68:13
 69:16,21 76:19
 78:1,22,25
initial 24:1
initiated 28:9,13
 79:25
inquiries 61:6
instructed 20:18,19
 35:1
instruction 41:22
 46:5
instructions 10:7
 11:18 20:20 31:8
insurance 7:1
intended 63:8
intention 78:4,4
interest 29:5 69:5
interested 26:17
 32:2,12 33:21
 59:19 83:15
internally 7:22
internet 59:9 65:9
 65:12
introduced 13:8
 17:13 23:21
introducing 17:17
introduction 13:6
 17:25
inventory 8:7
invoice 47:11,12,16
 53:16,18,23 54:1,5
 54:11,17 73:19,21
 75:11,16,18,22
involved 29:17,21

**j**

j 2:6 37:7
january 13:2 14:20
 21:21 22:1

jazzmin 1:18 82:6
 82:15 83:5,20
 85:16
jean 37:5 39:11
 50:25 59:7 73:5
jeep 1:8,9 5:4,8
 6:10
johnson 56:5,10
july 1:13 27:16
 28:4,11 52:13 53:6
 82:8,12 83:17 84:4
 85:6
june 27:16 28:3,11
 52:13 53:6 55:15
justin 10:22 11:1
 21:8 24:13 33:7,13
 41:9 43:15 46:3
 50:25
justin's 35:6,7
 41:24

**k**

keep 5:10 51:12
 59:1
kind 15:11 22:14
 24:23 49:4 76:22
knew 4:23 17:14,15
 17:17 46:19
know 6:2,4 7:12
 11:25 12:23 15:1,8
 15:12 17:21 18:1
 18:24 20:24 21:7,8
 21:17 22:3,4,9,9,20
 22:22 23:1 25:12
 25:13,20 26:20
 27:11 28:7,13,18
 28:20 29:2,4 30:3,4
 31:12 32:21,22,24
 32:25 33:4,23
 36:11,22 38:5
 39:21 41:4,5 43:2,9
 43:13,17,25 44:19

44:21 45:2,23 46:5
46:18 47:17,23
48:5 50:5,13,21
51:1,2,6,7,10,15,22
52:1,12 54:4,23
55:8,10,14,16
55:24 56:9 58:8
60:6 61:12 62:18
62:23 63:11,16,16
63:22,23,24,24
64:15 68:5,6 69:8
69:10,12,12,18,21
71:18,22,25 72:1,6
72:8,9 73:3,11,12
73:15,15 76:13,18
76:22 77:1,2,14,15
79:9,20 80:20,24
81:4,5
**knowledge** 39:1
**knowledgeable**
26:19 29:5
**known** 17:25

**l**

**l** 3:15 4:19,19
**lack** 22:23
**land** 79:21
**language** 55:22,24
**large** 44:7
**las** 2:3
**lauderdale** 2:4
**launch** 57:19
**law** 2:7
**laws** 28:7
**lawsuit** 11:7,12
19:8 29:23 34:16
56:4,7,10 77:7
**lawyers** 34:19
**lay** 76:12
**lead** 60:11 65:9
**leading** 12:6

**leads** 59:17 60:10
61:6,23 68:11,16
68:17 70:3 73:3
**learn** 12:25 27:15
61:8
**learned** 26:25 61:2
**leave** 77:23
**legal** 26:6 31:18
76:12
**letter** 3:6 85:7,11
**license** 82:9
**line** 70:9 84:6
**lines** 79:21
**list** 35:15,18,24
36:17,18,21 37:2
37:14 38:3 39:9,16
40:11,16 41:18,23
41:24 42:22 43:9
43:11,16,20,23
44:1,5,13,17,20
45:5,6 46:7,15,19
46:23 48:3,5,6,10
48:13,15,16,19,20
49:1,3,17 50:5,20
50:22 59:2 63:22
64:22 67:20,25
68:11,21,25 69:3
69:14 71:20,21,22
72:2,4,6,7,8,9,11
72:18 73:2,4,5,6,8
73:11 74:25 77:10
78:22,25 79:9,12
79:13,13 80:18
**listed** 15:2
**listen** 20:24 74:11
74:18
**listening** 62:6
**listing** 15:15
**lists** 36:12,15,16
44:8 69:4 70:1 73:9
80:1

**little** 18:18 23:20
**live** 34:3 67:12,22
68:17 70:4
**locate** 34:15
**located** 6:9 35:10
37:8
**lodge** 78:10
**log** 22:15 74:23
**logic** 44:22,22
**long** 5:18 6:11,18
7:2,6,17 65:18
**look** 24:24 35:3,5,7
35:13 47:3 61:10
66:24 67:7 71:12
**looked** 11:18 32:17
**looking** 25:14 35:7
53:20 56:25 61:21
**looks** 67:8 78:23
**lot** 9:14 59:1

**m**

**m** 37:7
**m1044691a** 73:8
**magruder** 2:11 3:4
4:20 9:10 11:17
20:21 21:4,15 23:6
26:5 28:14 30:5
31:9,17,25 32:10
34:17 42:23 45:17
45:22 46:8,16
48:22 49:9,18
51:18,25 56:17
62:11,16,22 66:8
68:18 69:20 70:6
72:13 74:13,19
76:11,17,25 77:13
77:18 78:10,14,17
81:15,18 85:2
**mail** 8:24 17:16
23:7,9 24:17 25:9
33:12 34:5,6 41:25
43:15 69:3 73:16

73:20 76:1
**mailers** 18:15
**mailing** 49:7
**maintain** 50:10
**making** 34:3 68:17
**management** 8:7
**manager** 7:1,5,20
7:21,24 8:2,6 14:15
28:23 59:9 71:2
**manager's** 29:3
**managers** 20:13
**manny** 4:20
**manuel** 2:2 5:2
**manufacturer**
13:10,12,21 14:24
15:1 53:2 57:3,16
58:7
**march** 33:1,7 45:12
45:21 46:22,24
47:4,5,13,18,25
48:24,24,25 49:4
49:16 54:1,5 61:24
63:13 64:6,9 70:23
71:4 73:14,21 78:1
80:7
**marked** 3:9 18:25
49:23 52:6 53:10
56:23 68:8 69:24
71:15
**market** 50:7,10
69:6
**marketing** 8:8,9,12
8:15,23 9:1,2,7
11:3 12:17 13:16
13:21 15:3,13
18:12 20:2 23:4,5
26:1,4 28:8 31:16
34:9,12 42:5 52:25
76:9 81:12
**markets** 8:19

material 16:12
math 60:6
matt 10:20 28:21
 29:6
mcwhite 65:20
mean 6:25 8:25
 24:16 52:15 54:8
 54:25 59:12,13
 68:24 70:25 80:24
meaning 57:19
means 14:12 54:19
media 74:8
memory 24:13 33:6
 33:11 48:25 52:13
 52:23 73:16,18
mention 42:11
 44:21
mentioned 14:23
 15:9 16:6,8,10
 25:22 26:12 42:11
 57:2,15
mentioning 65:6
message 9:3 19:16
 19:20,23 20:8,11
 20:16,19 21:3,7,20
 23:14 25:11,18,22
 25:25 26:4,13,21
 28:21 29:10,13
 30:11,13,15,19
 31:1,15,23 33:18
 42:20 66:2,25
 70:14 74:12,18
 76:24 80:3,10,12
messages 18:9,20
 22:1,3,4,7 31:12
 32:6,8,17,19,22,25
 33:25 43:6 45:3
 52:11 56:9,12
 65:16 66:7 74:11
 80:21 81:12

mhiraldo 2:5
miami 2:8
michael 14:9
middle 1:1
middleton 12:12
mike 14:5,10,15
mike's 14:8
mind 56:17
minutes 77:17
missing 68:14
mistake 33:7,10
 43:14,19 49:5
mistakes 73:17
monday 70:10
money 9:19 22:25
 49:2
money's 22:23
month 8:21 57:20
 58:3,5 74:3,7
monthly 15:12
 57:18 69:4
months 6:20 7:3
moved 12:15
musrati 1:18 82:6
 82:15 83:5,20
 85:16

**n**

n 2:1 3:1,1,15 4:1
 4:19,19 14:9 37:7
name 4:18 5:2,10
 12:2 14:8 20:7 25:7
 28:21 29:3,6,12
 31:2,5 37:6 39:24
 40:22 60:21 67:9
names 33:11 65:7
 67:20
need 6:4 47:2,3
 69:21 78:6
needed 37:23
negotiating 60:4

never 50:4 52:25
 73:6
new 7:9,10 9:21,22
night 67:19
nods 45:10
notary 82:6,16 83:5
noted 16:11
notes 83:10
notice 52:10
notification 24:23
 27:19,23
notify 59:19
number 19:18
 20:10,11,13,16
 21:18 22:9 24:3
 26:12,20 29:3
 36:22 53:13 59:8
 65:11 67:10 70:11
 70:22 71:1,3,6,9
 78:22 79:15,16,17
numbers 15:25
 22:8 31:13 41:23
 43:3,6,7 51:16,22
 63:25,25 65:8
 67:21 77:9 79:9,13
 79:14,21,21 80:1
 81:4

**o**

o 3:1,15 4:1 14:9,9
 85:2
oath 3:5 82:1
object 9:10 20:21
 21:15 23:6 26:5
 28:14 30:5 31:9,17
 31:25 32:10 34:17
 42:23 45:17,22
 46:8,16 48:22 49:9
 49:11,18 51:18
 62:11,16 66:8
 68:18 69:20 70:6
 72:13 74:13,19

76:11 77:13 78:8
objection 11:17
 21:4 51:25 62:22
 76:17,25 78:10
obtained 65:7
 77:11
obtaining 72:11
obviously 9:12
 12:21 13:18 17:17
 78:7
occur 60:15,16
 64:11
occurred 64:13
occurrence 13:20
offer 32:3
offered 16:21
offers 24:25 25:23
 26:18 33:21
office 37:11
offices 37:9
official 20:1
officially 7:18
oh 36:15 53:21
 54:21
okay 6:6,21 7:8,13
 7:17,19 10:17,20
 12:9,11,20,23
 13:12,23 15:16
 16:4,6 19:7,12
 20:10 21:20 22:3
 22:12 23:13,20
 24:6 27:8,11,17
 28:9,18 30:15 31:1
 31:15 33:3 34:9
 35:13 36:12,23,25
 38:16,21 39:23
 41:6,21 42:1,6,19
 49:22 50:15 51:15
 54:16 55:6 56:15
 58:6,10 59:2,21
 60:22 61:1 63:6,9

64:13,16,19,24
65:1,10 66:5,15
67:6 68:3 70:15
71:8 72:17 74:9,17
75:8,15,22 77:5,17
78:15 79:5 81:8
**olas** 2:3
**once** 5:17 85:13
**online** 8:23 9:14
**op** 15:16,17,17 16:8
16:11 23:3 34:12
54:8 75:10
**open** 77:23 78:11
**opened** 12:16
**opportunity** 15:3
15:12
**options** 57:21
**orange** 82:4 83:3
**order** 55:1 65:13
81:18
**ordering** 85:13,14
**original** 85:13
**originally** 63:7
**orlando** 1:2,16 2:13
6:8 12:15 85:4
**outcome** 22:15
33:15
**outside** 10:9 11:19
11:21
**owns** 11:1

**p**

**p** 2:1,1 3:15 4:1
**p.a.** 2:2
**p.m.** 1:14 56:19,20
65:24 77:19,20
81:21
**package** 17:16
**packages** 15:14
**page** 19:12 49:25
50:16 53:15 54:21
56:25 59:21 66:1

70:21 71:16 72:3,4
83:9 84:6
**pages** 50:1 70:1
**paid** 33:14 73:16
81:4
**paragraph** 19:13
19:14,17,21 30:10
31:16
**paragraphs** 32:7
**part** 15:22,23 16:8
16:11 17:15,16
18:19 25:25 57:22
59:23
**particularly** 77:25
**parties** 3:17 83:12
83:13 85:14
**partner** 4:21
**party** 15:3,13 18:12
20:2 22:24 57:21
59:18 85:13
**pass** 72:24
**pay** 16:18 30:6
54:14 73:13
**payable** 65:21
**paying** 23:3 59:24
**payment** 15:19
16:23 75:13
**penalties** 84:22
**people** 8:8 26:20
29:9 33:21 41:8,12
43:25 44:3 58:20
65:6 69:4 74:17,25
76:18 80:20
**percentage** 51:15
51:22 79:17
**perfect** 5:12 6:5
**performed** 17:2
**perjury** 84:22
**permission** 76:8
**person** 24:23 29:1
32:3,15

**personally** 82:8
**phone** 9:14 14:1
24:3 37:17 40:3,5
51:15,22 63:25,25
65:11 74:18 77:9
79:9,14,21,21 80:1
80:2
**phones** 79:6,6,6,18
**pick** 74:17
**picton** 1:3 84:3
**piece** 76:1
**pine** 1:16 2:12 85:3
**place** 1:15 25:10
**plaintiff** 1:6 5:3
**plaintiff's** 19:17
78:20
**plaintiffs** 2:5,10
**plan** 57:19
**platform** 38:7,9,18
38:22 41:15 45:1
51:16,23
**please** 4:6,17 5:23
19:12 54:21 55:17
56:2 59:21 65:22
67:17 70:9 85:8
**point** 11:10 17:8
70:17 77:11
**policy** 28:3,9,13
53:6
**poor** 17:7
**portion** 15:22
**position** 6:16,19
7:2,6,11,17 8:16
**possibly** 14:1
**postage** 73:19
**potentially** 47:23
**pre** 18:13 54:10
75:12
**preowned** 9:22
**prepare** 10:6,17
11:15 59:7

**prepared** 19:23
52:19
**prerecorded** 18:20
19:16 23:13 42:20
65:16 76:24
**presence** 10:9
**present** 10:12
**presumably** 41:19
**pretty** 8:25,25
24:14
**previous** 31:20
**previously** 19:1
49:22 52:5 53:10
56:23 68:7 69:24
71:15
**pricing** 57:13
**print** 55:19
**printed** 49:25
**prior** 5:14 9:14
12:3 17:17 23:18
28:3 60:14,19 61:1
**privileged** 10:10
**probably** 7:18 13:2
25:8 27:24 47:24
60:4 69:16 76:1
**procedure** 85:25
85:25
**proceedings** 4:3
81:20
**process** 8:8
**produce** 34:16
**produced** 69:15
72:21 82:9
**production** 18:17
47:11
**professional** 1:19
83:21 85:17
**promoted** 6:21 7:5
7:9,10
**promotions** 11:1,2
13:13,16,24 14:19

17:2,13 18:11
23:23 24:9 34:2
42:9 53:16 57:7
72:23
**proof** 23:4 76:3
**protection** 27:12
**prove** 22:10 63:16
**provide** 16:1 59:3,5
68:16
**provided** 56:3 65:6
68:11
**providing** 9:25
66:17
**public** 82:6,16 83:5
**pull** 38:7,9 39:8,16
**pulled** 41:14
**punch** 40:10
**punitive** 5:3
**purchase** 32:9
40:14,18 42:21
51:11,12,23 69:7
**purchased** 35:19
44:17
**purpose** 9:3 13:15
23:18 25:21 26:16
32:1,12 68:16
**purposes** 31:23
32:8 74:10
**push** 59:9,20
**put** 29:12 37:13
38:3

**q**

**q3** 52:13,15
**qualifies** 43:17
**quarter** 27:16
52:15
**question** 5:23 6:2
17:7 34:18,21
49:10 62:6 68:4
**questions** 5:23
77:21 78:6,15

81:16
**quote** 70:11

**r**

**r** 2:1 4:1 37:7
**radio** 8:22
**radiusappend**
72:23
**raise** 4:5
**ranges** 44:6
**rbm** 70:10
**reach** 23:23 29:1
57:7
**reached** 24:2 32:15
76:20
**reaching** 76:18
**read** 3:6 19:5 81:19
84:22 85:9
**readily** 58:23
**reading** 3:18 85:21
**real** 15:25
**really** 68:10
**realtime** 1:19 83:21
85:17
**reason** 75:6 84:6
**reasonable** 85:11
**recall** 33:20 44:4
66:23 68:13
**receipt** 85:11
**receive** 58:19 59:17
**received** 24:22 71:8
77:24 85:13
**receiving** 26:21
29:9 58:7
**recognize** 19:2,20
50:2,18 52:7 68:9
**recollection** 22:2
48:7
**recommendation**
14:3 60:22
**recommendations**
14:18

**recommended**
13:23 14:25 57:7
**recommending**
13:21 53:2
**record** 4:18 30:17
30:18,22 36:10
70:10,11,14,18,19
78:2,12 83:10
**recorded** 21:7
30:15 31:1 70:16
**refer** 5:6,13 27:14
**reference** 51:11
**referenced** 85:8
**references** 57:16
57:16
**referencing** 50:12
55:25
**referred** 7:22 57:18
**referring** 5:7 37:9
45:13 48:8 53:13
61:11 78:19
**reflect** 73:21
**reflected** 19:20
32:6 47:15 54:5,16
**reflecting** 16:22
**reflects** 72:4
**regard** 85:12
**regarding** 28:10
**registered** 1:19
83:21 85:17
**related** 10:23 28:5
28:6 35:9 67:15
80:7 81:9
**relation** 34:19
**relative** 83:11,13
**remaining** 78:11
**remember** 24:1
25:1,8 30:16,23
33:16 39:3 60:20
64:7,18 75:24 79:2

**rep** 14:4,5 68:25
**repair** 55:1,9
**report** 83:7
**reported** 1:18
**reporter** 1:19,19
3:5 83:1,21,21
85:17,17
**represent** 5:3 25:14
44:25 47:10
**request** 37:13,16
41:6
**requested** 76:20
77:12 78:23 83:8
**requesting** 59:3
**require** 23:4 76:3
79:3
**required** 18:23
27:8 55:8 76:8
**requires** 9:16
**research** 15:5
16:19,24,25 46:25
47:2 48:1 60:20,21
60:24 61:16,19,20
73:23,25 79:4
**reserve** 78:7
**reserved** 3:19
**respect** 77:25
**respective** 3:17
**respond** 26:7
**response** 5:24 6:3
66:18 70:19
**responsibilities** 8:5
8:12 26:1
**responsibility**
18:11
**responsible** 8:15
**responsive** 77:24
**result** 9:12 26:21
**review** 11:15 20:5
83:8 85:8,9,10

**right** 4:5 9:18 12:13,16 15:20 25:16 44:10 51:4,4 53:13,19,20 56:25 60:6 61:5 63:2 65:22 67:17 71:14 78:7,8 79:8 80:24 81:2,3

**ringless** 12:23,25 13:5 14:22 15:2,7,9 16:7,10,15 17:1,9 17:16,18,24 18:4,9 21:13,20 22:17 23:15,17 26:25 28:5,10 29:18 30:1 30:11 32:19 33:25 41:21,22 42:2,6,11 42:14 43:10,17 45:13 46:4,6,14,19 46:22 47:15,19 52:10,22 53:2,5 54:4,16,18,19 56:13 57:17 59:24 60:8,10,14 61:2,8 61:13,14,17,25 63:9 65:2 66:10 67:15 68:1 70:14 70:23 71:9 72:17 74:9,24 76:4 77:6 79:20 80:11

**ro** 54:24,25

**robert** 14:4

**roberts** 57:1,6

**robinson** 1:15 2:11 85:3

**robinson.com** 2:14 85:5

**rolled** 52:12 53:6

**rough** 7:13

**roughly** 7:7 8:1

**rpr** 1:18 82:6,15 83:5,20 85:16

**rule** 85:25,25

**rules** 85:11

**s**

**s** 2:1,2 3:1,8,15,15 4:1,19 37:7

**sale** 15:19 33:8 51:8

**sales** 6:17,18 7:5,19 7:21,24 8:2,6,8,8 15:19 20:13 28:22 28:25 29:2 38:15 38:15,19,22,24 41:7,11

**sat** 5:14

**saturday** 24:19 25:10

**saw** 18:14 19:4 73:6

**saying** 5:10 39:12 39:12

**says** 50:7 51:4,8 54:7,8,18 55:18,19 59:8 65:24 67:7,18 70:22 71:20

**sc** 12:12

**scenario** 12:4 16:21 29:2

**scheduled** 59:15

**scheduling** 10:21

**school** 12:19,21,22

**screen** 72:25

**script** 19:22,23 20:3 21:2 30:20,25 31:7 65:24 66:2,6 66:16 67:3

**scripts** 18:19 22:6 80:15 81:12

**scrub** 44:7

**search** 34:25 35:11 40:9

**searched** 35:2

**second** 15:23 30:19 33:6 49:11

**secure** 36:5 41:15

**secured** 36:2

**see** 19:14 30:13 43:20 49:3 50:7,22 51:3,3,8 54:7 55:18 59:8,22 60:1,24 61:11 78:12

**seeing** 27:4

**seek** 18:8

**seen** 42:13 47:10 50:4,24 55:6,22 72:7

**segregate** 38:21,22

**sell** 15:21 16:3

**selling** 9:20,21,23

**send** 17:24 18:3,4 18:12,13,23 20:19 22:5 30:1 36:12 43:6,23 45:3 54:13 61:13,14,17 65:13 65:24 66:5,5,10 68:25,25 72:11,17

**sending** 15:1 18:9 52:10 74:10

**sent** 16:6,12 18:14 18:19 19:17 20:5 21:21 22:3,7,11 24:25 25:18 27:23 30:11 31:12 32:18 32:20,22,25 33:18 35:14,24 36:1 37:22,22 41:6,22 42:19,21 43:10 46:6,13,22 48:2 57:22 58:2 59:7 60:11,16 61:6

63:24 64:20 65:11 67:12 68:20 71:5 73:5,24 74:23,25 76:9,23 80:17,20 80:21

**separate** 8:9 38:18 47:5,7,8,9,12 54:1 57:25

**served** 19:7

**service** 35:21 38:14 38:19,22,24,25 39:9,17 40:9,11,18 40:19 41:7,11 42:21 51:16 54:24 55:3 77:10,12 79:13

**services** 9:25

**servicing** 9:20 55:19

**set** 71:9

**setting** 29:17 33:22 34:4

**shaun** 1:12 3:2 4:12 4:19 82:7 83:7 84:4 84:25 85:2,6,7

**shchallen** 58:13

**she'll** 49:14

**sheet** 3:6 57:20 84:1

**short** 27:14 56:18

**shortly** 65:25

**show** 22:14 66:17 72:20 76:3 81:11

**showing** 22:15

**shown** 11:19 69:5

**sic** 37:7

**sign** 3:6 55:3,9,11 85:9,9

**signature** 82:14 83:19 85:24

signed 76:23 82:12
signing 3:18 85:21
signs 55:7
similar 36:7 56:13
 59:13 70:3
similarly 1:4
sincerely 85:15
single 36:18
sit 69:18 76:16
site 36:6 41:16
situated 1:5
six 6:20
skipped 49:25
small 55:17
snowball 63:4
social 74:8
software 38:14
 39:4
sorry 27:21 53:21
sound 25:16
sounds 21:17
spam 58:20
speak 10:17,20
 11:23
speaking 6:1 76:14
specht 10:22,25
 11:4,7 13:6,7,8
 19:24 20:5,7,15,19
 21:3,8,11,11 22:14
 24:2,6,11 25:2
 30:18 31:8 35:15
 35:25 36:12 37:22
 41:11,18 43:2,5,10
 46:3 50:25 58:6,9
 58:11 63:17,18
 65:23 66:5 67:6
 70:8,13 71:17
 72:10 73:18 79:5
specht's 37:20
special 9:4

specific 29:2 35:3
 37:23
specifically 41:10
 78:21 79:6
speck 70:22
spell 4:17 14:8 37:6
spend 15:21,23,25
 16:1
spending 49:2
spoken 10:23 11:4
 11:7,12 77:5
stand 39:2
stands 69:3
start 55:13
started 6:13,15
 12:7,13,18 25:19
 58:3
starting 49:14
starts 72:3
state 4:17 12:12
 82:3,6,16 83:2,5
stated 84:22
states 1:1 62:24
statute 85:12
stenographer 4:5
stenographic 83:10
stenographically
 1:18 83:7
step 10:5
stipulated 3:16
store 8:11 37:10
stores 17:14 27:4
street 1:16 2:12
 85:3
strike 16:9 70:2
 75:9
subject 70:9
submit 54:9 75:8
 75:15,15
submits 75:10

submitted 75:22
subsequent 81:6,9
subsidize 13:17
success 27:4
sued 30:1
suggested 13:12
 23:22 30:1 42:6,8
 42:14 85:10
suite 2:3,8
sunday 24:19 25:11
support 15:13
sure 17:11 18:2
 20:1 23:1 24:4,14
 24:14 25:17 26:8
 26:17 27:7 33:19
 37:1 38:23 44:10
 58:8 62:6 63:17
 65:19 66:19 71:13
 73:4 77:18 79:17
swear 4:7
sworn 4:13 82:9
symbols 73:10
system 58:19 76:2

**t**

t 3:1,1,8,15,15
tactic 60:4
take 9:15 10:5
 34:14 56:15
taken 56:19 77:19
talk 19:8 30:10
 49:14 78:11
talked 11:20 80:6
talking 79:11 80:2
talks 65:16
targeted 43:2 49:3
 69:3
tcpa 26:6 27:14,15
 27:18 28:3
tdm 69:3,3
technical 38:23

technology 13:1,5
 14:23 23:15,17
 27:1,2,9 61:3,9
 65:2
telephone 2:6
 13:25 19:17 20:10
 20:15 22:8 26:12
 27:11 31:13 41:23
 43:3 65:8 76:10,24
telepoint.com
 71:18
telepoint.com.
 71:18
television 8:22
tell 10:10,12 17:23
 20:15 27:1 29:6
 41:7 50:2 52:9
 53:12,15 63:18
 64:8,16 72:10,10
 73:1
terms 35:3 55:18
 63:18
testified 4:14 30:18
testimony 3:2 4:7
 21:10,11 61:2
 77:25 78:24
text 52:11 56:9,12
thank 4:22 52:4
thanks 34:14
thing 57:20 63:8
 69:2 75:7
things 8:24 42:10
 44:8 58:24
think 7:18 18:6,21
 43:8 62:5 77:24
 79:11 80:17
third 15:3,13 16:20
 18:12 20:2 22:24
 27:16 52:15 57:21
 59:18

| | | | |
|---|---|---|---|
| **three** 7:3,7,18 34:9 45:8,16 | **turn** 35:10 54:21 55:17 56:2 65:22 | **v** | 18:5 28:10 30:1 41:22 42:7 43:11 |
| **throw** 49:14 | **turning** 30:9 | **v** 84:3 | 46:4,6,14,20,22 |
| **thursday** 24:18 | **turnout** 33:20 | **value** 50:8 | 47:15 52:11,22 |
| **tiered** 34:9 | **two** 14:24 32:17 | **values** 50:10 | 53:2 54:4,16,19 |
| **time** 1:14 8:20 9:16 | 45:12 46:20 53:3 | **various** 8:18 56:5 | 57:17 59:24 60:9 |
| 11:10 14:5,5,17 | 62:7,14,21 | **vehicle** 9:15 32:2,9 | 60:10 61:13,14,17 |
| 19:4 21:22 23:14 | **type** 15:14 57:20 | 32:13 35:19 55:11 | 66:10 70:23 72:18 |
| 24:11 25:2,24 | 65:2 76:7 | 69:7 71:12 | 73:22 74:9 79:20 |
| 28:23 32:2 61:12 | **typical** 8:21 30:16 | **vehicles** 9:20,21,23 | 80:12 |
| 74:1 75:25 | **typically** 9:5,13 | 9:25 35:22 77:12 | **volunteered** 40:2,4 |
| **times** 5:16 62:4,5 | 16:20,20,21 20:2,3 | **vendor** 22:24 60:19 | 40:6,20 |
| **title** 68:10 69:9 | 24:18 30:23 | 61:14,17,24 62:2 | **vs** 1:7 |
| **today** 5:14 76:14 | | **vendors** 13:21 | |
| 76:16 77:3,22,25 | **u** | 59:18 | **w** |
| 78:9 79:11 80:13 | **u** 3:15 4:19 | **verbiage** 77:2 | **waive** 85:9,21 |
| **today's** 10:6,18 | **uh** 44:14 46:2 | **veritext** 85:8 | **waiver** 85:20 |
| 11:16 | 55:21 58:22,25 | **version** 19:22 | **want** 4:20 5:10 |
| **told** 29:12,15 62:20 | 59:16 | **versus** 63:25 | 9:12 28:24,24 |
| **tonight** 71:20 | **ultimately** 16:14 | **visit** 65:12 | 30:24 39:8 40:11 |
| **total** 62:5 | 79:10 | **visited** 24:11 | 40:13 44:10 56:15 |
| **touch** 71:2 72:25 | **understand** 5:7 6:2 | **vms** 54:18 | 71:24 72:20 78:10 |
| **track** 22:25 | 6:3 17:6 32:13 | **voice** 70:11 | **wanted** 28:22 |
| **tracked** 26:23 | 62:13 75:20 | **voicelogic** 11:23,25 | 30:18 31:7 41:7 |
| **training** 8:8 | **understanding** | 44:23,24,25 | 74:17 |
| **transaction** 55:4 | 15:11 21:12,22 | **voicemail** 12:23,25 | **way** 60:12 67:14 |
| **transcribed** 19:16 | 22:21 23:16 29:14 | 13:5 14:23 15:7 | 79:2 |
| **transcript** 3:19 | 35:13 40:12 42:25 | 16:15 17:1,9,18 | **ways** 8:18 |
| 30:20 83:8,9 84:2 | 44:2,6 46:9,13 47:1 | 18:9 21:13,20 | **we've** 11:19,20 |
| 85:7,9,10,13,14,21 | 48:11,14,18 52:20 | 22:16,17 23:15,17 | 18:25 32:13,17 |
| **transferred** 79:1 | 61:1 73:2 76:7 | 26:25 28:5 29:18 | 39:21 43:10 44:12 |
| **transmission** 36:10 | **understood** 10:15 | 30:11 32:19 33:25 | 52:5 61:5,5 62:7 |
| **transmitted** 35:25 | **unique** 22:7 31:12 | 41:21 42:2,12,15 | 74:9 75:19 77:24 |
| 60:12 79:10 | **united** 1:1 | 43:17 45:14 47:19 | 79:11,12 80:1,12 |
| **true** 60:3,5 61:4 | **unusual** 22:22 | 53:5 56:13 60:14 | 80:22 |
| 83:9 84:23 | **upgrading** 32:2 | 61:3,8,25 63:10 | **website** 54:8,9 |
| **trusting** 42:4 | **upload** 76:2 | 64:19 65:2 67:15 | 59:18 61:7 65:12 |
| **truth** 4:8,8,9 | **uploaded** 41:15 | 68:1 70:14 71:4,9 | 65:15,18 |
| **try** 27:5 | **use** 20:7 27:8 28:12 | 72:11 73:13 74:24 | **websites** 58:24 |
| **tuesday** 1:13 | 31:2,4 38:14 42:6 | 76:4 77:6 | **wednesday** 25:15 |
| | 60:19 61:24 65:1 | **voicemails** 15:2,9 | **week** 25:12 33:6 |
| | 70:22 | 16:7,11 17:16,24 | 45:12,24 48:8,8 |

62:25
**weekday** 58:4
**weekend** 24:15
62:25
**weeks** 21:12 46:20
**went** 23:2 27:3
45:23 66:7,11 67:4
**william** 57:1
**williams** 14:4
**willis** 56:5
**witness** 4:10 76:12
**word** 5:6 22:23
**wording** 18:6
**work** 24:13,18,21
55:9 78:12 79:5,17
79:21
**worked** 6:11
**working** 12:7,13,18
28:23 29:8
**works** 11:1 37:9
43:4
**worth** 22:23
**write** 5:25 66:18
70:17 84:2
**writing** 15:4
**written** 76:22
**wrong** 33:12

**x**

**x** 3:8

**y**

**yeah** 5:21 8:1 9:22
11:21 14:9 26:11
34:6 36:16 39:5
40:8 45:18 46:11
49:13 52:16,18
66:22 77:18
**year** 7:10,12 52:14
53:7 55:15 61:15
**years** 5:19 6:12 7:7
7:18 8:3

**yep** 6:14
**yesterday** 81:18

**z**

**zip** 51:4

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under

rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.